## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| | § | |
| In re: | § | |
| | § | |
| IMAGE TRENDS INC., | § | Case No. 14-11583 |
| | § | |
| Debtor. | § | |
| | § | |

**DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(A) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING AND TO
GRANT SECURITY INTERESTS AND SUPER-PRIORITY ADMINISTRATIVE
EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 105, 364(c) AND 364(d);
(B) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C § 362; AND
(C) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

Image Trends Inc., the above-captioned debtor and debtor-in-possession (the "**Debtor**" or "**Borrower**"), by and through its undersigned counsel, hereby moves the Court (the "**Motion**") pursuant to sections 105(a), 361, 362, 364, and 507 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") for entry of interim and final orders authorizing the Debtor to enter into a revolving senior secured super-priority credit facility in the aggregate amount not to exceed $921,000 (the "**DIP Financing**") substantially on the terms set forth in the Secured Super-Priority Debtor-in-Possession Credit Agreement between the Debtor and Astral Images Corporation ("**DIP Lender**"), annexed hereto as <u>Exhibit A</u> (as amended, supplemented, or otherwise modified and in effect from time to time, the "**DIP Loan Agreement**" and, together with any and all schedules thereto and other related documents and agreements entered into in connection with or related to the DIP Financing, the "**DIP Loan Documents**"), (b) modifying the automatic stay to the extent applicable, (c) granting related relief, and (d) scheduling a final hearing pursuant to Rule 4001 of the Bankruptcy Rules.  In support of this Motion, the Debtor respectfully states as follows:

# I.
# JURISDICTION AND VENUE

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is core within the meaning of 28 U.S.C. § 157(b).

2.      The statutory predicates for the relief sought herein are sections 105(a), 361, 362, 364, and 507 of the Bankruptcy Code, and the procedural predicates are Rules 2002, 4001, and 9014 of the Bankruptcy Rules.

# II.
# BACKGROUND

## A.    Procedural Background

3.      On October 24, 2014 (the "**Petition Date**"), an involuntary petition was filed against the Debtor under chapter 7 of the Bankruptcy Code by Grinberg Asset Holdings, LLC ("**Grinberg**"), Dave Cavena, and Oxberry, LLC, which was amended on January 7, 2015 to add Lisa Griffin as a petitioning creditor (collectively, the "**Petitioning Creditors**").  On November 18, 2014, the Debtor filed its Answer to the involuntary petition (Dk. 5), contesting the standing of at least one, and potentially all three, of the original Petitioning Creditors.

4.      On the date hereof (the "**Motion to Convert Date**"), the Debtor exercised its right to convert the case to one under chapter 11 the Bankruptcy Code (the "**Bankruptcy Case**").

5.      The Debtor has continued in possession of its properties and is operating and managing its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      No request has been made for the appointment of a trustee or examiner, and a creditors' committee has not been appointed in this case.

B.        **Overview of the Debtor's Business and Pre-Petition Capital Structure**

7.        The Debtor is in the advanced image processing business and is a leader in motion picture scanning technology.  In particular, the Debtor is in the business of (a) providing software, hardware, professional services and system design services to customers, (b) developing, licensing and incorporating imaging technologies in offerings and embedded in the products of original equipment manufacturers, (c) developing image correction and enhancement tools for the imaging professional and advanced amateur markets, and (d) advanced image processing (the "**Business**").

8.        As of the Petition Date, the Debtor's outstanding secured debt was $725,000.  This consists of (a) $400,000 borrowed from Warren N. Lieberfarb ("**Lieberfarb**") pursuant to that certain Convertible Promissory Note, dated as of June 9, 2009 (the "**First WL Debt**")[1]; (b) $160,000 borrowed from Lieberfarb pursuant to that certain Promissory Note, dated as of July 28, 2014 (the "**Second WL Debt**", and together with the First WL Debt, the "**WL Debt**"); (c) $65,000 borrowed from the DIP Lender pursuant to that certain Promissory Note, dated January 21, 2015 (the "**First Astral Debt**") and (d) $100,000 borrowed from the DIP Lender pursuant to that certain Promissory Note, dated January 21, 2015 (the "**Second Astral Debt**", and together with the First Astral Debt, the "**Astral Debt**").

9.        The Debtor defaulted on its obligations under the First WL Debt.  In exchange for Lieberfarb's agreement to forbear from exercising its rights and remedies under the First WL Debt and to extend additional credit pursuant to the Second WL Debt, pursuant to that certain Security Agreement, effective as of July 28, 2014 (the "**WL Security Agreement**"), Lieberfarb was granted a first priority security interest in substantially all of the Debtor's property.  Lieberfarb perfected its

---

[1] The Debtor disputes that the First WL Debt was properly perfected and reserves the right to seek to set aside any such lien in the event that such claim is not waived as described in paragraph 11 hereof.

security interest by filing a financing statement in accordance with the Uniform Commercial Code (a "**UCC-1 Statement**") for the WL Debt on August 6, 2014.

10. The Astral Debt is secured pursuant to that certain Security Agreement, effective as of January 21, 2015 (the "**Astral Security Agreement**"), by the Debtor in favor of the DIP Lender, which grants the DIP Lender a security interest in all of Debtor's present and future Accounts, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Documents, Equipment, General Intangibles, Instruments, Inventory, Investment Property, Letter-of-Credit Rights and Supporting Obligations, and the Proceeds and products of any of the foregoing (all as defined in the Astral Security Agreement). The DIP Lender perfected its security interest by filing a UCC-1 Statement on or about January 21, 2015.

11. On January 21, 2015, Lieberfarb assigned to the DIP Lender for good and valuable consideration (a) the Second WL Debt and (b) the right to waive any claim related to the First WL Debt. As such, the DIP Lender holds a perfected pre-petition secured lien against all of the Debtor's assets in the aggregate amount of no less than $325,000 plus accrued interest on account of the Second WL Debt and the Astral Debt (the "**Pre-Petition DIP Lender Lien**").

12. In addition, the Dell Financial Services L.L.C. ("**Dell**") has asserted a lien (the "**Dell Lien**") on computer equipment, peripherals, and other equipment (collectively, the "**Dell Equipment**") leased to the Debtor pursuant to Lease #001-8976709-001, dated May 19, 2014, and Lease #001-8976709-002, dated May 28, 2014 (collectively, the "**Dell Leases**"), along with any other Dell Equipment leased pursuant to the Dell Leases that are in substantially the same form, and all of the Debtor's rights, title and interest in and to use any software and services (collectively, the "**Dell Software**") financed under and described in the Dell Leases, including all substitutions, additions, accessions and replacements thereto and thereof, now or hereafter installed in, affixed to,

or used in, conjunction with the Dell Equipment and Dell Software, and the proceeds thereof, together with all rental or installment payments, insurance proceeds, credits or refunds obtained by the Debtor from a manufacturer, licensor or service provider, or other proceeds and payments due and to become due and arising from or relating to the Dell Equipment, Dell Software or Dell Leases (collectively, the "**Dell Collateral**")

13.     Finally, as of the Petition Date, the Debtor's outstanding unsecured debt totaled more than $11,000,000.  The majority of the Debtor's unsecured debt consists of amounts due to various employees for wages and a portion of which may be entitled to priority status.  The Debtor's largest unaffiliated unsecured creditor is the Texas Emerging Technology Fund, which provided the Debtor with a $1,000,000 unsecured loan.

**C.     Sale of the Debtor's Business**

14.     Earlier this year, the Debtor's former CEO, Daniel Sullivan, pled guilty to criminal charges completely unrelated to the Debtor's Business.  Concurrent with the investigation and the ultimate departure of Mr. Sullivan as CEO, the Debtor's financials weakened.  In addition, due to an ongoing dispute with Grinberg, the Debtor suffered a liquidity crisis, which impaired its ability to attract new investments, enter into new contracts and retain its valuable employees.

15.     Ultimately, the Debtor began seeking out other strategic alternatives, including a merger or a sale of the Debtor's assets.  In November 2014, the Debtor began negotiations for the sale of certain of its assets to the DIP Lender.  On January 21, 2015, the Debtor and the DIP Lender executed an asset purchase agreement encompassing the terms of the proposed transaction (the "**Purchase Agreement**").  The terms of the sale are more fully described in the *Motion of the Debtor Pursuant to Section 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006 for (I) an Order Approving Bidding Procedures and Bid Protections for the Sale of Certain Designated Assets of the Debtor; and (II) an Order (A) Approving the Sale of Certain Designated*

*Assets of the Debtor Free and Clear of all Liens, Claims, and Encumbrances, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Certain Related Relief*, filed contemporaneously herewith (the "**Sale Motion**").

## D.    The Proposed DIP Financing

16.    The Debtor proposes to enter into the DIP Financing in order to fund the administration of its Bankruptcy Case and the Sale of its assets, solely in accordance with the budget set forth as <u>Exhibit C</u> (the "**Budget**").  The DIP Financing will provide the Debtor with up to $921,000 to fund necessary operations of the Debtor and to administer this Bankruptcy Case through the closing date of the Sale of the Debtor's assets to the DIP Lender or to a higher and better bidder. Without such funding, the Debtor would have to cease operations and lose substantial value to the detriment of all creditors.  In addition, the DIP Financing is required to pay the expenses (the "**Gap Period Expenses**") incurred by the Debtor during the period (the "**Gap Period**") between the Petition Date and the date on which the Bankruptcy Court enters an order for relief converting the Bankruptcy Case to one under chapter 11 of the Bankruptcy Court (the "**Conversion Date**"). Finally, the Debtor may need to make additional capital expenditures pending the closing of the Sale to maintain the value of its assets, and the DIP Financing permits the Debtor to request funding for such expenditures, subject to the Lender's approval.

17.    Pursuant to Rule 4001 of the Bankruptcy Rules, the principal terms of the DIP Loan Agreement[2] are as follows:

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the DIP Loan Agreement.  To the extent there is any inconsistency between the description of the DIP Financing in this Motion and the terms of the DIP Loan Documents themselves, the DIP  Loan Documents shall control.

**Borrower:** Image Trends Inc.

**DIP Lender:** Astral Images Corporation

**DIP Loan Amount:** A revolving senior credit facility in an aggregate amount not to exceed $921,000.

DIP Loan Agmt. at § 1.01 (Definition of "Commitment"), § 2.01.

**Maturity Date:** The earliest of:

(a) four (4) months after the Closing Date (defined below),

(b) the date a sale of all or substantially all of the assets of the Borrower is consummated,

(c) the effective date of a confirmed plan of reorganization for the Borrower as confirmed by the Bankruptcy Court,

(d) the conversion of the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code,

(e) the appointment of a trustee pursuant to section 1104 of the Bankruptcy Code,

(f) the dismissal or termination of the Bankruptcy Case, and

(g) the date of acceleration or the termination of the DIP Financing.

DIP Loan Agmt. at § 1.01 (Definition of "Maturity Date").

**Use of Proceeds:** Proceeds of the DIP Financing will be used:

(i) to pay the fees and expenses incurred in connection with the negotiation, execution and delivery of the DIP Loan Agreement and the other DIP Loan Documents,

(ii) for working capital and other general corporate purposes of the Borrower, including indemnity expenses under Section 8.04 of the DIP Loan Agreement, subject to the Budget and to the extent not prohibited under the DIP Loan Agreement,

(iii) to pay certain agreed-upon liabilities and obligations of the Borrower to its employees and other creditors incurred during the Gap Period pursuant to section 503 of the Bankruptcy Code, in an amount not to exceed $150,000 in the aggregate

(iv) to pay the aggregate amount outstanding under the Astral Debt;

(v) to pay the fees and expenses of (a) the Borrower's advisors and (b) the advisors to any committee of unsecured creditors in an aggregate amount not to exceed $10,000, if any, in each case associated with the Bankruptcy Case and as approved by the Bankruptcy Court,

(vi) to make any other payments permitted to be made by the Bankruptcy Court to the extent permitted under the Budget and not prohibited by the DIP Loan Agreement, and

(vii) to make any payments of fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) and all fees payable to the clerk of the Bankruptcy Court.

DIP Loan Agmt. at § 3.10.

**Limitation on Use of Funds:**

No portion of the DIP Financing shall be available for any fees or expenses incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against the DIP Lender, (ii) in connection with challenging, invalidating, disallowing, re-characterizing, setting aside, avoiding, subordinating, in whole or in part, or taking or attempting to take any other action to render unenforceable the liens, claims, interests and adequate protection of the DIP Lender, including the Pre-Petition DIP Lender Lien, or (iii) in connection with challenging its bid for the Sale of the Purchased Assets.

DIP Loan Agmt. at § 3.10.

**Repayment**

All commitments of the DIP Lender under the DIP Financing will terminate and all amounts outstanding under the DIP Financing, including, without limitation all premiums, interest, fees and expenses, shall be due and payable in full on the Maturity Date.[3]

The Borrower may repay the DIP Financing at any time upon one business day's notice to the DIP Lender.  Amounts repaid on the DIP Financing may be re-borrowed.

DIP Loan Agmt. at §§ 2.01, 2.07, 2.08.

**Funding Dates:**

The closing of the DIP Financing shall occur on the date that the conditions precedent to the initial extension of credit shall have been satisfied (or shall have been waived in the sole discretion of the DIP

---

[3] In the event that the DIP Lender is the highest and best bidder for the Purchased Assets, pursuant to the terms of the Purchase Agreement, the Debtor's obligations to pay principal and interest under the DIP Loan Agreement will be forgiven and discharged.  Purchase Agreement at § 2.6.

Lender) (the "**Closing Date**").

Upon the Closing Date, the Borrower will be entitled to an initial extension of credit under the DIP Financing not to exceed $445,000. After the Final Order is entered, advances under the DIP Financing shall be available to the Borrower on a weekly basis on three business days' notice. Advances for amounts not included in the Budget are only available upon request and with prior approval of the Lender, which will not be unreasonably withheld.

DIP Loan Agmt. at § 1.01 (Definition of "Closing Date"), § 2.02, § 2.03.

**Fees:** The DIP Lender is not charging any fees in connection with the DIP Financing.

**Interest Rate:** Twelve percent (12%) per annum, calculated on the basis of a 360-day year and actual days elapsed, and payable on the Maturity Date.

DIP Loan Agmt. at § 2.05.

**Default Interest Rate:** Two percent (2%) per annum above the non-default interest rate.

DIP Loan Agmt. at § 2.06.

**Liens and Priorities:** Subject to the Carve-Out (as defined below) and the Dell Lien, all obligations of the Borrower under the DIP Financing (the "**DIP Obligations**") will be secured by a first priority perfected priming lien (the "**DIP Lien**") upon all of the property of the Borrower, whether now owned or hereafter acquired, and all proceeds thereof (the "**Collateral**") pursuant to sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code; provided however, that the Debtor's claims and causes of action under chapter 5 of the Bankruptcy Code, and the proceeds thereof, are excluded from the Collateral; provided further, that the DIP Lien is junior to the Dell Lien on the Dell Collateral.

Subject to the Carve-Out (as defined below), all DIP Obligations will be entitled to super-priority claim status pursuant to section 364(c)(1) of the Bankruptcy Code.

DIP Loan Agmt. at § 1.01 (Definition of "Requisite Priority"), § 3.15.

**Carve-Out:** The term "Carve Out" means:

(a) all statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) and all fees payable to the clerk of the

Bankruptcy Court, and

(b)    (i) the reasonable fees and expenses of attorneys retained by the Borrower as approved by final order of the Bankruptcy Court; and

(ii) the reasonable fees and expenses of attorneys retained by any committee of unsecured creditors as approved by final order of the Bankruptcy Court, in an aggregate amount not to exceed $10,000,

with each of (i) and (ii) above in the amounts consistent with the Budget; provided however, that for purposes of clause (b) above, the amount of the Carve Out shall not exceed $150,000, which amount shall not be reduced by the amount of any compensation or reimbursement of budgeted expenses and fees incurred, awarded or paid prior to the occurrence of an Event of Default in respect of which the Carve Out is invoked, and provided further, that the term "Carve Out" does not include any fees or expenses incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against the DIP Lender, (ii) in connection with challenging, invalidating, disallowing, re-characterizing, setting aside, avoiding, subordinating, in whole or in part, or taking or attempting to take any other action to render unenforceable the liens, claims, interests and adequate protection of the DIP Lender, including the Pre-Petition DIP Lender Lien, or (iii) in connection with challenging it bid for the Sale of the Purchased Assets.

DIP Loan Agmt. at § 1.01 (Definition of "Carve Out").

**Adequate Protection:**    The DIP Lender is the lender under the Second WL Debt and the Astral Debt, which comprises substantially all of the Debtor's undisputed pre-petition secured debt.  The DIP Lender consents to the priming of the Pre-Petition DIP Lender Lien.

The DIP Lien does not prime the Dell Lien.

**Validity of Liens**    The Debtor has stipulated to the amount, validity, priority and extent of the Pre-Petition DIP Lender Lien.  Such stipulation is binding upon all other parties in interest unless a party in interest files an adversary proceeding or contested matter contesting the Pre-Petition DIP Lender Lien within the earlier of (i) 45 days after the Conversion Date or (ii) 30 days after the appointment of a creditor's committee.  The Debtor has further stipulated to the amount of the First WL Debt.

DIP Loan Agmt. at § 3.16.

**Covenants:**

Affirmative Covenants: Among other things, (i) preserve corporate existence and business operations, (ii) maintain all material properties necessary in the operation of the Borrower's business, (iii) maintain Borrower's insurance, (iv) pay certain post-petition obligations, (v) provide periodic financial statements to the DIP Lender; (vi) notify the DIP Lender with respect to certain material occurrences, (vii) maintain proper books and records, (viii) provide the DIP Lender with visitation and inspection rights, (ix) execute any further documents that may be required under applicable law to effectuate the transactions contemplated in the DIP Loan Documents, and (x) use best efforts to obtain entry of Sale Procedures Order and Sale Order (as defined in the Sale Motion).

Negative Covenants: Among other things, the Borrower shall not (i) incur any additional indebtedness (subject to certain enumerated exceptions), (ii) grant any liens upon or security interests in the Borrower's property (subject to certain enumerated exceptions), (iii) enter into any sale-leaseback transactions, (iv) make certain investments, loans and advances, (v) change its corporate structure or existence, or (vi) dispose of the Borrower's property, except as contemplated by the Purchase Agreement.

DIP Loan Agmt. at §§ 5.01-5.11, 6.01-6.12.

**Conditions to Initial Extension of Credit:**

Customary borrowing conditions, including documentation, certification of material facts, obtaining necessary third-party consents, approvals and waivers, and Bankruptcy Court approval, as well as the Debtor reaching a written agreement, in a form and substance satisfactory to the Lender, with certain creditors regarding the amounts to be paid for the Gap Period Expenses.

DIP Loan Agmt. at § 4.02.

**Conditions to All Extensions of Credit:**

Customary borrowing conditions regarding the continued truth and correctness of all representations of the Borrower, the absence of an Event of Default, and the provision of a valid borrowing request.

DIP Loan Agmt. at § 4.01.

**Section 506(c):**

The DIP Loan Agreement does not contain any limitations on surcharge under section 506(c) of the Bankruptcy Code.

**Indemnification:**

The DIP Loan Documents shall provide that the Borrower agrees to indemnify and hold the DIP Lender and its directors, officers, employees, agents and shareholders harmless from and against, any and all losses, claims, damages, liabilities and related expenses,

including reasonable counsel fees, charges and disbursements, incurred by or asserted against any indemnified person arising out of, in any way connected with, or as a result of (i) the execution or delivery of the DIP Loan Agreement or any other DIP Loan Document or any agreement or instrument contemplated thereby, the performance by the parties thereto of their respective obligations thereunder or the consummation of the transactions contemplated thereby (including the Bankruptcy Case), (ii) the use of the proceeds of the Advances under the DIP Loan Agreement, or (iii) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not the DIP Lender is a party thereto (and regardless of whether such matter is initiated by a third party or by the Borrower or any its Affiliates); *provided* that such indemnity shall not, as to the DIP Lender, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of the DIP Lender.

DIP Loan Agmt. at § 8.04.

**Events of Default:**     Events of Default under the DIP Loan Agreement include:

(i) material falsity of any representation or warranty made in connection with any DIP Loan Document;

(ii) default in the payment of any principal or interest due under the DIP Financing when due and payable;

(iii) default in the observance or performance by Borrower of any covenant or condition, including without limitation, the failure to timely provide a Weekly Expenditure Report and the failure to use the DIP Loan proceeds in accordance with the limitations set forth in the DIP Loan Agreement;

(iv) failure to pay any amounts due on other indebtedness following the Conversion Date;

(v) the DIP Loan Documents or DIP Orders cease to create a valid Lien on any of the Collateral or the Borrower shall initiate an action against the DIP Lender that affects the DIP Lender's claims or Collateral;

(vi) the Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or the Borrower requests any such relief;

(vii) any other claim or lien having priority senior to or *pari passu*

with the DIP Lender's claims and liens shall arise;

(viii) the Interim Order is not entered within 15 days of the Conversion Date, or ceases to be in full force and effect before the Final Order is entered, or the Final Order is not entered within 30 days of the Closing Date or ceases to be in full force and effect;

(ix) the Borrower fails to comply with the terms of the Interim Order or the Final Order in any material respect;

(x) the Interim Order or the Final Order are amended or otherwise modified without the written consent of the DIP Lender;

(xi) the Borrower's filing of a motion seeking, or the Bankruptcy Court's entry of an order authorizing, (i) payment of a pre-petition claim not approved by the DIP Lender, (ii) approval of a First Day Order not approved by the DIP Lender, (iii) relief from the automatic stay to permit foreclosure on any assets, or (iv) approving any settlement with any creditor or otherwise providing for adequate protection

(xii) the Sale Motion is not filed by the Conversion Date or the Sale Procedures Order and Sale Order are not entered within 60 days of the Conversion Date;

(xiii) the Borrower's exclusivity period terminates;

(xiv) the Borrower consummates a sale of its assets without the DIP Lender's consent other than pursuant to the Sale Procedures Order; and

(xv) the DIP Lender is prevented, for any reason, from submitting a bid for the Purchased Assets on the terms set forth in the Purchase Agreement.

DIP Loan Agmt. at Art. VII.

| **Remedies/ Modification of the Automatic Stay:** | Customary remedies, including modification of the automatic stay immediately upon the occurrence of an Event of Default without further action or order of the Bankruptcy Court, <u>provided however</u>, the DIP Lender shall be entitled to exercise all of its rights and remedies under the DIP Loan Documents only upon three business days' written notice to the Borrower. |

The stay is further modified to the extent necessary to allow for the perfection of the DIP Lien.

DIP Loan Agmt. at Art. VII.

**III.**
**RELIEF REQUESTED AND BASIS THEREFOR**

18. By this Motion, the Debtor seeks entry of two orders: First, at an emergency hearing to be held on a date set by order of the Court, the Debtor requests entry of an interim order, in substantially the form attached hereto as Exhibit B (the "**Interim Order**"), (a) authorizing the Debtor to enter into the DIP Financing and grant the DIP Lender the liens and super-priority claims described herein, (b) modifying the automatic stay to the extent applicable and necessary, and (c) scheduling a final hearing (the "**Final Hearing**") pursuant to Rule 4001 of the Bankruptcy Rules. Second, the Debtor requests entry of a final order (the "**Final Order**," and together with the Interim Order, the "**DIP Orders**") authorizing the relief granted in the Interim Order on a permanent basis.

19. The estate has insufficient money to conduct a sale process to maximize value and the Debtor believes that the value of the Purchased Assets will rapidly diminish if a Sale is not quickly consummated. Thus, the Debtor needs the DIP Financing to maintain its Business pending the closing of the Sale in order to maximize the value of the Purchased Assets for the benefit of all creditors. The Debtor has negotiated with the DIP Lender to present this Motion on a consensual basis in order to expedite the process and achieve the highest value possible for creditors.

20. Thus, the Debtor believes that, in its business judgment, entry into the DIP Loan Agreement is in its best interests. Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith. *See, e.g., Trans World Airlines, Inc. v. Travellers Int'l AG. (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994), *rev'd on other grounds*, 134 F.3d 188 (3d Cir. 1998) (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section

364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest.").  As such, the Court should authorize the Debtor to enter into the DIP Financing.

**A.**     **The DIP Financing Should be Approved**
         **Under Section 364 of the Bankruptcy Code**

21.     Bankruptcy Code section 364(c) provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense, the court may authorize the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses, (ii) secured by a lien on property of the estate that is not otherwise subject to a lien, or (iii) secured by a junior lien on property of the estate that is subject to a lien.  11 U.S.C. § 364(c).

22.     Courts consider various factors in determining whether obtaining post-petition financing pursuant to section 364(c) is appropriate, including whether (1) the debtor is unable to obtain unsecured credit under section 364(b), *i.e.*, by allowing a lender only an administrative claim; (2) the credit transaction is necessary to preserve the assets of the estate; and (3) the terms of the transaction are fair, reasonable, and adequate under the circumstances.  *See In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312-13 (Bankr. D. Del. 2011) (noting these three factors in considering proposed post-petition financing) (citations omitted); *see also In re Farmland Indus., Inc.*, 294 B.R. 855, 879 (Bankr. W.D. Mo. 2003) (noting that courts look to various factors including whether "the proposed financing is an exercise of sound and reasonable business judgment").

23.     In addition, section 364(d)(1) of the Bankruptcy Code provides that a court may authorize a debtor to incur post-petition debt on a senior or "priming" basis if (a) the debtor is unable to obtain credit otherwise and (b) there is "adequate protection of the interest of the holder of the lien

on the property of the estate on which such senior or equal lien is proposed to be granted." *See* 11 U.S.C. § 364(d)(1); *In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010).

### 1.      <u>The Debtor is Unable to Obtain Unsecured Credit</u>

24.      The Debtor urgently requires working capital financing in order to preserve and maintain its Business during the bankruptcy case up to the date on which it consummates the Sale pursuant to the Sale Motion.  In addition, the Debtor has insufficient cash with which to pay its Gap Period administrative claims.  Since the filing of the Involuntary Petition, the Debtor's options for securing financing have diminished.  Given the exigent financial circumstances, the Debtor effectively had no other source of financing aside from the DIP Lender.  The Debtor is not aware of any other lender that would provide the DIP Loan other than the DIP Lender.  The DIP Lender is the only party that has offered to discuss and negotiate the terms of financing, and is unwilling to provide DIP Financing on an unsecured basis or without receiving a priming lien.  As such, the Debtor has determined that the DIP Financing offered by the Lender as part of its overall bid for the Debtor's assets is the best and only option for the critical post-petition financing.

### 2.      **The Transaction Under the DIP Loan Documents is Necessary <br> to Preserve the Estate and is in the Best Interests of Creditors**

25.      The Debtor has insufficient cash with which to operate its Business or to protect its assets.  Without immediate access to post-petition financing, the Debtor will be unable to maintain its Business pending the closing of the Sale or pay its Gap Period creditors.  This would significantly impair the value of the Debtor's assets and jeopardize the Debtor's ability to sell its assets to the detriment of all creditor constituencies.  By obtaining the DIP Financing, the Debtor will be in a position to preserve the value of its assets during the chapter 11 sale process for the benefit of all creditors.  For example, the Budget provides for the payment of the certain rent and employee obligations, including the Debtor's obligations under section 503 of the Bankruptcy Code incurred

during the Gap Period, which would otherwise remain unpaid. Similarly, the DIP Loan Agreement permits the Debtor to request funds not covered by the Budget for, among other things, capital expenditures that the Debtor may need to make pending the closing of the Sale, which are necessary to preserve the value of the Debtor's assets. Moreover, it is vital to the success of the bidding process outlined under the Sale Motion that the Debtor obtain approval to immediately access the DIP Financing, on an interim and final basis, as contemplated by the DIP Loan Agreement.

26.    Absent approval of the relief sought herein, the Debtor faces a substantial risk of irreparable damage to the value of its assets and the probability of conversion of the bankruptcy case back to a case under chapter 7 without the ability to sell its assets in an orderly manner for the benefit of the Debtor's creditors. *See In re Sun Healthcare Group, Inc.*, 245 B.R. 779, 781 (Bankr. D.Del. 2000) (noting that the court had approved debtor-in-possession financing to "permit the Debtors to continue to operate to preserve their estates"). Accordingly, the Debtor needs sufficient liquidity to avoid a forced liquidation of their assets on a "fire-sale" basis to the detriment of all creditors.

### 3.    The Terms of the DIP Financing are Fair and Reasonable Under the Circumstances

27.    In determining whether the terms of post-petition financing are fair and reasonable, courts consider the relative circumstances of both the debtor and the potential lender. *In re Farmland*, 294 B.R. at 886-89; *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co., Inc.)*, 65 B.R. 358, 364-65 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).

28.    Under the circumstances of this case, including the Debtor's lack of liquidity, the filing of the Involuntary Petition and the need for a quick disposition of the Debtor's assets, the terms

of the DIP Financing are fair and reasonable.  First, the terms and conditions of the DIP Loan Agreement were negotiated by the parties in good faith and at arms' length and were instituted for the purpose of enabling the Debtor to meet ongoing operational expenses while in chapter 11 and preserving the value of the Collateral for the Sale of the assets pursuant to the Sale Motion.  Second, the terms themselves are reasonable and favorable to the Debtor.  There is no fee for the DIP Loan, the DIP Lender is not seeking a lien on the Debtor's claims and causes of action under chapter 5 of the Bankruptcy Code or the proceeds thereof, and the DIP Loan does not impose any restrictions on the ability of the trustee to surcharge the collateral or try to convert the DIP Lender's pre-petition secured claims into administrative claims.  Similarly, under the circumstances, the interest rate is reasonable.

29.     Furthermore, the DIP Financing subjects the security interests and administrative expense claims granted to the DIP Lenders to the Carve Out for certain administrative and professional fees, including (i) fees required to be paid to the Court and to the United States Trustee, and (ii) the reasonable fees and expenses incurred by the professionals of (a) the Debtor or (b) an unsecured creditor's committee in an aggregate amount not to exceed $10,000, if any, prior to a default and up to $150,000 more following default. Carve-outs for professional fees have been found to be reasonable and necessary to ensure that statutory creditor's committees and debtors' estates are adequately assisted by counsel and other professionals. *See In re Ames*, 115 B.R. at 38. Accordingly, the terms of the DIP Financing are fair and reasonable.

30.     As such, the DIP Financing, including without limitation, the grant of super-priority administrative expense claim status for all of the Debtor's DIP Obligations and the grant of a junior lien to the DIP Lender on the Dell Collateral, should be approved under section 364(c) of the Bankruptcy Code.

4.        **DIP Lender Consents to the Priming of the Pre-Petition DIP Lender Lien**

31.        Generally, in order for a debtor to incur post-petition debt on a senior or "priming"

basis, it must provide adequate protection to the lienholder whose lien is being primed.  11 U.S.C.

§ 364(d)(1).  However, in this case, the only undisputed pre-petition liens being primed by the DIP

Financing are the pre-petition liens of the DIP Lender.  The Dell Lien is not being primed, and in

regards to the Dell Collateral, the DIP Lien is junior to the Dell Lien.  The DIP Lender has consented

to the relief requested herein.

32.        Accordingly, the Debtor respectfully asserts that it has satisfied the requirements of

sections 364 of the Bankruptcy Code, and requests that the Court enter the Interim Order approving

the DIP Loan Agreement and related DIP Loan Documents to immediately preserve the Debtor's

estate, and enter the Final Order to ensure that the Debtor's estate is maintained through the

consummation of the Sale.

B.        **The DIP Financing was Negotiated in Good Faith and Should be
          Afforded the Protection of Section 364(e) of the Bankruptcy Code**

33.        Pursuant to section 364(e) of the Bankruptcy Code, any reversal or modification on

appeal of an authorization to obtain credit or incur debt or a grant of priority or a lien under section

364 of the Bankruptcy Code shall not affect the validity of that debt incurred or priority or lien

granted as long as the entity that extended credit "extended such credit in good faith."  *See* 11 U.S.C.

§ 364(e).

34.        Courts generally hold that "good faith" in the context of post-petition financing

means, consistent with the Uniform Commercial Code, honesty in fact in the conduct or transaction

concerned.  *See Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. (In re Ellingsen

MacLean Oil Co.)*, 834 F.2d 599, 605 (6th Cir. 1987) (citing U.C.C. § 1-201(19)).  Additionally,

"[g]ood faith is measured with respect to the good faith of the lender as contrasted to that of the

borrower."  Transcript of Record (Court Decision) at 736:24-25, *In re Lyondell Chem. Co*., No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009).  Moreover, a lender's desire to ensure that it is repaid, to make money on interest and fees and to protect pre-petition positions are understandable and acceptable motivations for a post-petition lender in negotiating a deal.  *Id*. at 737:6-14.

35.     The terms of the DIP Financing were negotiated at arm's length and reflect the most advantageous terms available to the Debtor in light of the exigent circumstances it faces.  All of the DIP Obligations will be extended by the DIP Lender in good faith (as such term is used in section 364(e) of the Bankruptcy Code).  No consideration is being provided to any party to the DIP Obligations, other than as set forth herein and in the Interim Order. As such, the DIP Lender should be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim Order or any provision thereof is vacated, reversed, or modified on appeal or otherwise.

**C.     The Automatic Stay Should Be Modified on a Limited Basis**

36.     The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtor to grant the security interests, liens, and super-priority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens.  Stay modification provisions of this sort are ordinary and usual features of debtor-in-possession financing facilities and are reasonable under the present circumstances.

37.     The Debtor further requests that, upon the occurrence of an Event of Default under the DIP Loan Agreement, the automatic stay be immediately vacated to permit the Lender to exercise all rights and remedies under the DIP Loan Documents or the DIP Orders, as applicable, without further action or order of the Bankruptcy Court.  However, the DIP Lender will be entitled to exercise all of its rights and remedies under the DIP Loan Documents only upon three business days' written notice to the Borrower. Such relief is an appropriate balance, providing the DIP Lender with

the ability to exercise its rights upon the Debtor's Event of Default without having to seek further relief from the Court, while simultaneously providing the Debtor with notice and the opportunity to seek reinstatement of the automatic stay.

**D.      Approval of the DIP Financing on an Interim Basis is Necessary to Prevent Immediate and Irreparable Harm**

38.      Rule 4001(c)(2) of the Bankruptcy Rules governs the procedures for obtaining authorization to obtain post-petition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion.  If the motion so requests, the court may conduct a hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c)(2).  "Immediate and irreparable harm" exists where loss of the business threatens the ability of the debtor to reorganize.  *See In re Ames*, 115 B.R. at 36 n.2.  Approval of a DIP facility on an interim basis under Rule 4001(c)(2) is left to the discretion of the court as informed by the facts of each case.  *See In re Pan Am Corp.*, 1992 WL 154200 *1, *6 (S.D.N.Y. June 18, 1992).

39.      Absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending the Final Hearing, the Debtor will be immediately and irreparably harmed. The Debtor needs to obtain immediate access to liquidity under the DIP Financing in order to, among other things, continue the operation of its business, maintain relationships with customers, make payroll and capital expenditures, and satisfy other working capital and operational needs. Thus, the credit provided under the DIP Financing will enable the Debtor to continue to operate its Business in an orderly and reasonable manner to preserve and enhance the value of its estate for the benefit of all parties in interest.

40.     The availability of interim funding under the DIP Loan Agreement will also provide necessary assurance of the Debtor's ability to meet its near-term obligations and encourage creditors, employees, contract counterparties and customers to continue its relationships with the Debtor. Failure to meet these obligations and to provide these assurances will cause creditors, customers, contract counterparties and employees to lose confidence in the Debtor, thereby causing irreparable harm to the value of the Debtor's business and assets. In addition, the implementation of the DIP Financing will promote the consummation of the Sale of the Debtor's assets pursuant to and in accordance with the Sale Motion.

41.     Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtor's assets for the benefit of all parties. As such, the Debtor believes that, under the circumstances, entry of the Interim Order is necessary to prevent immediate and irreparable harm to the estates and therefore is warranted under the requirements of Bankruptcy Rule 4001(c)(2).

**E.     Request for a Final Hearing**

42.     Pursuant to Rule 4001(c)(2) of the Bankruptcy Rules, the Debtor requests that the Court set a date, which is no sooner than 14 days after the date of this Motion and no later than 30 days after the entry of the Interim Order, to hold a hearing to consider entry of the Final Order and the permanent approval of the relief requested in this Motion.

**IV.**
**REQUEST FOR RELIEF UNDER BANKRUPTCY RULE 6004(h)**

43.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 6004(h). Given the nature of the relief requested herein, the Debtor respectfully requests a waiver of the 14-day stay under Bankruptcy Rule 6004(h) so that the Interim

Order on this Motion may be effective immediately. As set forth above, the Debtor needs immediate access to funding under the DIP Financing in order to prevent irreparable damage to the Debtor's Business and to preserve the value of its assets. Accordingly, the Debtor submits that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h).

**V.**

**<u>CONCLUSION</u>**

WHEREFORE, the Debtor respectfully requests that the Court enter the Interim Order, substantially in the form attached hereto as <u>Exhibit B</u>, (a) authorizing the Debtor to enter into the DIP Financing and grant the DIP Lender the liens and super-priority claims described herein, (b) modifying the automatic stay to the extent applicable and necessary, (c) scheduling the Final Hearing pursuant to Bankruptcy Rule 4001, and (d) granting such other and further relief as the Court deems appropriate.

Respectfully submitted,

*/s/ Morris D. Weiss*

HOHMANN, TAUBE & SUMMERS, L.L.P.
Eric J. Taube
State Bar No. 19679350
Morris D. Weiss
State Bar No. 21110850
100 Congress Ave., Suite 1800
Austin, Texas 78701
512 472 5997 – phone
512 472 5248 – fax
Email: erict@hts-law.com
           morrisw@hts-law.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing document has been served upon all parties on the attached service list via the method indicated on January 21, 2015.


*/s/ Morris D. Weiss*
Morris D. Weiss