IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

|  |  |  |
|---|---|---|
| In re: | § § § | |
| IMAGE TRENDS INC., | § | Case No. 14-11583 |
| Debtor. | § § § § | |

**MOTION OF THE DEBTOR PURSUANT TO SECTIONS 105, 363 AND 365
OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 6004 AND
6006 FOR (I) AN ORDER APPROVING BIDDING PROCEDURES AND BIDDER
PROTECTIONS FOR THE SALE OF CERTAIN DESIGNATED ASSETS OF THE
DEBTOR; AND (II) AN ORDER (A) APPROVING THE SALE OF CERTAIN
DESIGNATED ASSETS OF THE DEBTOR FREE AND CLEAR OF ALL LIENS,
CLAIMS, AND ENCUMBRANCES, (B) AUTHORIZING THE ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND
UNEXPIRED LEASES, AND (C) GRANTING CERTAIN RELATED RELIEF**

Image Trends Inc., the above-captioned debtor and debtor-in-possession (the "**Debtor**" or

"**Seller**"), by and through its undersigned counsel, hereby moves the Court (the "**Motion**") pursuant

to sections 105, 363 and 365 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy**

**Code**"), Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**") and Rule 6004(b) of the Local Rules for the United States Bankruptcy Court

for the Western District of Texas (the "**Local Rules**") for entry of (i) an order approving bidding

procedures and bidder protections for the sale (the "**Sale**") of certain designated assets of the Debtor

(the "**Purchased Assets**"), and (ii) an order (a) authorizing the sale of the Purchased Assets free and

clear of all liens, claims, encumbrances, and other interests pursuant to sections 105, 363(b), (f), and

(m) of the Bankruptcy Code, (b) authorizing the assumption and assignment of certain executory

contracts and unexpired leases pursuant to sections 363 and 365 of the Bankruptcy Code, and

(c) granting related relief. In support of this Motion, the Debtor respectfully states as follows:

**I.**
**JURISDICTION AND VENUE**

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is core within the meaning of 28 U.S.C. § 157(b).

2.      The statutory predicates for the relief sought herein are sections 105, 363, and 365 of the Bankruptcy Code, Rules 2002, 6004, and 6006 of the Bankruptcy Rules, and Rule 6004(b) of the Local Rules.

**II.**
**BACKGROUND**

**A.      Procedural Background**

3.      On October 24, 2014 (the "**Petition Date**"), an involuntary petition was filed against the Debtor under chapter 7 of the Bankruptcy Code by Grinberg Asset Holdings, LLC ("**Grinberg**"), Dave Cavena, and Oxberry, LLC, which was amended on January 7, 2015 to add Lisa Griffin as a petitioning creditor (collectively, the "**Petitioning Creditors**").  On November 18, 2014, the Debtor filed its Answer to the involuntary petition (Dk. 5), contesting the standing of at least one, and potentially all three, of the original Petitioning Creditors.

4.      On the date hereof (the "**Motion to Convert Date**"), the Debtor exercised its right to convert the case to one under chapter 11 the Bankruptcy Code (the "**Bankruptcy Case**").

5.      The Debtor has continued in possession of its properties and is operating and managing its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      No request has been made for the appointment of a trustee or examiner, and a creditors' committee (the "**Committee**") has not been appointed in this case.  In addition, no known creditors' committee existed prior to the Petition Date.

B.      **Overview of the Debtor's Business**

7.      The Debtor is in the advanced image processing business and is a leader in motion picture scanning technology.  In particular, the Debtor is in the business of (a) providing software, hardware, professional services and system design services to customers, (b) developing, licensing and incorporating imaging technologies in offerings and embedded in the products of original equipment manufacturers, (c) developing image correction and enhancement tools for the imaging professional and advanced amateur markets, and (d) advanced image processing  (the "**Business**").

8.      As of the Petition Date, the Debtor's outstanding secured debt was $725,000.  This consists of (a) $400,000 borrowed from Warren N. Lieberfarb ("**Lieberfarb**") pursuant to that certain Convertible Promissory Note, dated as of June 9, 2009 (the "**First WL Debt**"); (b) $160,000 borrowed from Lieberfarb pursuant to that certain Promissory Note, dated as of July 28, 2014 (the "**Second WL Debt**", and together with the First WL Debt, the "**WL Debt**"); (c) $65,000 borrowed from the Buyer pursuant to that certain Promissory Note, dated January 21, 2015 (the "**First Astral Debt**") and (d) $100,000 borrowed from the Buyer pursuant to that certain Promissory Note, dated January 21, 2015 (the "**Second Astral Debt**", and together with the First Astral Debt, the "**Astral Debt**").

9.      The Debtor defaulted on its obligations under the First WL Debt.  In exchange for Lieberfarb's agreement to forbear from exercising its rights and remedies under the First WL Debt and to extend additional credit pursuant to the Second WL Debt, pursuant to that certain Security Agreement, effective as of July 28, 2014 (the "**WL Security Agreement**"), Lieberfarb was granted a first priority security interest in substantially all of the Debtor's property.  Lieberfarb perfected its security interest by filing a financing statement in accordance with the Uniform Commercial Code (a "**UCC-1 Statement**") for the WL Debt on August 6, 2014.

10.     The Astral Debt is secured pursuant to that certain Security Agreement, effective as of January 21, 2015 (the "**Astral Security Agreement**"), by the Debtor in favor of the Buyer, which grants the Buyer a security interest in all of Debtor's present and future Accounts, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Documents, Equipment, General Intangibles, Instruments, Inventory, Investment Property, Letter-of-Credit Rights and Supporting Obligations, and the Proceeds and products of any of the foregoing (all as defined in the Astral Security Agreement).  The Buyer perfected its security interest by filing a UCC-1 Statement on or about January 21, 2015.

11.     On January 21, 2015, Lieberfarb assigned to the Buyer for good and valuable consideration (a) the Second WL Debt and (b) the right to waive any claim related to the First WL Debt.  As such, the Buyer holds a perfected pre-petition secured lien against all of the Debtor's assets in the aggregate amount of no less than $325,000 plus accrued interest on account of the Second WL Debt and the Astral Debt (the "**Pre-Petition DIP Lender Lien**").

12.     In addition, the Dell Financial Services L.L.C. ("**Dell**") has asserted a lien (the "**Dell Lien**") on computer equipment, peripherals, and other equipment (collectively, the "**Dell Equipment**") leased to the Debtor pursuant to Lease #001-8976709-001, dated May 19, 2014, and Lease #001-8976709-002, dated May 28, 2014 (collectively, the "**Dell Leases**"), along with any other Dell Equipment leased pursuant to the Dell Leases that are in substantially the same form, and all of the Debtor's rights, title and interest in and to use any software and services (collectively, the "**Dell Software**") financed under and described in the Dell Leases, including all substitutions, additions, accessions and replacements thereto and thereof, now or hereafter installed in, affixed to, or used in, conjunction with the Dell Equipment and Dell Software, and the proceeds thereof, together with all rental or installment payments, insurance proceeds, credits or refunds obtained by

the Debtor from a manufacturer, licensor or service provider, or other proceeds and payments due and to become due and arising from or relating to the Dell Equipment, Dell Software or Dell Leases (collectively, the "**Dell Collateral**")

13.     Finally, as of the Petition Date, the Debtor's outstanding unsecured debt totaled more than $11,000,000.  The majority of the Debtor's unsecured debt consists of amounts due to various employees for wages and a portion of which may be entitled to priority status.  The Debtor's largest unaffiliated unsecured creditor is the Texas Emerging Technology Fund, which provided the Debtor with a $1,000,000 unsecured loan.

## C.     Sale of the Debtor's Business

14.     Earlier this year, the Debtor's former CEO, Daniel Sullivan, pled guilty to criminal charges completely unrelated to the Debtor's Business.  Concurrent with the investigation and the ultimate departure of Mr. Sullivan as CEO, the Debtor's financials weakened.

15.     In addition, the Debtor suffered a liquidity crisis as a result of an ongoing dispute with Grinberg.  Specifically, the Debtor and Grinberg are parties to an agreement (the "**Grinberg Agreement**"), which the Debtor  believes should be a significant source of revenue.  However, Grinberg denies that it has generated throughput under the Grinberg Agreement that would give rise to such revenues.  The Debtor has been unable to verify Grinberg's assertions, leading to the loss of the expected revenue.  This loss created a liquidity crisis, which impaired the Debtor's ability to attract new investments, enter into new contracts and retain its valuable employees.

16.     Ultimately, the Debtor began seeking out other strategic alternatives, including a merger or a sale of the Debtor's assets.  In November 2014, the Debtor accepted an offer in principle for the purchase of certain designated assets and began negotiations for the sale and purchase of such assets with the Buyer.  The Buyer's equity holders include Lieberfarb, as well as another third party that has no prior relationship with the Debtor or its creditors.  As part of these negotiations, and due

to the Debtor's liquidity problems, the Debtor also began negotiations with Astral for the provision of a debtor-in-possession loan in conjunction with the Sale in the aggregate amount of $921,000 (the "**DIP Loan**").[1]

17.     The Debtor believes that closing the Sale of the Purchased Assets as quickly as is practicable is necessary to maximize value for the Debtor's estate as the value of the Purchased Assets is declining and their value can only be preserved by a quick sale.  First, there are certain employees of the Debtor that are critical to maintaining the value of the Purchased Assets (collectively, the "**Critical Employees**").  The Critical Employees are currently not being paid by the Debtor due to its lack of necessary operating capital and there is an imminent risk that they will secure other employment, thereby further diminishing the value of the Purchased Assets.  Following the Closing of the Sale, the Buyer intends to employ the Critical Employees.

18.     Second, the Debtor is a party to an Agreement, dated December 3, 2012 (the "**LG Agreement**"), with Lasergraphics, Inc. ("**LG**"), pursuant to which LG is granted an unlimited and perpetual worldwide right to incorporate certain of the Debtor's intellectual property rights relating to technology that allows film scanners to detect, minimize or eliminate the visibility of defects on motion picture film into scanners manufactured by LG.  As part of the LG Agreement, LG is required to sell these enhanced scanners exclusively to the Debtor, unless the Debtor cannot meet certain minimum purchasing requirements, at which time LG is permitted to freely sell such scanners without compensation to the Debtor.  The Debtor is currently not meeting these minimum

---

[1] In connection with this bankruptcy case and this Motion, the Debtor is seeking debtor-in possession financing in the *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to Obtain Post-Petition Financing and to Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (II) Modifying the Automatic Stay Pursuant to 11 U.S.C § 362; and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001* (the "**DIP Financing Motion**"), filed contemporaneously herewith.

purchasing requirements, and, consequently, the Purchased Assets will lose additional value unless the LG Agreement is amended, assumed and assigned to the Buyer.

19. Finally, the value of the Purchased Assets is inherently intertwined with the Debtor's ability to market its technology to original equipment manufacturers, which ability is hampered by the Debtor's lack of sufficient operating capital. For example, prior to the Petition Date, the Debtor was negotiating with the government of the United Kingdom to provide certain technology. These negotiations ultimately stalled due to the Debtor's lack of sufficient operational capital that renders it unable to actually start performance on any agreement that may be negotiated.

### III.
### RELIEF REQUESTED

20. By this Motion, the Debtor seeks entry of two orders: First, at an emergency hearing to be held on a date set by order of the Court, the Debtor requests entry of an order, in substantially the form attached hereto as Exhibit B (the "**Sale Procedures Order**"), among other things, (a) approving the Debtor's proposed procedures for submitting and considering competing bids for the Purchased Assets, including the proposed form and manner of notice and the related dates and deadlines (the "**Bidding Procedures**"), (b) approving the Debtor's proposed bidder protections for the Buyer as the "stalking horse" bidder, as described below (the "**Bid Protections**"), and (c) approving the Debtor's proposed procedures for the assumption and assignment of certain executory contracts.

21. Second, the Debtor requests the entry of an order (the "**Sale Order**"), (a) authorizing the Sale of the Purchased Assets to the Buyer, or to a higher and better bidder, free and clear of all liens, claims, encumbrances, and other interests pursuant sections 105, 363(b), (f), and (m) of the Bankruptcy Code, (b) authorizing the assumption and assignment of certain executory contracts and

unexpired leases in connection with the Sale pursuant to sections 363 and 365 of the Bankruptcy Code, and (c) granting related relief.

**A.**      **The Asset Purchase Agreement**

22.      On January 21, 2015, the Debtor and Astral executed an asset purchase agreement encompassing the terms of the proposed transaction (the "**Purchase Agreement**"). A copy of the fully executed Purchase Agreement is attached as hereto as <u>Exhibit A</u> and is incorporated herein by reference.[2]

23.      The principal terms of the Purchase Agreement are summarized and highlighted as follows:[3]

| | |
|---|---|
| **Transaction**: | The Buyer will acquire certain designated assets of the Seller as defined in the Purchase Agreement. *See* Section 2.1 of the Purchase Agreement. |
| **Purchase Price**: | The total consideration to be paid by Buyer under the Purchase Agreement (the "**Purchase Price**") consists of: (a)      $25,000 in cash, (b)      a credit bid of $100,000 plus accrued interest for the aggregate obligations due under the Second Astral Debt, (c)      a credit bid of $160,000 plus accrued interest for the aggregate obligations due under the Second WL Debt, (d)      a credit bid for the amounts drawn-down under the DIP Loan as of the Closing Date plus accrued interest, (e)      a waiver of the security interest with regards to the First WL Debt, and (f)      the Assumed Liabilities. *See* Section 2.6 of the Purchase Agreement. |
| **Purchased Assets**: | All of Seller's right, title and interest in, to and under the following |

---

[2] Defined terms not otherwise defined herein shall have the meaning ascribed to them in the Purchase Agreement.
[3] To the extent there is any inconsistency between the description of the Purchase Agreement in this Motion and the terms of the Purchase Agreement itself, the Purchase Agreement shall control.

assets, properties, contract rights and Business:

(a) all assets listed on Schedule 2.1(a) to the Purchase Agreement;

(b) all of Seller's rights, title and interest in, to and under the executory contracts and unexpired leases designated for assumption and assignment pursuant to section 365 of the Bankruptcy Code, as identified on Schedule 2.1(b) to the Purchase Agreement, as such Schedule may be amended, revised or supplemented from time to time prior to 30 days after the Closing Date by written notice from the Buyer to the Seller (the "**Assumed Contracts**");

(c) all of Seller's rights, title and interest in, to and under all Intellectual Property Rights owned, licensed or used by the Seller (including the goodwill of the Business in which any of the marks are used), including the items listed in Schedule 2.1(c) to the Purchase Agreement (the "**Intellectual Property Rights**");

(d) all of Seller's right, claims, credits, causes of action or rights of setoff against third parties relating to the Purchased Assets, including, without limitation, unliquidated rights under manufacturers' and vendors' warranties and rebates;

(e) all books and records related to the Seller's Business and the Purchased Assets;

(f) all computer software programs and data used in connection with the Purchased Assets;

(g) all goodwill associated with the Purchased Assets, together with the right to represent to third parties that Buyer is the successor, free and clear of any liens, claims and encumbrances, to the Business operated by the Seller;

(h) any non-disclosure agreements entered into between the Seller and any current or former employees or consultants or any other third parties to protect confidential information of Seller; and

(i) any Intellectual Property Rights assignment agreements, including, without limitation, any agreements executed by employees or agents acknowledging the proprietary interest of Seller in any Intellectual Property Rights.

*See* Section 2.1 of the Purchase Agreement.

| | |
|---|---|
| **Excluded Assets**: | The Excluded Assets shall include:<br><br>(a) all of Seller's cash and cash equivalents on hand and in banks and security deposits, prepaid expenses and similar credit arrangements except for any deposits or prepaid amounts in respect of Assumed Contracts or other Purchased Assets;<br><br>(b) insurance policies;<br><br>(c) all contracts of the Seller that are not an Assumed Contract;<br><br>(d) bank accounts (to be identified by Seller at least 5 business days prior to Closing) necessary to administer the estate and the related banking records and check stock;<br><br>(e) capital stock of Seller and agreements related thereto;<br><br>(f) minute and stock books of Seller and any other documents relating to the organization, maintenance and existence of Seller as a corporation;<br><br>(g) tax records; and<br><br>(h) any rights, defenses, claims, demands, actions, deposits and causes of action that Seller may have against any Person, including without limitation, causes of action under chapter 5 of the Bankruptcy Code, other than any such rights, defenses, claims, demands, actions, deposits or causes of action (x) against Buyer or its Affiliates or (y) related to or arising from a Purchased Asset, Assumed Contract or Assumed Liability.<br><br>*See* Section 2.2 of the Purchase Agreement. |
| **Assumed Liabilities**: | Buyer shall assume from Seller and agree to pay the following liabilities of the Seller (the "**Assumed Liabilities**"), and no others:<br><br>(a) the Cure Amounts for the Assumed Contracts, and<br><br>(b) all liabilities and obligations of the Seller from and after the Closing Date under each Assumed Contract provided that the Seller has arranged for the payment of the Cure Amount.<br><br>*See* Section 2.3 of the Purchase Agreement. |
| **Excluded Liabilities**: | All liabilities other than Assumed Liabilities.  Without limiting the generality of the preceding sentence, the Excluded Liabilities include, without limitation:<br><br>(a) any liability arising out of any pending or threatened action, suit, proceeding, or investigation relating to any event or condition occurring or |

existing prior to the Closing Date, including, without limitation, the items described in Schedule 3.7 to the Purchase Agreement;

(b) any liability or obligation relating to any violation of any law, rule, regulation, judgment, injunction, order or decree relating to any event or condition occurring or existing prior to the Closing Date;

(c) any liability or obligation of the Seller, or any member of any consolidated, affiliated, combined or unitary group of which the Seller is or has been a member, for taxes;

(d) any liability or obligation for (i) the costs and expenses incurred or owed in connection with the administration of the Debtor's chapter 11 bankruptcy case and (ii) the costs and expenses of Seller in connection with the transactions contemplated under the Purchase Agreement, and any contracts related thereto;

(e) any accounts payable of the Seller;

(f) any liability or obligation for or relating to indebtedness for borrowed money;

(g) any liability or obligation relating to an Excluded Asset;

(h) any liabilities, commitments or obligations that arise (whether under the Assumed Contracts or otherwise) with respect to the Purchased Assets or the use thereof on or prior to the Closing Date or related to periods on or prior to the Closing Date or are to be observed, paid, discharged or performed on or prior to the Closing Date (in each case, including any liabilities that result from, relate to or arise out of tort or other product liability claims);

(i) any liabilities of Seller arising under or in connection with any benefit plan providing benefits to any present or former employee of Seller;

(j) any liabilities of Seller for any present or former employees, officers, directors, retirees, independent contractors or consultants of Seller, including, without limitation, any liabilities associated with any claims for wages or other benefits, bonuses, accrued vacation, workers' compensation, severance, retention, termination or other payments;

(k) any liability or obligation of any kind under any contract that is not an Assumed Contract;

(l) any liability for fraud, breach, misfeasance or under any other theory relating to any Seller's conduct, performance or non-performance under any agreement; and

| | |
|---|---|
| | (m) any liabilities or obligations of the Seller for any claims under section 503 of the Bankruptcy Code.

*See* Section 2.4 of the Purchase Agreement. |
| **Assumed Contracts**: | Those executory contracts and unexpired leases designated for assumption and assignment pursuant to section 365 of the Bankruptcy Code, as identified on Schedule 2.1(b) to the Purchase Agreement, as such Schedule may be amended, revised or supplemented from time to time prior to 30 days after the Closing Date by written notice to the Seller. Seller shall pay all Cure Amounts associated with the Assumed Contracts, which amounts shall be advanced by the Buyer to Seller for such payment.

*See* Sections 2.5 and 5.6 of the Purchase Agreement. |
| **Buyer's Conditions to Closing**: | (a) The Seller's representations and warranties shall be true and correct in all material respects as of the Closing Date as though made as of such time, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date). Seller shall have performed or complied in all material respects with all obligations and covenants required under the Purchase Agreement to be performed or complied with by Seller by the Closing Date and shall have delivered a certificate to Buyer dated the Closing Date confirming the foregoing.

(b) No provision of any applicable statute, rule, regulation, executive order, decree, temporary restraining order, judgment, preliminary or permanent injunction or other order enacted, entered, promulgated, enforced or issued by any Governmental Entity shall be in effect that (i) prevents the sale and purchase of the Purchased Assets or any of the other transactions contemplated by this Agreement, (ii) would adversely affect or interfere with the operation of the Business previously conducted after the Closing, or (iii) would require Buyer or any of its Affiliates to sell or otherwise dispose of, hold separate or otherwise divest itself of, or operate in any particular manner, any of the Purchased Assets or any of the assets, properties or business of Buyer or any of its Affiliates.

(c) There shall not be pending or threatened by any Governmental Entity any suit, action or proceeding, (i) challenging or seeking to restrain, prohibit, alter or materially delay the sale and purchase of the Purchased Assets or any of the other transactions contemplated by this Agreement, or seeking to obtain from Buyer or any of its Affiliates in connection with the sale and purchase of the Purchased Assets any material damages or (ii) seeking to prohibit Buyer or any of its Affiliates from effectively controlling or operating a material portion of the Business or the |

| | |
|---|---|
| | Purchased Assets. |
| | (d) Seller shall have received all Required Consents as set forth in Schedule 3.4 of the Purchase Agreement. |
| | (e) The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not have been modified, amended or stayed, except as agreed to by Buyer, and shall have become a Final Order. |
| | (f) The Intellectual Property Rights shall be transferred to the Buyer, and upon Closing shall be free and clear of all liens, claims, interests and encumbrances of any kind or nature whatsoever. |
| | (g) All documentation that is necessary to transfer and assign to Buyer the Intellectual Property Rights or to perfect and record such transfer and assignment shall have been delivered to Buyer. |
| | (h) Seller shall have provided a properly executed certificate of non-foreign status in a form meeting the requirements of Treasury Regulations Section 1.1445-2(b)(2). |
| | (i) Seller shall have delivered to Buyer appropriate assignment agreements in respect of any Intellectual Property Rights constituting Purchased Assets. |
| | *See* Section 9.1 of the Purchase Agreement. |
| **Seller's Conditions to Closing**: | (a) The Buyer's representations and warranties shall be true and correct as of the Closing Date as though made as of such time, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date). Buyer shall have performed or complied in all material respects with all obligations and covenants required under the Purchase Agreement to be performed or complied with by Buyer by the Closing Date and shall have delivered a certificate to Seller dated the Closing Date and signed by the chief financial officer or other similar officer of Buyer confirming the foregoing and certifying the resolutions of Buyer's Board of Directors approving the transactions contemplated under the Purchase Agreement. |
| | (b) No provision of any applicable statute, rule, regulation, executive order, decree, temporary restraining order, judgment, preliminary or permanent injunction or other order enacted, entered, promulgated, enforced or issued by any Governmental Entity shall be in effect that prevents the sale and purchase of the Purchased Assets or any of the transactions contemplated by the Purchase Agreement. |
| | (c) There shall not be pending or threatened by any Governmental Entity |

| | |
|---|---|
| | any suit, action or proceeding, (i) challenging or seeking to restrain, prohibit, alter or materially delay the sale and purchase of the Purchased Assets or any of the other transactions contemplated by the Purchase Agreement or seeking to obtain from Seller in connection with the sale and purchase of the Purchased Assets any material damages.<br><br>(d) The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not have been modified, amended or stayed, except as agreed to by Seller, and shall have become a Final Order.<br><br>*See* Section 9.2 of the Purchase Agreement. |
| **Closing**: | Shall be as soon as practicable, but in any event no later than on the later to occur of (i) the date on which the conditions to Closing set forth in Article 9 of the Purchase Agreement shall have been satisfied or waived and (ii) the first business day following the day that is fourteen (14) days after the entry of the Sale Order and after the Sale Order has become a Final Order, or at such other time or place as Buyer and Seller may agree in writing.<br><br>*See* Section 2.9 of the Purchase Agreement. |
| **Deposit**: | The Buyer has not furnished a deposit in connection with the Purchase Agreement. |
| **Free and Clear**: | The Sale will be free of all Liens (as defined in the Purchase Agreement), other than the Permitted Liens set forth on <u>Schedule 2.1</u> of the Purchase Agreement and the Assumed Liabilities.<br><br>*See* Section 2.8 of the Purchase Agreement. |
| **Relationship between Buyer and Debtor**: | There is no relationship between the Buyer and Debtor, except that one of the equity holders of the Buyer is a pre-petition secured creditor of the Debtor and the Buyer is a pre-petition secured creditor and the DIP lender to the Debtor.  The transaction is an arm's length transaction, negotiated in good faith.<br><br>The Debtor will have no relationship or connection with the Buyer after the consummation of the sale. |
| **Relationship with Secured Creditors**: | The sale involves the payment of all or a portion of the Debtor's secured debt.  Lieberfarb is a party to an Advisor Agreement with the Debtor, dated May 1, 2012, and served as a director of the Debtor for a brief period in 2014. |
| **Agreements with Management**: | No agreements exist between the Buyer and existing managers or directors of the Debtor. |

| Insider Compensation | Current compensation received by officers, directors, key employees or other insiders pending approval of the sale is set forth in the DIP Loan budget. |
|---|---|
| Notice Timing | Notice of the hearing on the motion to approve the motion to sell will be provided as is necessary under the circumstances. |
| Record Retention: | All books of account and other financial records (including, without limitation, accountant's work papers) pertaining to the Seller's Business and the Purchased Assets will be sold with the Purchased Assets.<br><br>Nonetheless, the Debtor will retain, or have reasonable access to, its books and records following the Closing Date, thereby enabling it to administer its chapter 11 case in an orderly and efficient manner.<br><br>*See* Sections 2.1 and 7.4 of the Purchase Agreement. |
| No Stay: | Relief from the 14-day stay of Bankruptcy Rule 6004(h) is requested.<br><br>*See* Section 5.4 of the Purchase Agreement. |

24.     The full terms and conditions of the proposed transaction are set forth in the Purchase Agreement annexed as <u>Exhibit A</u> and reference should be made to the Purchase Agreement for additional terms.  To the extent there is any inconsistency between the summary of the transaction set forth in this Motion and the terms in the Purchase Agreement, the Purchase Agreement shall control.

**B.      Proposed Procedure for the Assumption and Assignment of Executory Contracts**

25.     In accordance with the Purchase Agreement, the Debtor seeks to assume and assign to the Buyer certain executory contracts and unexpired leases to be designated by the Buyer. Specifically, the Purchase Agreement contemplates that the Buyer will identify the contracts that the Debtor will assume and assign in Schedule 2.1(b) to the Purchase Agreement, which schedule can be amended by the Buyer at any time prior to 30 days after the Closing Date by providing written notice to the Debtor.

26. Promptly after the Closing Date, with respect to any Assumed Contracts, the Debtor shall pay all amounts, as determined by the Bankruptcy Court or as otherwise agreed-upon by the Buyer and the counterparty to such Assumed Contracts, required under section 365 of the Bankruptcy Code to cure any and all defaults under any Assumed Contracts, and to compensate the parties to the Assumed Contracts for any actual pecuniary losses resulting from such defaults (the "**Cure Amounts**"). The Cure Amounts shall be advanced by the Buyer to the Debtor for such payment.

27. In order to establish the Cure Amounts for each of the Assumed Contracts, the Debtor requests approval of the following procedure:

(a) The Debtor will file and serve a "Notice of Proposed Cure Amount" (a "**Cure Notice**"), substantially in the form attached hereto as <u>Exhibit C</u>, on the non-Debtor parties (the "**Contract Counterparties**") to the Assumed Contracts identified on Schedule 2.1(b) promptly upon entry of the Sale Procedures Order (defined below). The Cure Notice will identify the contract designated for assumption and assignment, and set forth the amounts the Debtor believes are owed to each Contract Counterparty in order to cure any defaults that exist under such Assumed Contract.

(b) To the extent that a contract is added as an Assumed Contract following the entry of the Sale Procedures Order, the Debtor will promptly file and serve a Cure Notice on the affected Contract Counterparties.

(c) Objections, if any, to the proposed Cure Amount or to the proposed assumption and assignment of the Assumed Contracts, including, but not limited to, objections related to adequate assurance of future performance or objections relating to whether applicable law excuses the Contract Counterparty from accepting performance by, or rendering performance to, the Buyer for purposes of section 365(c)(1) of the Bankruptcy Code, must be in writing and filed with this Court and served on counsel to the Debtor and the Buyer so as to be received no later than ten calendar days after the filing of the Cure Notice (the "**Assumption Objection Deadline**").

(d) If an objection is timely filed, the Debtor, the Buyer and the Contract Counterparty shall meet and confer in good faith to attempt to resolve any such objection without Court intervention. Any objections to the Cure Amounts which are not otherwise resolved by the parties shall be heard by the Court at the Sale Hearing (as defined below). Any objections timely filed to a Cure Notice for which the objection deadline falls on a date after the Sale Hearing shall be heard by the Court on a date or dates to be set by the Court after the Sale Hearing.

(e)     Any Contract Counterparty to an Assumed Contract who fails to timely file an objection to the proposed Cure Amount or the proposed assumption and assignment by the Assumption Objection Deadline will be deemed to have consented to such Cure Amount and the assumption and assignment of such Assumed Contract, and such party shall be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts against the Debtor, its estate or the Buyer.

(f)     The decision to assume and assign the Assumed Contracts is subject to Court approval and the consummation of the Sale. Accordingly, the Debtor shall be deemed to have assumed and assigned each of the Assumed Contracts as of the date of and effective only upon the Closing Date, and absent such closing, each of the Assumed Contracts shall neither be deemed assumed nor assigned and shall in all respects be subject to subsequent assumption or rejection by the Debtor under the Bankruptcy Code.

(g)     At any time prior to 30 days after the Closing Date, the Buyer may, in its sole discretion, exclude any executory contract or unexpired lease previously designated as an Assumed Contract by written notice to the Seller and the Contract Counterparty. Upon service of such notice, the executory contracts and/or unexpired leases referenced in such notice shall no longer be considered Assumed Contracts; shall not be deemed to be, or to have been, assumed or assigned; and shall remain subject to assumption, rejection or assignment by the Debtor.

(h)     Inclusion of any document on the list of Assumed Contracts shall not constitute or be deemed to be a determination or admission by the Debtor or the Buyer that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, all rights with respect thereto being expressly reserved. The Buyer shall have no rights in and to a particular Assumed Contract until such time as the particular Assumed Contract is assumed and assigned in accordance with the procedures set forth herein.

(i)     Pursuant to the Purchase Agreement, with respect to any Assumed Contracts, the Debtor shall pay any Cure Amounts set by the Court or as otherwise agreed-upon by the Buyer and the Contract Counterparty in connection with the proposed assumption and assignment of any Assigned Contract, which amounts shall be advanced by the Buyer, promptly after the Closing Date.

## C.     **Proposed Bidding Procedures**

28.     The Debtor requests approval of the following procedures for submitting and considering bids for the Sale of the Purchased Assets, including the related dates and deadlines described below:

(a)     **Participation Requirements**. Parties interested in making a competing bid for the purchase of some or all of the Purchased Assets (each, a "**Potential Bidder**") will be

required to execute a confidentiality agreement in form and substance acceptable to the Debtor prior to gaining access to the due diligence materials.

(b)     **Due Diligence**.  The Debtor will afford Potential Bidders such due diligence access or additional information as may be reasonably requested by the Potential Bidder and that the Debtor, in its business judgment, determines to be reasonable and appropriate under the circumstances.

(c)     **Submission of Bids**.  In order to qualify as a Qualified Bid (as defined below) for the Purchased Assets, a Potential Bidder must timely submit a written bid that satisfies the following criteria:

   i.     The bid must exceed the Purchase Price by at least $75,000 plus an amount sufficient to pay the Breakup Fee (defined below);

   ii.     The bid must be accompanied by a cash deposit in an amount equal to 10% of the aggregate value of such bid (each, a "**Good Faith Deposit**");

   iii.     The bid must be accompanied by an executed Purchase Agreement in substantially the form of the Purchase Agreement attached as Exhibit A and a blackline showing any modifications the bidder is proposing, and that:

     a.     indicates which of the Purchased Assets or other assets of the Debtor such bidder proposes to acquire pursuant to the Purchase Agreement;

     b.     indicates which of the Debtor's executory contracts and unexpired leases such bidder intends to take assignment of pursuant to the Purchase Agreement; and

     c.     does not contain any conditions to closing which are not contained in the Purchase Agreement (including financing and due diligence) or is based on terms or conditions any less favorable, or otherwise more burdensome or conditional than those set forth in the Purchase Agreement;

   iv.     The bid must include financial statements of the Potential Bidder (or the entity that will furnish the funding required to consummate and perform under the Purchase Agreement) establishing such entity's financial wherewithal to timely close the transactions contemplated thereunder;

   v.     The bid must contain written evidence demonstrating adequate assurance of future performance by the acquiring entity to the Contract Counterparties under the unexpired leases and executory contracts to be assumed and assigned pursuant to the Purchase Agreement, which may include, without limitation, a representation as to the solvency of the Potential Bidder following consummation of the Potential Bidder's purchase of the Purchased Assets;  and

vi.      The bid must contain a written statement identifying the controlling interest holders in the acquiring entity and evidence that the board of directors (or comparable governing body) for the entity making the bid has fully authorized and approved the submission, execution, and delivery of the Purchase Agreement and the consummation of the transactions contemplated thereby.

vii.      The bid must be delivered to the following parties: (i) the Debtor, Image Trends, Inc., Building One, Suite 450, 6300 Bridgepoint Parkway, Austin, TX 78730; (ii) the Debtor's counsel, Hohmann, Taube & Summers, L.L.P., Attn: Eric J. Taube, Esq. and Morris Weiss, Esq., 100 Congress Ave., 18th Floor, Austin, Texas 78701; and (iii) counsel for the Buyer, Sheppard Mullin Richter & Hampton LLP, Attn: Edward H. Tillinghast, III, Esq. and Blanka K. Wolfe, Esq., 30 Rockefeller Plaza, New York, NY 10112.

(d)      **Qualification of Bid**.  After a Potential Bidder has delivered a bid, the Debtor, in consultation with any official Committee (if one is appointed), will determine whether (i) the Potential Bidder has demonstrated the financial capacity to consummate the purchase of the Purchased Assets, (ii) is reasonably likely to be able to and willing to consummate the contemplated transactions, and (iii) has otherwise timely satisfied the requirements described above.  If so, the Debtor shall designate such potential bidder as a "**Qualified Bidder**" and such bid as a "**Qualified Bid**," and will promptly notify such bidder and the Buyer of this determination.  The Debtor acknowledges that the Buyer is a Qualified Bidder and the Purchase Agreement executed by the Buyer is a Qualified Bid.

(e)      **Deadline for Submission of Bids**.  The deadline for submitting any and all competing bids shall be no later than February 11, 2015 at 5:00 p.m. CST, or such other date as is established by the Court (the "**Bid Deadline**").

(f)      **Auction**.  In the event that competitive Qualified Bids are received, the Debtor will conduct an auction to determine the highest or best bid for the Purchased Assets on February 12, 2015, or such other date as may be established by the Court, at the law offices of the Debtor's counsel, 100 Congress Ave., 18th Floor, Austin, Texas 78701, beginning at 10:00 a.m. CST.  The Auction may be adjourned by announcement of the adjournment at the Auction to those parties who appear thereat.

(g)      **Auction Procedures**.  Only Qualified Bidders who have submitted Qualified Bids will be eligible to participate at the Auction.  At the Auction, Qualified Bidders will be permitted to increase and/or improve their bids, provided that Qualified Bidders other than the Buyer concurrently increase their Good Faith Deposit to represent 10% of their most recent bid.  The bidding at the Auction shall start and continue in increments of at least $50,000.  The Buyer shall have the right, but not the obligation, to participate in the Auction. The Auction shall continue in one or more rounds of bidding and shall conclude after each participating bidder has had a reasonable opportunity to submit an additional subsequent bid with full knowledge of the then existing highest or best bid and the identity of the other party making the then highest or best bid.  The Debtor may conduct the Auction in the manner it determines will maximize the value of the Purchased Assets.  If the only Qualified Bidder is

the Buyer, the Auction will be cancelled and the Buyer will be declared the Successful Bidder (defined below).

(h)    **Determination of Successful Bidder**.  At the conclusion of the Auction, the highest or best bid, as determined by the Debtor consistent with these Bidding Procedures, shall be designated as the "**Successful Bidder**."  The Debtor may designate the next highest or best bidder for the Purchased Assets at the Auction as the "**Backup Bidder**."

(i)    **Sale Hearing**.  Only in the event that the Buyer is not the Successful Bidder or an objection is timely filed to this Motion by the Sale Objection Deadline (as defined below) or an objection to a Cure Notice is not consensually resolved, the Court will hold a hearing to approve the Sale of the Purchased Assets to the Successful Bidder (the "**Sale Hearing**") on or before February 18, 2015, or such other date as is established by the Court. Any Sale Hearing shall be an evidentiary hearing and parties shall be prepared to present their evidence in support of or in opposition to the proposed Sale at the Sale Hearing.  If the Successful Bidder fails to consummate the purchase of the Purchased Assets, the Backup Bid will automatically be deemed the Successful Bid.

(j)    **Closing**.  Closing shall take place promptly after the entry of the Sale Order, but in any event no later than on the later to occur of (i) the date on which the conditions to Closing set forth in Article 9 of the Purchase Agreement shall have been satisfied or waived and (ii) the first business day following the day that is fourteen (14) days after the entry of the Sale Order and after the Sale Order has become a Final Order, or at such other time or place as Buyer and Seller may agree in writing.

(k)    **Return of Good Faith Deposit**.  The Good Faith Deposits of all Qualified Bidders shall be held in escrow by the Debtor and shall not become property of the Debtor's estate.  Upon the closing of the Sale, the Good Faith Deposit of any Qualified Bidders that are not the Successful Bidder will be returned.

(l)    **Reservation of Rights**.  The Debtor reserves the right, in consultation with its professionals, and any Committee, if any, to alter these Bidding Procedures, and to establish procedures and rules during the Auction, as they may determine reasonably appropriate to maximize the value realized by the estates.

**D.**    **Proposed Notice Procedures**

29.    Not later than three calendar days after the entry of the Sale Procedures Order (the "**Mailing Deadline**"), the Debtor will cause a notice of the Sale, substantially in the form attached hereto as Exhibit D (the "**Sale Notice**"), to be sent by first-class mail postage prepaid, or by another method reasonably calculated to provide notice, to (i) the Office of the United States Trustee for the Western District of Texas, (ii) counsel for the Committee, if any (iii) counsel for the Buyer, (iv) the

Debtor's 20 largest creditors, (v) all entities known to have expressed a bona fide interest in acquiring the assets being sold, and (vi) all other known parties-in-interest in these bankruptcy cases (including any party who has entered an appearance and request for service of papers pursuant to Fed. R. Bankr. P. 2002).

30.     In addition, on the Mailing Deadline, or as soon as practicable thereafter, the Debtor will cause a publication version of the Sale Notice, substantially in the form attached hereto as Exhibit E (the "**Publication Notice**"), to be published one time in the Wall Street Journal – Regional Edition.  In addition, on the Mailing Deadline, or as soon as practicable thereafter, the Debtor will cause the Publication Notice to be published on the Debtor's website at www.imagetrends.com.

31.     The Debtor requests that the Court set a deadline of February 11, 2015 at 5:00 p.m. CST (the "**Sale Objection Deadline**") as the deadline for any objection to the relief requested in this Motion to be filed with the Court and delivered to the following parties:  (i) the Debtor, Image Trends, Inc., Building One, Suite 450, 6300 Bridgepoint Parkway, Austin, TX 78730; (ii) the Debtor's counsel, Hohmann, Taube & Summers, L.L.P., Attn: Eric J. Taube, Esq. and Morris Weiss, Esq., 100 Congress Ave., 18th Floor, Austin, Texas 78701; and (iii) counsel for the Buyer, Sheppard Mullin Richter & Hampton LLP, Attn: Edward H. Tillinghast, III, Esq. and Blanka K. Wolfe, Esq., 30 Rockefeller Plaza, New York, NY 10112.

32.     The Debtor requests that the Court deem this notice and opportunity to object to be sufficient for all purposes.

**E.     Proposed Stalking Horse Bid Protections**

33.     The Debtor also requests that the Court approve the provisions of the Purchase Agreement regarding the payment of a breakup fee in the amount of 5% of the Purchase Price (the "**Breakup Fee**"), which is to be paid to the Buyer in accordance with the Purchase Agreement under the following conditions: (a) if the Bankruptcy Court approves the Sale of any or all of the Purchased

Assets to an entity other than the Buyer; (b) an order is entered, which has not been withdrawn within ten calendar days, dismissed or reversed, dismissing the Bankruptcy Case or converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, or (c) the Debtor files a motion, application or other petition to effect or consent to the foregoing. Purchase Agreement at § 11.2.

34.     The requested Breakup Fee was negotiated by the parties in good faith and at arm's length, primarily through counsel, with significant give-and-take. Accordingly, the Debtor has determined that the Breakup Fee is reasonable. The DIP Loan provided by Buyer has preserved the value of the Debtor's assets. Moreover, the Buyer has incurred substantial expenses in negotiating the purchase of the Purchased Assets, and such negotiations and the Buyer's offer for the Purchased Assets will maximize the value to be obtained from the Purchased Assets for the benefit of all creditors. The Buyer is not seeking any expense reimbursement. As such, the Debtor has determined, in its business judgment, that the Breakup Fee is reasonable under the circumstances.

35.     In addition, in the event that the Buyer is not the Successful Bidder for the Sale of the Purchased Assets, the Debtor has agreed that the proceeds of such Sale will be used (a) first, to repay the outstanding amounts of the DIP Loan, (b) second, to repay the outstanding amounts of the Second Astral Debt, and (c) third, to repay the outstanding amounts of the Second WL Debt.

## IV.
### BASIS FOR RELIEF REQUESTED

### A.     The Bidding Procedures are Appropriate and in the Best Interests of the Debtor's Estate and its Creditors

36.     The dominant goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R, 650, 659

(Bankr. S.D.N.Y. 1992), *appeal dismissed*, 3 F.d 49 (2d Cir. 1993) ("It is a well-established principle of bankruptcy law that the . . . [debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (*quoting In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

37.     As a result, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. *See, e.g., In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("[C]ourt-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates"); *Integrated Res.*, 147 B.R. at 659.

38.     The Debtor believes it is in the best interests of its estate to commence a bidding procedure immediately, as the Debtor has limited funding and resources to proceed with a long sale process.  The Bidding Procedures proposed herein allow for an expedited sale of the Debtor's assets that is necessitated by its circumstances.  The Debtor also believes that the proposed Bidding Procedures will promote active bidding from seriously interested parties, and will provide a framework for an orderly and fair sale process that will encourage participation by financially capable bidders or will confirm that the Buyer's bid is the best and highest bid for the Purchased Assets.  The proposed Bidding Procedures contain terms typical for a process through which a sale of this nature is consummated and should increase the likelihood that the Debtor will receive the greatest possible consideration for the Purchased Assets.  The Bidding Procedures also set forth a schedule for achieving these objectives in an expeditious manner, balancing the Debtor's desire to maximize recovery for the benefit of the estates, with the need to move quickly to avoid any further deterioration in value. *See In re Texas Rangers Baseball Partners,* 431 B.R. 706 (Bankr. N.D. Tex.

2010) (approving shortened time frame of less than three weeks between issuance of bidding procedures order by the Bankruptcy Court and auction sale of assets to preserve the value of the purchased assets).

**B.     The Notice Procedures are Appropriate**

39.     Under Bankruptcy Rule 2002, the Debtor is required to notify its creditors of any proposed sale of its assets, including a disclosure of the time and place of the Sale Hearing, the terms and conditions of the Sale and the deadline for filing any objections related thereto.  The Debtor's proposed notice procedures, including the Sale Notice and the Publication Notice, include adequate information to (a) enable interested parties to bid on the Purchased Assets pursuant to the Sale Procedures Order, and (b) inform parties-in-interest of the Sale Hearing and the Sale Objection Deadline.  As such, the Debtor believes that the notice to be provided by the mailing of the Sale Notice and the publication of the Publication Notice constitutes good and adequate notice and fully complies with Bankruptcy Rule 2002.

**C.     The Breakup Fee is Appropriate and in the
          Best Interests of the Debtor's Estate and its Creditors**

40.     In general, bid protections encourage a potential purchaser to invest the requisite time, money and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtors' assets, despite the inherent risks and uncertainties of the chapter 11 process.  Typically, bidding incentives are judged under a business judgment standard, which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. *See e.g.*, *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (internal quotation marks and citation omitted).  To receive administrative expense priority pursuant

to section 503(b) of the Bankruptcy Code, the bidding incentive must provide some post-petition benefit to the estate.  *Calpine Corp. v. O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999) (identifying at least two instances in which bidding incentives may provide benefit to the estate: first, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited;"  second, where the availability of bidding incentives induces a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely).

41.  Courts typically approve bid protections, like the Breakup Fee, in chapter 11 bankruptcy sales.  *See e.g., In re Lincolnshire Campus, LLC*, 2010 WL 5269706 *1 (Bankr. N.D. TX. July 23, 2010) (approving breakup fee and expense reimbursement under section 503(b) of the Bankruptcy Code in the context of a sale of substantially all of the debtor's assets under section 363 of the Bankruptcy Code); *In re Texas Rangers Baseball Partners*, 431 B.R. at 715 (same); *see also In re APP Plus*, 223 B.R. 870, 875 (Bankr. E.D.N.Y. 1998) (approving break-up fee in connection with sale of substantially all of the debtors' assets pursuant to 11 U.S.C. § 363(b)); *In re Kmart*, Case No. 02-B-02474 (SPS) (Bankr. N.D. Ill. May 10, 2002) (authorizing a termination fee and overbid amounts for potential bidders).

42.  The Debtor believes that the Breakup Fee is fair and reasonable, an exercise of its sound business judgment, and that it provides a benefit to its estate.  Specifically, the Buyer has engaged in extensive analysis and due diligence of the Debtor's assets, and has incurred significant expenses in negotiating the purchase of the Purchased Assets, for which it is not seeking reimbursement.  In addition, since the Petition Date and the acceptance of its offer to purchase the Purchased Assets, the Buyer has been helping the Debtor maintain the Business, including

conversations with the Critical Employees to preserve the value of the Debtor's assets. The Buyer's management has expended considerable time in working with the Debtor, which has provided valuable consideration to the estate. The Purchased Assets are not readily marketable assets, and require a purchaser that has a specialized interest in the advanced image processing business. As a result of the Buyer's efforts, the Debtor has secured a stalking horse bidder for assets that are not easily marketable, with a minimum price for the Purchased Assets that is fair, reasonable, and on which other bidders can rely. In light of the costs undertaken by the Buyer, the Breakup Fee serves as an inducement for the Buyer to conduct the costly due diligence necessary to provide a competitive floor bid, and will compensate the Buyer for its risk in the event that it is not the Successful Bidder. This is especially important given that the Buyer is not seeking any reimbursement of the expenses it has incurred in negotiating the transaction. In addition, the Buyer has provided value to the estate post-petition by providing the Debtor with the DIP Loan, which permits the Debtor to fund its Bankruptcy Case to enable a Sale to occur.

43. Moreover, if the Breakup Fee is triggered, it will be the result of the Debtor securing a higher and better offer for the Purchased Assets, which will benefit the Debtor's creditors, residents and employees. Consequently, the payment of the Breakup Fee will not diminish the Debtor's estate because it will only be payable if the Debtor consummates a sale that provides consideration that is greater than the Purchase Price by an amount sufficient to pay the Breakup Fee.

44. The Debtor's agreement to pay the Breakup Fee is the product of good faith, arm's-length negotiations between the Debtor and Buyer. The Breakup Fee is fair and reasonable in amount, and it is reasonably intended to compensate the Buyer for the risk of being used as a stalking horse bidder and ultimately being outbid for the Purchased Assets. Thus, the payment of the

Breakup Fee is a sound exercise of the Debtor's business judgment and will provide the a post-petition benefit to the Debtor's estate.

**D.     The Sale of the Purchased Assets Pursuant to the Purchase Agreement is Authorized by Section 363(b) of the Bankruptcy Code**

45.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate . . . ."  11 U.S.C. § 363(b)(l).  Section 105(a) provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

46.     A sale of a debtor's assets is authorized under section 363 of the Bankruptcy Code if there is a business justification for the sale.  *Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines Inc. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986); *see also Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (*citing Fulton State Bank v. Schipper (In re Schipper))*, 933 F.2d 513, 515 (7th Cir. 1991)); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986).  Among the factors in determining whether there is sufficient business justification for the sale, the bankruptcy judge:

> should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike. He might, for example, look to such relevant factors as the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis–a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value. This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge.

*In re Continental Air Lines, Inc.*, 780 F.2d at 1226 (*quoting Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.))*, 722 F.2d 1063, 1071 (2d Cir. 1983)). "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigation v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). When a valid business justification exists, the law vests the debtor's decision to use property out of the ordinary course of business with a strong presumption that "'in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." *In re Integrated Res.*, 147 B.R. at 656 (*quoting Smith v. Van Gorkom*, 488 A. 2d 858, 872 (Del. 1985)). Therefore, parties objecting to the Debtors' proposed sale must make a showing of "bad faith, self-interest, or gross negligence." *Integrated Res.*, 147 B.R. at 656.

47.     Moreover, the Bankruptcy Court has authority under section 105(a) of the Bankruptcy Code to approve non-ordinary course transactions under section 363(b) of the Bankruptcy Code. The Fifth Circuit has acknowledged that section 105 confers broad powers on bankruptcy courts:

> [Section] 105 [is] 'an omnibus provision phrased in such general terms as to be the basis for a broad exercise of power in the administration of a bankruptcy case. The basic purpose of § 105 is to assure the bankruptcy courts power to take whatever action is appropriate or necessary in aid of the exercise of their jurisdiction…

*See Davis v. Davis (In re Davis)*, 170 F.3d 475, 492 (5th Cir 1999) (citation omitted). While the Debtor realizes that section 105(a) of the Bankruptcy Code "may only be used to carry out the provisions of Title 11," the underlying premise of chapter 11 is the continued and uninterrupted operation of the debtor in possession to the greatest extent possible. *In re CoServ, L.L.C.*, 273 B.R. 487, 494 n.9 (Bankr. N.D. Tex. 2002). Thus, the Debtor's requested relief is consistent with the "furtherance of the provisions of the Bankruptcy Code." *Id.*; *see also In re Southmark Corp.*, 113

B.R. 280, 281 (Bankr. N.D. Tex. 1990) (stating that "the court may use [section] 105(a) to fashion orders that are necessary or appropriate to further a substantive provision of the [IRC]").

48.     The Debtor has proposed the sale of the Purchased Assets after thorough consideration of all viable alternatives, and has concluded that the Sale is supported by a number of sound business reasons.  The Debtor has determined that a reorganization rather than a sale is not a viable option due to the Debtor's financial situation.  Hence, the Debtor has determined, in its considered business judgment, that a Sale of the Purchased Assets as requested herein provides the best and most efficient means for the Debtor to maximize the value of its estate, and avoid further deterioration in value.

49.     As a result of the Debtor's efforts to date, the Debtor believes that the Buyer's offer is reasonable, constitutes fair and reasonable consideration for the Purchased Assets, and will maximize value.  In particular, part of the Buyer's Purchase Price is the waiver of the secured claim status of the First WL Debt, which Lieberfarb claims is a secured claim but which the Debtor disputes.  The resolution of this dispute provides significant value to the Debtor's estate as it eliminates the need to litigate the issue, thereby preserving valuable assets for the Debtor's creditors.  The Purchase Agreement neither impermissibly restructures the rights of the Debtor's creditors nor impermissibly dictates a liquidation plan.  Notwithstanding these determinations, however, the Debtor has also proposed a competitive bidding process in order to confirm that the Buyer's offer is the best and highest offer for the Purchased Assets.

50.     Based on the foregoing, the sale of the Purchased Assets is justified by sound business reasons and is in the best interests of the Debtor and its estate.  Accordingly, pursuant to section 363(b) of the Bankruptcy Code, the Debtor requests approval of the sale to the Buyer as set forth herein.

**E.**     **The Sale of the Purchased Assets Free and Clear of Liens, Claims,**
          **and Interests is Authorized Under Section 363(f) of the Bankruptcy Code**

51.     The Debtor also requests that the Court authorize the Sale of the Purchased Assets to

the Buyer free and clear of any and all liens, claims, charges, encumbrances and interests

(collectively, the "**Interests**"), which may be asserted or otherwise exist, with any such Interests to

attach to the proceeds of the Sale of the Purchased Assets, subject to the rights and defenses of the

Debtor, if any, with respect thereto.

52.     Section 363(f) of the Bankruptcy Code provides that a debtor may sell property of the

estate free and clear of any other entity's interest in such property if:

> (1)     applicable nonbankruptcy law permits sale of such property
>          free and clear of such interest;
>
> (2)     such entity consents;
>
> (3)     such interest is a lien and the price at which such property is
>          to be sold is greater than the aggregate value of all liens on
>          such Purchased Assets;
>
> (4)     such interest is in a bona fide dispute; or
>
> (5)     such entity could be compelled, in a legal or equitable
>          proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

53.     While the term "any interest," as used in section 363(f), is not defined in the

Bankruptcy Code, courts have held that the scope of section 363(f) of the Bankruptcy Code is not

limited to *in rem* interests.  *In re Leckie Smokeless Coal Co*., 99 F.3d 573, 581-82 (4th Cir. 1996);

*Folger Adam Security v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 258 (3d Cir. 2000) (citing 3

Collier on Bankruptcy 363.06[1]).  Thus, a debtor can "sell its assets under § 363(f) free and

clear of successor liability that otherwise would have arisen under federal statute." *Folger Adam*,

209 F.3d at 258.

54.     Section 363(f) is drafted in the disjunctive.  Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the Sale of the Purchased Assets free and clear of all Interests, except with respect to any Interests that are Assumed Liabilities or Permitted Liens under the Purchase Agreement.  *See Citicom Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988).

55.     The Debtor believes that each Interest that is not an Assumed Liability or Permitted Lien satisfies at least one of the five conditions in section 363(f) of the Bankruptcy Code.  In particular, the Sale Order provides for all Interests to attach to the proceeds from the Sale of the Purchased Assets in the order of their priority and with the same validity, priority, force and effect which such Interests now have against the Purchased Assets, subject to the rights, claims, defense and other objections, if any, of the Debtor and parties in interest with respect to such Interests.  The Debtor accordingly requests authority to convey the Purchased Assets to the Buyer, free and clear of all such Interests, other than Permitted Liens and the Assumed Liabilities.

**F.     The Buyer is a Good Faith Purchaser and is Entitled to the**
       **Full Protections of Section 363(m) of the Bankruptcy Code**

56.     The Buyer is a good faith purchaser and is thus entitled to the protections of section 363(m) of the Bankruptcy Code.  Specifically, section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

57.     While the Bankruptcy Code does not define "good faith," courts have held that there must be a showing of fraud or collusion between the purchaser and the debtor to demonstrate a lack of good faith.  *Bleaufontaine, Inc. v. Roland Int'l (In re Bleaufontaine, Inc.)*, 634 F.2d 1383, 1388 n.7

(5th Cir. 1981) ("Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *see also Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997) (same); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (same). Courts generally determine that parties have acted in good faith with respect to a proposed sale if the purchase price is adequate and reasonable and the terms of the sale are disclosed fully. *See In re Abbotts Dairies*, 788 at 149-50.

58.     Here, the Purchase Agreement was negotiated at arms-length, the Buyer has acted in good faith at all times, and the Purchase Agreement is not tainted by self-dealing, collusion or manipulation.   The Purchase Price is fair and reasonable, and the terms of the Sale have been fully disclosed and are subject to an active process to determine if a higher or better bid exists. Accordingly, the Debtor requests that the Court make a finding that the Buyer is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

**G.     The Court Should Approve the Assumption and Assignment of the Assumed Contracts Under Section 365 of the Bankruptcy Code**

59.     In connection with the approval of the Sale to the Buyer, the Debtor also requests approval of the assumption and assignment of the Assumed Contracts to the Buyer.

60.     Specifically, section 365(f)(2) of the Bankruptcy Code permits a debtor to assign an executory contract or unexpired lease if "(A) the [debtor] assumes such contract or lease in accordance with the provisions of this section; and (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease."   11 U.S.C. § 365(f)(2).   Section 365(a) of the Bankruptcy Code authorizes a

debtor to assume an executory contract or unexpired lease, 11 U.S.C. § 365(a), and section

365(b)(1), in turn, codifies the requirements for such assumption, providing that:

> (b)(l) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
> (A)    cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
>
> (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).  The meaning of "adequate assurance of future performance" for the purpose

of the assumption of executory contracts and unexpired leases pursuant to section 365 of the

Bankruptcy Code depends on the facts and circumstances of each case, but should be given

"practical, pragmatic construction."  *See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*,

103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr.

S.D.N.Y. 1985) (adequate assurance of future performance does not mean an absolute assurance that

debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr.

N.D. Ill. 1985).

61.    It is well established that the decision to assume or reject an executory contract or

unexpired lease is a matter within the "business judgment" of the debtor.  *See Delightful Music Ltd.

v. Taylor (In re Taylor)*, 913 F.2d 102, 107 (3d Cir. 1990); *Sharon Steel Corp. v. Nat'l Fuel Gas

Distrib. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989).  Accordingly, assumption or rejection of any

executory contract is appropriate where the assumption or rejection would benefit the estate.  *Sharon

Steel*, 872 F.2d at 39.

62.     The assumption and assignment of the Assumed Contracts satisfies the requirements of section 365 of the Bankruptcy Code.  First, to the extent that there is any default under any of the Assumed Contracts, the Purchase Agreement provides that the Debtor, with funds supplied by the Buyer, will cure any such defaults.  The Assumption and Assignment Procedures outlined above provide for sufficient notice of the proposed assignment of and Cure Amount for each Assumed Contract to be supplied to each Contract Counterparty, and a process for objecting and reconciling the Cure Amount for each Assumed Contract.  Second, the Buyer has sufficient assets to continue performance under each of the Assumed Contracts.  To the extent necessary, the Buyer can demonstrate that adequate assurance of future performance is present.  Thus, the requirements for assumption and assignment under section 365 of the Bankruptcy Code are satisfied.

63.     The assumption and assignment of the Assumed Contracts is an integral part of the Purchase Agreement.  The Sale of the Purchased Assets to the Buyer will provide significant benefit to the Debtor's estate and allow the Debtor, in its business judgment, to maximize the value of the Purchased Assets for the benefit of its estate.   Thus, the assumption and assignment of the Assumed Contracts is a sound exercise of the Debtor's business judgment.  The Debtor requests that the assumption and assignment of the Assumed Contracts be approved, notwithstanding any anti-assignment provisions therein.

## V.
## <u>NOTICE</u>

64.     The Debtor intends to seek entry of the Sale Procedures Order on an expedited basis pursuant to a Motion for Expedited Hearing filed concurrently herewith.  Notice has been made to all parties in interest as reflected in the attached certificate of service.

65.     The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

**VI.**
**REQUEST FOR RELIEF UNDER BANKRUPTCY RULES 6004(h) AND 6006(d)**

66.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

67.     The Debtor requests that the Sale Order be effective immediately by providing that the 14-day stay under Rules 6004(h) and 6006(d) is inapplicable and waived, so that it may proceed as expeditiously as possible with the Sale.  As described above, the Debtor believes that, absent a prompt sale, the value of the Purchased Assets will decline in value to the detriment of its creditors. Therefore, it is imperative that the Sale Order be effective immediately to permit the Sale to close without any further delay.

**VII.**
**CONCLUSION**

WHEREFORE, the Debtor respectively requests that the Court (i) enter an order, substantially in the form attached as Exhibit B, approving the Bidding Procedures, Assumption and Assignment Procedures, and Bid Protections, and (ii) enter an order (a) authorizing the Sale of the Purchased Assets to the Buyer or another Successful Bidder free and clear of all liens, claims, encumbrances, and other interests pursuant to sections 105, 363(b), (f), and (m) of the Bankruptcy Code, (b) authorizing the assumption and assignment of the Assumed Contracts pursuant to sections 363 and 365 of the Bankruptcy Code, and (c) granting such other and further relief to the Debtor as the Court may deem proper.

Dated:  January 21, 2015          Respectfully submitted,
        Austin, TX

                                  /s/ *Morris D. Weiss*
                                  Eric J. Taube
                                  State Bar No. 19679350
                                  Morris D. Weiss
                                  State Bar No. 21110850
                                  HOHMANN, TAUBE & SUMMERS, L.L.P.
                                  100 Congress Ave., 18th Floor
                                  Austin, Texas 78701
                                  Tel: 512-472-5997
                                  Fax: 512-472-5248
                                  E-mail: morrisw@hts-law.com

                                  *Proposed counsel to the Debtor*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing document has been served upon all parties on the attached service list via the method indicated on January 21, 2015.

                                  /s/ *Morris D. Weiss*
                                  Morris D. Weiss

**SERVICE LIST**

**Debtor**
Image Trends, Inc.
Building One, Suite 450
6300 Bridgepoint Parkway
Austin, TX 78730

**Government Entities**
*(via overnight delivery or Express Mail unless otherwise noted)*
U.S. Trustee *(via ECF)*
903 San Jacinto Blvd., Suite 230
Austin, TX 78701

State of Texas Franchise Tax
Central Services Building
1711 San Jacinto Blvd., Suite 180
Austin, TX 78701-1416

**Counsel to Petitioning Creditors**
Stephen W. Sather *(via ECF)*
Barron & Newburger, P.C.
1212 Guadalupe, Suite 104
Austin, TX 78701

**Counsel to Lender**
Sheppard Mullin Richter & Hampton LLP
Attn: Edward H. Tillinghast, III, Esq. and Blanka K. Wolfe, Esq.
30 Rockefeller Plaza
New York, NY 10112
*Via email by consent to*
BWolfe@sheppardmullin.com and
etillinghast@sheppardmullin.com

**Counsel to Warren Lieberfarb**
Norton Rose Fulbright
Attn: Greg Wilkes
2200 Ross Avenue, Suite 2800
Dallas, TX 75201-2784
*Via email by consent to* greg.wilkes
@nortonrosefulbright.com

**Employees** *(via email and First Class Mail)*
Albert Edgar
3912 Eaton Avenue
Austin, TX 78727

Amanda Cook
6263 McNeil Drive
Apt # 1536
Austin, TX 78729

Darryl R. Polk
9102 Balcones Club Drive
Austin, TX 78750

Martin Potucek
9440 Altona Way
Austin, TX 78767

Michael Wilder
11011 West Cave Blvd.
Dripping Springs, TX 78620

Wayne Galella
10703 Callanish Park Drive
Austin, TX 78750

**Other Creditors** *(via overnight delivery or Express Mail unless otherwise noted)*
ADP, LLC
1ADP Drive
MS-100
Augusta, GA 30909

Alteran, Inc.
Mr. Steve Crouch
9420 Lurline Ave., Ste C
Chatsworth, CA 91311

Bestline Communications
500 Capital of TX Highway North
Reserve 8, Suite 200
Austin, TX 78746

Bridgepoint Consulting, LLC
Mr. Bob Smith
6300 Bridgepoint Parkway
Building One, Suite 575
Austin, TX 78730

CT Corp - State of Delaware Rep.
Madison Corporate Team 1
8020 Excelsior Drive
Suite 200
Madison, WI 53717

Daniel J. Sullivan 344 75-380 *(via First Class mail)*
FCI Fort Worth
Federal Correctional Institution
P.O. Box 15330
Fort Worth, TX 76119

Equity Commonwealth Management LLC
Attn: Chief Operating Officer and General Counsel
Two North Riverside Plz, Ste 600
Chicago, IL 60606

George Halloran
484 Cypress Road
Rochester Hills, MI 48309

Lasergraphics
20 Ada
Irvine, CA 92618

Luminus Systems
Mr. Gary Mueller
1775 Wiehle Avenue, Suite 400
Reston, VA 20190

Michael Conley
4210 Lakeway Blvd
Austin, TX 78734

Michael Wilkes
5813 York Bridge Circle
Austin, TX 78749

Pilot HSA, LLC
3070 Winward Plaza
Suite F815
Alpharetta, GA 30005

Sheppard Parker
4817 Twin Valley Drive
Austin, TX 78731

Susan Sullivan
11705 Woodland Hills Trail
Austin, TX 78732

Tak Kambara *(via email and First Class Mail)*
221,0004, Kanagawa-ku
454-4-603
Nishioguchi
Yokohama, Japan 454-4-603

Ross-Co Investment Company, LP
Attn:  Mr. Kennard B. Ross
1305 Brians Meadow Cove
Austin, TX 78746-6757

Imadio LLC
7113 Seneca Falls Loop
Austin, TX 78739

**<u>Exhibit A</u>**
**Purchase Agreement**

SMRH:203859685.7

**<u>Execution Version</u>**

**ASSET PURCHASE AGREEMENT**

**dated as of**

**January 21, 2015**

**between**

**Image Trends Inc.**

**and**

**Astral Images Corporation**

# TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS..................................................................................................1

    **Section 1.1**   **Definitions**.............................................................................1

ARTICLE 2 PURCHASE AND SALE ..................................................................................5

    **Section 2.1**   **Purchase and Sale** ................................................................5

    **Section 2.2**   **Excluded Assets**...................................................................6

    **Section 2.3**   **Assumption of Liabilities**.................................................7

    **Section 2.4**   **Excluded Liabilities**..........................................................7

    **Section 2.5**   **Assignment of Contracts and Rights**...............................8

    **Section 2.6**   **Consideration** .....................................................................9

    **Section 2.7**   **Allocation**............................................................................9

    **Section 2.8**   **Sale Free and Clear**..........................................................9

    **Section 2.9**   **Closing**...............................................................................10

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF SELLER................................10

    **Section 3.1**   **Organization and Standing; Authority**......................10

    **Section 3.2**   **No Conflicts; Consents**.................................................11

    **Section 3.3**   **Sufficiency of and Title to the Purchased Assets**....................11

    **Section 3.4**   **Required Consents**..........................................................11

    **Section 3.5**   **Material Contracts**.........................................................12

    **Section 3.6**   **Intellectual Property**......................................................13

    **Section 3.7**   **Litigation**.........................................................................14

    **Section 3.8**   **Compliance with Laws and Court Orders**................14

    **Section 3.9**   **Brokers and Finders**......................................................15

    **Section 3.10**   **Subsidiaries**...................................................................15

Section 3.11    **No Warranties** ...................................................................15

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF BUYER ..................................15

Section 4.1    **Organization and Standing; Authority** .....................................15

Section 4.2    **No Conflicts; Consents**. .......................................................15

Section 4.3    **Availability of Funds** .........................................................16

Section 4.4    **Brokers and Finders** ...........................................................16

Section 4.5    **Actions and Proceedings, etc.** ...............................................16

Section 4.6    **No Warranties** ...................................................................16

Section 4.7    **Assignment of WL Debt** .......................................................16

ARTICLE 5 COVENANTS OF SELLER ...........................................................16

Section 5.1    **Conduct of the Business** .......................................................16

Section 5.2    **Access to Information; Assistance** ..........................................17

Section 5.3    **Notices of Certain Events** ....................................................17

Section 5.4    **Bankruptcy Court Approval** .................................................18

Section 5.5    **Permits** ............................................................................19

Section 5.6    **Cure Amounts** ...................................................................19

Section 5.7    **Name Changes** ...................................................................19

ARTICLE 6 COVENANTS OF BUYER .............................................................20

Section 6.1    **Confidentiality** ...................................................................20

Section 6.2    **No Additional Representations** ..............................................20

Section 6.3    **Assignment to Affiliate** .......................................................20

Section 6.4    **Buyer's Cooperation** ...........................................................20

Section 6.5    **Delivery of List of Assumed Contracts** ...................................20

ARTICLE 7 COVENANTS OF ALL PARTIES ....................................................20

Section 7.1    **Commercially Reasonable Efforts; Further Assurances** ..........20

Section 7.2    **Certain Filings**................................................................21

Section 7.3    **Public Announcements**.....................................................21

Section 7.4    **Post-Closing Access to Books and Records** ...............21

ARTICLE 8 TAX MATTERS..............................................................................22

Section 8.1    **Tax Matters** ......................................................................22

Section 8.2    **Tax Cooperation; Allocation of Taxes**. .......................22

Section 8.3    **Transfer Taxes** .................................................................23

Section 8.4    **Tax Payments Made by Buyer**........................................23

ARTICLE 9 CONDITIONS TO CLOSING.........................................................23

Section 9.1    **Conditions to Buyer's Obligations** ..............................23

Section 9.2    **Conditions to Obligation of Seller** ..............................25

Section 9.3    **Frustration of Conditions**..............................................25

ARTICLE 10 SURVIVAL .................................................................................25

Section 10.1    **Survival** .........................................................................25

ARTICLE 11 TERMINATION...........................................................................26

Section 11.1    **Grounds for Termination**................................................26

Section 11.2    **Effect of Termination** ...................................................26

ARTICLE 12 MISCELLANEOUS .....................................................................27

Section 12.1    **Notices** ...........................................................................27

Section 12.2    **Amendments and Waivers**. ...........................................27

Section 12.3    **Fees and Expenses**.........................................................28

Section 12.4    **Successors and Assigns** ................................................28

Section 12.5    **Governing Law** .............................................................28

Section 12.6    **Counterparts; Effectiveness** .........................................28

Section 12.7    **Entire Agreement; Third Party Beneficiaries**...........28

**Section 12.8**   **Captions** ..........................................................................................29

**Section 12.9**   **Severability** ......................................................................................29

**Section 12.10** **Consent to Jurisdiction**..................................................................29

**Section 12.11 WAIVER OF JURY TRIAL**........................................................29

# ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT dated as of January 21, 2015 between Image Trends Inc., a Delaware corporation and a debtor-in-possession in a chapter 11 case pending in the United States Bankruptcy Court (the "Seller"), and Astral Images Corporation, a Delaware corporation ("Buyer").

W I T N E S S E T H:

WHEREAS, on October 24, 2014 (the "Petition Date"), an involuntary petition (the "Involuntary Petition") was filed against the Seller, as debtor (the "Bankruptcy Case"), under title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Texas, Austin Division (the "Bankruptcy Court");

WHEREAS, on November 18, 2014, Seller filed its Answer of Image Trends Inc. to the Involuntary Petition;

WHEREAS, on January 21, 2015, the Seller consented to the relief sought in the Involuntary Petition and exercised its right to convert the case to a case under chapter 11 of the Bankruptcy Code; and

WHEREAS, subject to the approval of the Bankruptcy Court, as set forth herein, Buyer desires to acquire from Seller, and Seller desires to sell, convey, transfer and assign to Buyer, the Purchased Assets (as defined below), together with certain obligations and liabilities, all in the manner and subject to the terms and conditions set forth herein and in accordance with Sections 363 and 365 and other applicable provisions of the Bankruptcy Code.

NOW, THEREFORE, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

**Section 1.1** **Definitions**.

(a) The following terms, as used herein, have the following meanings:

"Affiliate" of any Person shall mean any Person directly or indirectly controlling, controlled by, or under common control with, such Person; provided, that for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, membership or partnership interests, election or appointment of directors, by contract or otherwise.

"Agreement" means this Agreement and all exhibits and schedules attached hereto, as amended, consolidated, supplemented, novated or replaced by the parties from time to time, as the same may be amended from time to time.

"Allocation Statement" shall have the meaning given such term in Section 2.7.

"Apportioned Obligations" means all real property taxes, personal property taxes and similar ad valorem obligations levied with respect to the Purchased Assets for a taxable period which includes (but does not end on) the Closing Date.

"Assigned Intellectual Property" means any and all Intellectual Property Rights of Seller.

"Assumed Contracts" means Seller's Contracts identified on Schedule 2.1(b).

"Assumed Liabilities" shall have the meaning given such term in Section 2.3.

"Bankruptcy Case" shall have the meaning given to such term in the recitals to this Agreement.

"Bankruptcy Code" shall have the meaning given to such term in the recitals to this Agreement.

"Bankruptcy Court" shall have the meaning given to such term in the recitals to this Agreement.

"Books and Records" means all books of account and other financial records (including, without limitation, accountant's work papers) pertaining to the Seller's Business and the Purchased Assets.

"Breakup Fee" means the amount in cash equal to 5% of the Consideration.

"Business Day" means any day, other than a Saturday, Sunday or a day on which banks located in Austin, Texas shall be authorized or required by law to close.

"Buyer" shall have the meaning given such term in the Preamble.

"Closing" shall have the meaning given such term in Section 2.8.

"Closing Date" means the date on or as of which the Closing occurs.

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Consideration" shall have the meaning given such term in Section 2.6.

"Contracts" means all commitments, contracts, leases, licenses, agreements and understandings, written or oral, relating to the Seller's assets or the operations of the Seller's Business.

"Cure Amount" shall have the meaning given such term in Section 5.6.

"Excluded Assets" shall have the meaning given such term in Section 2.2.

"Excluded Contracts" shall have the meaning given to such term in Section 2.1(b).

"Excluded Liabilities" shall have the meaning given such term in Section 2.4.

"Final Order" means an order or judgment entered and adopted by the Bankruptcy Court as to which (i) the time for appeal has expired and a notice of appeal has not been timely filed, or (ii) any appeal taken has been finally dismissed or determined and is not subject to further review.

"First WL Debt" means that certain Promissory Note dated June 9, 2009, by Seller to the order of Warren N. Lieberfarb in the principal amount of $400,000 as secured by that certain Security Agreement effective as of July 28, 2014, by Seller in favor of Warren N. Lieberfarb.

"Governmental Entity" means any federal, state, county, municipal, local, foreign, international, regional, or other governmental authority or any court of competent jurisdiction, administrative agency or commission or other governmental authority, board, body or instrumentality, domestic or foreign.

"Intellectual Property Rights" means all patents, patent applications and other patent rights (including any divisions, continuations, continuations-in-part, requests for continued examinations, substitutions, or reissues and reexaminations thereof, whether or not any such applications are modified, withdrawn or resubmitted), trademarks, trade dress, service marks, corporate names, domain names, trade names, brand names, service marks, service names, mask works, assumed names, logos, inventions, trade secrets, designs, technology, know-how, processes, procedures, techniques, methods, inventions, proprietary data, formulae, research and development data, computer software programs and other intangible property, copyrights (including all variants thereof and any registration or applications for registration of any of the foregoing and non-registered copyrights), including all files, manuals, documentation and source and object codes related to any of the foregoing, or any other similar type of proprietary intellectual property right (whether or not patentable or subject to copyright, mask work or trade secret protection) and the Assigned Intellectual Property, in each case which is owned, licensed or used by the Seller.

"Lien" means, with respect to any property or asset, any mortgage, lien, pledge, charge, easement, option, right of first refusal, right of first offer, right of first use or occupancy, indenture, deed of trust, right of way, tenancy, restriction on the use of real property, restriction upon voting or transfer, encroachment, license to a third party, lease to a third party, security agreement, security interest, encumbrance, claim (as defined in Section 101 of the Bankruptcy Code) or other adverse claim, restriction or limitation of any kind in respect of such property or asset or irregularities in title thereto.  For the purposes of this Agreement, a person shall be deemed to own subject to a Lien any property or asset which it has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement relating to such property or asset.

"New DIP Loan" means the loan or loans made by the Buyer to the Seller under that certain Secured Super-Priority Debtor-in-Possession Credit Agreement, dated as of January 21, 2015, between the Buyer, as Lender, and the Seller, as Borrower.

"Nondisclosure Agreement" means that certain Nondisclosure Agreement, effective as of October 23, 2014, between Astrotech Corporation and Image Trends Inc.

"Permitted Liens" means those liens set forth on Schedule 2.1.

"Person" means and includes any individual, partnership, association, joint venture, corporation, limited liability company, limited liability partnership, trust, trustee, any other entity or organization and any Government Entity.

"Petition Date" shall have the meaning given such term in the recitals to this Agreement.

"Post-Closing Tax Period" means any Tax period (or portion thereof) beginning on or after the day following the Closing Date.

"Pre-Closing Tax Period" means any Tax period (or portion thereof) ending on or before the Closing Date.

"Promissory Note" means that certain promissory note in the principal amount of up to $921,000 made by the Seller and delivered to the Buyer under the New DIP Loan.

"Purchased Assets" shall have the meaning given such term in Section 2.1.

"Required Consents" shall have the meaning given such term in Section 3.4.

"Sale Motion" shall have the meaning given such term in Section 5.4(b).

"Sale Order" means an order issued by the Bankruptcy Court in a form reasonably satisfactory to the Buyer, which shall approve the transactions contemplated by this Agreement.

"Sale Procedures Motion" shall have the meaning given such term in Section 5.4(a).

"Sale Procedures Order" shall have the meaning given such term in Section 5.4(a).

"Scheduled Intellectual Property" shall have the meaning given such term in Section 3.6(a).

"Second Astral Debt" shall mean the liability of the Seller under that certain Promissory Note dated January 21, 2015, made by the Seller payable to the order of the Buyer in the principal amount of $100,000, and secured by that certain Security Agreement dated as of January 21, 2015, executed by the Seller in favor of the Buyer.

"Second WL Debt" means that certain Promissory Note dated as of July 28, 2014, by Seller to the order of Warren N. Lieberfarb pursuant to which loans were made to the Debtor in the principal amount of $160,000 as secured by that certain Security Agreement effective as of July 28, 2014, by Seller in favor of Warren N. Lieberfarb, which documents were assigned to Buyer pursuant to that certain Assignment, dated as of January 21, 2015, by and between Warren N. Lieberfarb and Buyer.

"Seller" shall have the meaning given such term in the Preamble.

"Seller's Business" means the business of providing software, hardware, professional services and system design services to customers, licensing and incorporating imaging technologies in offerings and embedded in original equipment manufacturers products, developing image correction and enhancement tools, and advanced image processing.

"Seller's Knowledge" means the actual knowledge after undertaking reasonable diligence of Terry Hazell.

"Tax" or "Taxes" means all taxes, assessments, charges, duties, fees, levies or other governmental charges including, without limitation, all federal, state, local, foreign and other net or gross income, gross receipts, alternative or add-on minimum tax, franchise, profits, capital gains, capital, transfer, sales, use, ad valorem, occupation, premium, property, excise, severance, environmental (including taxes under IRC section 59A) or windfall profits tax, stamp, license, payroll, employment, withholding and other taxes, assessments, charges, customs, duties, fees, levies or other governmental assessments or charges of any kind whatsoever (whether payable directly or by withholding and whether or not requiring the filing of a return), all estimated taxes, deficiency assessments, additions to tax, penalties and interest, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Treasury Regulations" means the United States Treasury regulations promulgated under the Code.

## ARTICLE 2
## PURCHASE AND SALE

**Section 2.1** **Purchase and Sale**.  Except as otherwise provided below, upon the terms and subject to the conditions of this Agreement, Buyer agrees to purchase from Seller and Seller agrees to sell, transfer, convey, assign and deliver, or cause to be sold, transferred, conveyed, assigned and delivered, to Buyer at Closing, free and clear of all Liens, all of Seller's right, title and interest in, to and under the following assets, properties, contract rights and other rights (collectively, the "Purchased Assets"):

(a)      all assets shown on Schedule 2.1(a) hereto;

(b)      all of Seller's right, title and interest in, to and under all of Seller's executory contracts identified as an Assumed Contract on Schedule 2.1(b), as may be amended at any time or from time to time prior to 30 days after the Closing by written notice provided by Buyer to Seller.  Any executory contracts or unexpired leases not identified as an assumed contract on Schedule 2.1(b) are referred to herein as the "Excluded Contracts";

(c)      all of Seller's rights, title and interest in, to and under all Intellectual Property Rights owned, licensed or used by the Seller (including the goodwill of the Business in which any of the marks are used), including the items listed in Schedule 2.1(c);

(d)　　except as provided in <u>Section 2.2(h)</u>, all of Seller's right, claims, credits, causes of action or rights of setoff against third parties relating to the Purchased Assets, including, without limitation, unliquidated rights under manufacturers' and vendors' warranties and rebates;

(e)　　all Books and Records, files and papers, whether in hard copy or computer format related to the Purchased Assets, including, without limitation, engineering information, sales and promotional literature, manuals and data, sales and purchase correspondence, lists of present and former suppliers, lists of present and former customers, personnel and employment records, and any information relating to Tax imposed on the Purchased Assets;

(f)　　all computer software programs and data used in connection with the Purchased Assets;

(g)　　all goodwill associated with the Purchased Assets, together with the right to represent to third parties that Buyer is the successor to the Business operated by the Seller;

(h)　　any non-disclosure agreements entered into between the Seller and any current or former employees or consultants or any other third parties to protect confidential information of Seller; and

(i)　　any Intellectual Property Rights assignment agreements, including, without limitation, any agreements executed by employees or agents acknowledging the proprietary interest of Seller in any Intellectual Property Rights.

**Section 2.2　　Excluded Assets**.　Notwithstanding anything to the contrary herein or otherwise, Buyer expressly understands and agrees that all assets and properties of Seller other than the Purchased Assets shall be excluded assets (the "<u>Excluded Assets</u>"), which shall include the following:

(a)　　all of Seller's cash and cash equivalents on hand and in banks and security deposits, prepaid expenses and similar credit arrangements except for any deposits or prepaid amounts in respect of Assumed Contracts or other Purchased Assets;

(b)　　insurance policies;

(c)　　the Excluded Contracts;

(d)　　bank accounts (to be identified by Seller at least 5 Business Days prior to Closing) necessary to administer the estate and the related banking records and check stock;

(e)　　capital stock of Seller and agreements related thereto;

(f)　　minute and stock books of Seller and any other documents relating to the organization, maintenance and existence of Seller as corporations;

(g)　　Tax records; and

(h)     any rights, defenses, claims, demands, actions, deposits and causes of action that Seller may have against any Person, including without limitation, causes of action under chapter 5 of the Bankruptcy Code, other than any such rights, defenses, claims, demands, actions, deposits or causes of action (x) against Buyer or its Affiliates or (y) related to or arising from a Purchased Asset, Assumed Contract or Assumed Liability.

Section 2.3     **Assumption of Liabilities**.  Upon the terms and subject to the conditions of this Agreement, at the Closing, Buyer will assume only the following obligations of Seller (the "Assumed Liabilities"), and no others:

(a)     the Cure Amounts for the Assumed Contracts; and

(b)     all liabilities and obligations of the Seller from and after the Closing Date under each Assumed Contract provided that the Seller has arranged for the payment of the Cure Amount.

Section 2.4     **Excluded Liabilities**.  Notwithstanding any provision in this Agreement, Buyer is assuming only the Assumed Liabilities and is not assuming any other liability or obligation of the Seller (or any predecessor owner of all or part of the Seller's business and assets) of whatever nature whether presently in existence or arising hereafter, including, without limitation, any liability for any claim, action, suit or proceeding pending against, or judgment against, the Seller (including the Purchased Assets) as of the Closing Date.

All such other liabilities and obligations shall be retained by and remain obligations and liabilities of the Seller (all such liabilities and obligations not being assumed being herein referred to as the "Excluded Liabilities").  Notwithstanding any provision is this Agreement or any other writing to the contrary, Excluded Liabilities include, without limitation:

(a)     any liability or obligation arising out of any action, suit, proceeding, or investigation pending or threatened as of, or arising out of or relating to any event or condition occurring or existing prior to, the Closing, including, without limitation, the items described in Schedule 3.7;

(b)     any liability or obligation arising out of or relating to any violation of any law, rule, regulation, judgment, injunction, order or decree occurring or arising out of or relating to any event or condition occurring or existing prior to the Closing;

(c)     any liability or obligation of the Seller, or any member of any consolidated, affiliated, combined or unitary group of which the Seller is or has been a member, for Taxes; provided that Apportioned Obligations shall be paid in the manner set forth in Section 8.2;

(d)     any liability or obligation for (i) all costs and expenses incurred or owed in connection with the administration of the Chapter 11 Case (including the U.S. Trustee fees, the fees and expenses of attorneys, accountants, financial advisors, consultants and other professionals retained by Seller, the creditors' committee (if any), the postpetition lenders or the prepetition lenders incurred or owed in connection with the administration of the Chapter 11

Case) and (ii) all costs and expenses of Seller in connection with the transactions contemplated under this Agreement, and any contracts related thereto;

(e)     any accounts payable of the Seller;

(f)     any liability or obligation for or relating to indebtedness for borrowed money;

(g)     any liability or obligation relating to an Excluded Asset;

(h)     any liabilities, commitments or obligations that arise (whether under the Assumed Contracts or otherwise) with respect to the Purchased Assets or the use thereof on or prior to the Closing Date or related to periods on or prior to the Closing Date or are to be observed, paid, discharged or performed on or prior to the Closing Date (in each case, including any liabilities that result from, relate to or arise out of tort or other product liability claims);

(i)     any liabilities of Seller arising under or in connection with any benefit plan providing benefits to any present or former employee of Seller;

(j)     any liabilities of Seller for any present or former employees, officers, directors, retirees, independent contractors or consultants of Seller, including, without limitation, any liabilities associated with any claims for wages or other benefits, bonuses, accrued vacation, workers' compensation, severance, retention, termination or other payments;

(k)     any liability or obligation of any kind under any Contract that is not an Assumed Contract;

(l)     any liability or obligation for fraud, breach, misfeasance or under any other theory relating to any Seller's conduct, performance or non-performance under any agreement; and

(m)     any liabilities or obligations of the Seller for any claims under section 503 of the Bankruptcy Code.

**Section 2.5**    **Assignment of Contracts and Rights**.  Subject to the approval of the Bankruptcy Court and pursuant to the Sale Order, the Assumed Contracts will be assumed by Seller and assigned to Buyer on the Closing Date under Section 365 of the Bankruptcy Code. All Assumed Contracts shall be assigned to Buyer at Closing.  Seller and Buyer will use their commercially reasonable efforts (but without any payment of money by Seller or Buyer) to obtain the consent of the other parties to any such Purchased Asset, Assumed Contract or any claim or right or any benefit arising thereunder for the assignment thereof to Buyer as Buyer may request.  If such consent is not obtained, or if an attempted assignment thereof would be ineffective or would adversely affect the rights of Seller thereunder so that Buyer would not in fact receive all such rights, Seller and Buyer will cooperate in a mutually agreeable arrangement under which Buyer would, to the extent permitted by applicable law, obtain the benefits and assume the obligations thereunder in accordance with this Agreement.  Seller will, to the extent permitted by applicable law, promptly pay to Buyer when received all monies received by Seller

under any Purchased Asset, Assumed Contract or any claim or right or any benefit arising thereunder, except to the extent the same represents an Excluded Asset.

**Section 2.6    Consideration**.    The consideration for the Purchased Assets (the "Consideration") consists of:

(a)    $25,000 (the "Cash Amount"),

(b)    $100,000 plus accrued interest, payable in the form of the exercise of credit bid rights under Section 363(k) of the Bankruptcy Code with respect to the aggregate obligations then outstanding under the Second Astral Debt,

(c)    $160,000 plus accrued interest, payable in the form of the exercise of credit bid rights under Section 363(k) of the Bankruptcy Code with respect to the aggregate obligations then outstanding under the Second WL Debt,

(d)    the amounts drawn-down under the New DIP Loan as of the Closing Date plus accrued interest, payable in the form of the exercise of credit bid rights under Section 363(k) of the Bankruptcy Code with respect to the aggregate obligations then outstanding under the New DIP Loan,

(e)    a waiver of the security interest with regards to the First WL Debt; and

(f)    the Assumed Liabilities.

**Section 2.7    Allocation**.  The consideration for the Purchased Assets, as determined for United States federal income Tax purposes pursuant to Treasury Regulations Section 1.1060-1(c) (the "Tax Purchase Price"), shall be allocated for such purposes, as provided in Treasury Regulations Section 1.1060-1(c) and the other provisions of the Treasury Regulations referred to therein, as agreed between Buyer and Seller (the "Allocation Statement").  Buyer and Seller shall execute and file all United States federal income Tax Returns in a manner consistent with any allocations agreed or determined pursuant hereto and shall not take any position in any other Tax Return, before any Governmental Entity, or in any Tax proceeding that is inconsistent with any such allocation, except pursuant to a final "determination" (as defined in Section 1313(a) of the Code or corresponding provision of state, local or foreign law) or as otherwise required by applicable law.  Buyer and Seller shall timely file any IRS Form 8594 and any other United States federal income Tax Return prepared in a manner consistent with the allocations agreed or determined pursuant hereto relating to the Purchased Assets and shall file any other tax return with any state, local or foreign Governmental Entity in a manner that is not inconsistent therewith, except as otherwise required by applicable law.  Any redetermination (within the meaning of Treasury Regulations Section 1.338-7) of the Tax Purchase Price shall be made as required thereby and shall be taken into account by Buyer and Seller in carrying out the provisions hereof and the preparation and filing of Tax Returns referred to above to the extent applicable.

**Section 2.8    Sale Free and Clear**.  Seller acknowledges and agrees that the Sale Order shall provide that, on the Closing Date, and concurrently with the Closing, all then existing or thereafter arising Liens of, against or created by Seller or their bankruptcy estate, to the fullest

extent permitted by Section 363 of the Bankruptcy Code, other than the Permitted Liens, and the Assumed Liabilities, shall be fully released from and with respect to the Purchased Assets.  On the Closing Date, the Purchased Assets shall be transferred to Buyer, free and clear of all Liens, other than the Permitted Liens and the Assumed Liabilities, to the fullest extent permitted by Section 363 of the Bankruptcy Code.

**Section 2.9**    **Closing**.  Subject to the terms and conditions of this Agreement, the sales and purchases of the Purchased Assets, the assignments of the Assumed Contracts and the assumptions of the Assumed Liabilities contemplated hereby shall take place at a closing (the "<u>Closing</u>") to be held at the offices of Norton Rose Fulbright, 98 San Jacinto Boulevard, Suite 1100, Austin, Texas 78701, or at such other location as the parties hereto shall agree in writing, at 11:00 A.M., as soon as practicable, but in any event no later than on the later to occur of (i) the date on which the conditions to Closing set forth in <u>Article 9</u> shall have been satisfied or waived and (ii) the first Business Day following the day that is fourteen (14) days after the entry of the Sale Order and after the Sale Order has become a Final Order, or at such other time or place as Buyer and Seller may agree in writing.

(a)    Buyer shall deliver to Seller the Cash Amount in immediately available funds by wire transfer to an account of Seller with a bank in the United States designated by Seller, by notice to Buyer, which notice shall be delivered not later than two Business Days prior to the date of the Closing (the "<u>Closing Date</u>") (or if not so designated, then by certified or official bank check payable in immediately available funds to the order of Seller in such amount).

(b)    Seller shall deliver to Buyer such deeds, bills of sale, assignments and other instruments of conveyance reasonably requested by Buyer to vest in Buyer all of Seller's right, title and interest in, to and under the Purchased Assets.

(c)    Seller and Buyer shall enter into an Assignment and Assumption Agreement in a form reasonably satisfactory to the Buyer.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF SELLER

Subject to the entry of the Sale Order, Seller hereby represents and warrants to Buyer as follows:

**Section 3.1**    **Organization and Standing; Authority**.  Seller is a corporation validly existing and in good standing under the laws of its jurisdiction of incorporation and has all corporate powers and all governmental licenses, authorizations, permits, consents and approvals required to enter into this Agreement and the transactions contemplated thereunder.  Seller has heretofore delivered to Buyer true and complete copies of the certificate of incorporation and bylaws of Seller as currently in effect.  Subject to approval of this Agreement by the Bankruptcy Court, Seller has all requisite corporate power and authority to enter into this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby.  Subject to approval by the Bankruptcy Court, (a) all corporate acts and other proceedings required to be taken by Seller to authorize the execution, delivery and performance of this

Agreement and the consummation of the transactions contemplated hereby have been duly and properly taken and (b) this Agreement has been duly executed and delivered by Seller and constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

Section 3.2    **No Conflicts; Consents**.

(a)    Except as set forth in Schedule 3.2(a) or as excused by the Bankruptcy Code, the execution and delivery of this Agreement by Seller do not, and the consummation of the transactions contemplated hereby and compliance with the terms hereof will not, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation, modification or acceleration of any obligation under, or loss of a benefit relating to the Purchased Assets under, or result in the creation of any Lien (other than any Permitted Lien) upon any of the Purchased Assets under, any provision of (i) the certificate of incorporation or bylaws of Seller, (ii) assuming the obtaining of all of the Required Consents, any loan or credit agreement, note, bond, mortgage, indenture, lien, lease or any other contract, agreement, instrument, permit, commitment, concession, franchise or license applicable to the Seller or its properties or assets or the Purchased Assets or (iii) any judgment, injunction, order or decree, or statute, law, ordinance, rule or regulation applicable to Seller or its assets.

(b)    No material consent, approval, grant, concession, agreement, franchise, license, permit, order or authorization of, or registration, declaration or filing with, any Governmental Entity is required to be obtained or made by or with respect to Seller in connection with the execution, delivery and performance of this Agreement or the consummation of the transactions contemplated hereby, other than (i) compliance with any notices, motions, orders or approvals required by the Bankruptcy Court or the Bankruptcy Code and the rules thereunder, (ii) those set forth on Schedule 3.2(a) and (iii) those that may be required solely by reason of Buyer's participation in the transactions contemplated hereby.

Section 3.3    **Sufficiency of and Title to the Purchased Assets**.  As of the Closing Date, Seller has good and marketable title to each of the Purchased Assets that is owned by it, and valid leasehold interests in each of the Purchased Assets that is leased by it.  Each of the Purchased Assets: (i) as of the Closing Date is free and clear of all Liens, except the Permitted Liens; (ii) as of the Closing Date is not subject to any pending actions relating to any such property, except as set forth in Schedule 3.3(a)(ii); (iii) has received all approvals of Governmental Entities (including licenses) required in connection with the ownership or operation thereof and has been operated and maintained in accordance with applicable laws, rules and regulations; and (iv) is not subject to any lease, sublease, license, concession, or other agreement, written or oral, granting to any party or parties the right of use or occupancy of any portion of any property or right of way.  As of the Closing, each item of the Purchased Assets is in the working order and state of repair it was in on the date of this Agreement, ordinary wear and tear excepted.

Section 3.4    **Required Consents**.  Schedule 3.4 sets forth each agreement, contract or other instrument binding upon Seller requiring a consent or other action by any person as a result of the execution, delivery and performance of this Agreement, unless such document can be

assumed and assigned without such consent under the Bankruptcy Code, except such consents or actions as would not, individually or in the aggregate, have a material adverse effect on the Purchased Assets and Assumed Liabilities, taken together, or the Business if not received or taken (the "Required Consents").

Section 3.5    **Material Contracts**.  To the Knowledge of Seller:

(a)    except as set forth in Schedule 3.5(a), as of the date hereof, Seller is not a party to or bound by:

(i)    any (A) lease for real property or (B) lease for personal property requiring aggregate payments after Closing of $100,000 or more;

(ii)    any agreement for the purchase by Seller of materials, supplies, goods, services, equipment or other assets that has a term of at least one year or that requires aggregate payments after Closing of $100,000 or more;

(iii)    any agreement for the sale by Seller of materials, supplies, goods, services, equipment or other assets that has a term of at least one year or that requires aggregate payments after Closing of $100,000 or more;

(iv)    any other agreement that requires aggregate payments after Closing of $25,000 or more;

(v)    any partnership, joint venture or other similar agreement or arrangement;

(vi)    any content license or distribution, marketing, agency or other similar agreement;

(vii)    any agreement with any investor or affiliate of Seller other than agreements relating to their investment in Seller;

(viii)    any agreement that limits the freedom of Seller to compete in any line of business or with any person or in any area or to own, operate, sell, transfer, pledge or otherwise dispose of or encumber any Purchased Asset or which would so limit the freedom of Buyer after the Closing Date; or

(ix)    any other agreement, commitment, arrangement or plan that is material to the Purchased Assets and the Assumed Liabilities, taken together, or the Business.

(b)    Each agreement listed in Schedule 3.5(a) is a valid and binding agreement of Seller and is in full force and effect, except as enforceability may be limited by any applicable bankruptcy, reorganization, insolvency or other laws affecting creditors' rights generally or by general principles of equity, regardless of whether such enforceability is considered in equity or law, and none of Seller or any other party thereto is in default or breach in any material respect under the terms of any such agreement, which would not be cured by the payment of the Cure

Amount, and no event or circumstance has occurred that, with notice or lapse of time or both, would constitute any event of default thereunder. True and complete copies of each such agreement have been delivered to Buyer.

(c)     The agreements marked with an asterisk on <u>Schedule 3.5(a)</u> represent all of the material agreements of Seller are or may be advantageous to the Business. The cure amount, if any, for each such agreement is set forth next to such agreement on <u>Schedule 3.5(a)</u>.

**Section 3.6     Intellectual Property**. To the Knowledge of Seller

(a)     <u>Schedule 3.6(a)</u> contains a true and complete list of each trademark (including service marks and logos), corporate name, trade name, domain name, patent, subscriber list, registered copyright and any material third party computer software other than "shrink-wrap and similar widely-available binary code and commercial end-user licenses that are available for less than $5,000 (including any registrations or applications for registration of any of the foregoing) owned, licensed or used by Seller as of the date hereof, which schedule indicates whether the right is owned or licensed by Seller and, if licensed, the name of the third party licensor (the "<u>Scheduled Intellectual Property</u>"). With respect to the Scheduled Intellectual Property, such schedule also specifies, to the extent applicable, (i) the jurisdictions in which such, rights are registered or in which an application for registration has been filed; (ii) the registration or application numbers; and (iii) with respect to the trademarks, the renewal dates.

(b)     Other than "shrink-wrap" and similar widely-available binary code and commercial end-user licenses that are available for less than $5,000, <u>Schedule 3.6(b)</u> sets forth a list of all licenses, sublicenses and other agreements as to which Seller is a party and pursuant to which any third party may assert claims against the Purchased Assets from and after the Closing Date.

(c)     Seller has good and marketable title to or a valid license to use all Intellectual Property Rights owned, licensed or used by Seller, free and clear of any Lien. None of such Intellectual Property Rights has been adjudged invalid or unenforceable in whole or part, and all such Intellectual Property Rights are valid and enforceable. Seller has taken reasonable steps in accordance with normal industry practice to maintain and protect the owned Intellectual Property Rights and their rights in the licensed Intellectual Property Rights, including payment of applicable maintenance fees and filing of applicable statements of use, except as has been agreed upon by the Seller and Buyer with respect to certain applications outside the United States and Canada. Except as set forth in <u>Schedule 3.6(c)</u>, the use by Seller of the Scheduled Intellectual Property does not infringe, misappropriate or otherwise violate the rights of any other person and, no other person is infringing, misappropriating or otherwise violating any such Intellectual Property Rights.

(d)     With respect to pending applications and applications for registration of the Scheduled Intellectual Property, Seller and its affiliates are not aware of any reason that could reasonably be expected to prevent any such application or application for registration from being granted with coverage substantially equivalent to the latest amended version of the pending application or application for registration, except as set forth in <u>Schedule 3.6(d)</u>. None

of the trademarks and applications for trademarks included in the Scheduled Intellectual Property has been the subject of an opposition or cancellation procedure.

(e)     Seller has taken reasonable steps in accordance with normal industry practice to maintain the confidentiality of all confidential Intellectual Property Rights owned, licensed or used by Seller.  None of the Scheduled Intellectual Property, the value of which is contingent upon maintaining the confidentiality thereof, has been disclosed other than (x) to employees, representatives and agents of Seller all of whom are bound by written confidentiality agreements substantially in the form previously disclosed to Buyer and (y) to third parties bound by written confidentiality agents.

(f)     The consummation of the transactions contemplated by this Agreement will not alter, impair or extinguish any Intellectual Property Rights owned, licensed or used by Seller.  Except as set forth in <u>Schedule 3.6(f)</u>, there exist no restrictions on the disclosure, use or transfer of any such owned Intellectual Property Rights.

(g)     Seller has not given an indemnity in connection with any Intellectual Property Rights to any person.

(h)     Neither Seller nor any of its affiliates has infringed, misappropriated or otherwise violated, any Intellectual Property Rights of any third person.  There is no material claim, action, suit, investigation or proceeding pending against, or threatened against or affecting, the Business or the Purchased Assets or any present or former officer, director or employee (in their capacity as such) of Seller (i) based upon, or challenging or seeking to deny or restrict, the rights of Seller in any of the Intellectual Property Rights owned, licensed or used by Seller, (ii) alleging that the use of any such Intellectual Property Rights or any services provided or processes used do or may infringe, misappropriate or otherwise violate any Intellectual Property Right of any third party or (iii) alleging that Seller or any affiliate of Seller infringed, misappropriated or otherwise violated any Intellectual Property Right of any third party.

    **Section 3.7    <u>Litigation</u>**.  <u>Schedule 3.7</u> contains an accurate list of all legal actions, suits and proceedings related to the Business or the Purchased Assets pending as of the date hereof against any Seller.  Except as described in <u>Schedule 3.7</u>, there is no action, suit, investigation or proceeding (or any basis therefor) pending against, or to the Seller's Knowledge, threatened against or affecting, the Business, any Purchased Asset before any court or arbitrator or any governmental body, agency or official which, individually or is the aggregate, could reasonably be expected to be material to the Purchased Assets and Assumed Liabilities, taken together, or the Business, or which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the transactions contemplated by this Agreement.

    **Section 3.8    <u>Compliance with Laws and Court Orders</u>**.  Seller is not in violation of and has not violated and, to the Seller's Knowledge, is not under investigation with respect to and has not been threatened to be charged with or given notice of any violation of, any law, rule, regulation, judgment, injunction, order or decree applicable to the Business or the Purchased Assets, except for violations that have not had and could not reasonably be expected to be material to the Purchased Asset and Assumed Liabilities, taken, together, or the Business.

Section 3.9    **Brokers and Finders**.  There is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of Seller who might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

Section 3.10    **Subsidiaries**.  Seller has no subsidiaries.

Section 3.11    **No Warranties**.  Except as expressly provided herein, neither Seller nor any other Person makes any express or implied representation or warranty on behalf of Seller. ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, ARE EXCLUDED FROM THE SALE AND TRANSFER OF THE PURCHASED ASSETS AND THE ASSUMED LIABILITIES.  THE FOREGOING PROVISION DOES NOT AFFECT THE VALIDITY OF THE REPRESENTATIONS AND WARRANTIES PRIOR TO CLOSING, IT BEING THE INTENTION OF EACH OF THE PARTIES (SELLER, ON THE ONE HAND, AND, BUYER, ON THE OTHER) THAT THE ACCURACY OF THE REPRESENTATIONS AND WARRANTIES IS A CONDITION TO THE OTHER PARTY'S OBLIGATIONS HEREUNDER.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows:

Section 4.1    **Organization and Standing; Authority**.  Buyer is a corporation duly formed, validly existing and in good standing under the laws of the State of Delaware and has all corporate powers and all material governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted.  Buyer has all requisite corporate power and authority to enter into this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby to be consummated by Buyer.  All corporate acts and other proceedings required to be taken by Buyer to authorize the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby to be consummated by Buyer have been duly and properly taken.  This Agreement has been duly executed and delivered by Buyer and constitutes a legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

Section 4.2    **No Conflicts; Consents**.

(a)    The execution and delivery of this Agreement by Buyer do not, and the consummation of the transactions contemplated hereby and compliance with the terms hereof will not, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation, modification or acceleration of any obligation under, any provision of (i) the certificate of incorporation or bylaws of Buyer or other comparable governing instruments of Buyer, as the case may be, or the comparable governing instruments of any subsidiary of Buyer or (ii) any judgment, injunction, order, decree, statute, law, ordinance, rule or regulation applicable to Buyer or its assets.

(b)    No material consent, approval, grant, concession, agreement, franchise, license, permit, order or authorization of, or registration, declaration or filing with, any Governmental Entity is required to be obtained or made by or with respect to Buyer or its Affiliates in connection with the execution, delivery and performance of this Agreement or the consummation of the transactions contemplated hereby, other than (i) compliance with any notices, motions, orders or approvals required by the Bankruptcy Court or the Bankruptcy Code and the rules thereunder and (ii) those that may be required solely by reason of Seller's participation in the transactions contemplated hereby.

**Section 4.3**    **Availability of Funds**.    Buyer has cash available sufficient to enable Buyer to purchase the Purchased Assets and otherwise consummate the transactions contemplated by this Agreement in a timely manner.

**Section 4.4**    **Brokers and Finders**.    There is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of Buyer who might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

**Section 4.5**    **Actions and Proceedings, etc.**    There are no (a) outstanding judgments, orders, injunctions or decrees of any Governmental Entity or arbitration tribunal against Buyer or any of its respective Affiliates, (b) lawsuits, actions or proceedings pending or, to the knowledge of Buyer, threatened against Buyer or any of its Affiliates, or (c) investigations by any Governmental Entity which are, to the knowledge of Buyer, pending or threatened against Buyer or any of its Affiliates, and which, in the case of each of clauses (a), (b) and (c), have a material adverse effect on the ability of Buyer to consummate the transactions contemplated hereby to be consummated by Buyer.

**Section 4.6**    **No Warranties**.    Except as expressly provided herein, neither Buyer nor any other Person makes any express or implied representation or warranty on behalf of Buyer. THE FOREGOING PROVISION DOES NOT AFFECT THE VALIDITY OF THE REPRESENTATIONS AND WARRANTIES PRIOR TO CLOSING, IT BEING THE INTENTION OF EACH OF THE PARTIES (SELLER, ON THE ONE HAND, AND, BUYER, ON THE OTHER) THAT THE ACCURACY OF THE REPRESENTATIONS AND WARRANTIES IS A CONDITION TO THE OTHER PARTY'S OBLIGATIONS HEREUNDER.

**Section 4.7**    **Assignment of WL Debt**.    The Assignment, dated January 21, 2015, by Warren Lieberfarb in favor of the Buyer, has been duly executed and delivered.

## ARTICLE 5
## COVENANTS OF SELLER

Seller agrees that:

**Section 5.1**    **Conduct of the Business**.    From the date hereof until the Closing Date, subject to the requirements and restrictions of the Bankruptcy Court proceedings, Seller shall use its best efforts to preserve the Purchased Assets, to conduct the Seller's Business in the ordinary course of business consistent with past practice, and to maintain and preserve intact its current

Business organization, operations and franchise and to preserve the rights, franchises, goodwill and relationships of its employees, customers, lenders, suppliers, regulators and others having relationships with the Business.

### Section 5.2 Access to Information; Assistance.

(a)    From the date hereof until the Closing Date, Seller will (i) give Buyer, its counsel, financial advisors, auditors and other authorized representatives access to the offices, properties, books and records of Seller relating to the Business or the Purchased Assets, (ii) furnish to Buyer, its counsel, financial advisors, auditors and other authorized representatives such financial and operating data and other information relating to the Business or the Purchased Assets as such Persons may reasonably request, if such access would not constitute a waiver of the attorney client privilege, and (iii) instruct the agents, counsel and financial advisors of Seller to cooperate with Buyer in its investigation of the Business. In addition, Seller will ensure that all equipment and machinery containing the Purchased Assets shall remain available to Buyer for ten days after the Closing. Any investigation pursuant to this Section 5.2 shall be conducted in such manner as not to interfere unreasonably with the conduct of the Seller. No investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Seller under this Agreement. Notwithstanding the foregoing, Buyer shall not have access to personnel records of Seller relating to individual performance or evaluation records, medical histories or other information which in Seller's good faith opinion is sensitive or the disclosure of which could subject Seller to risk of liability.

(b)    After the Closing, the Seller will hold, and will cause its respective officers, directors, employees, accountants, counsel, consultants, advisers and agents to hold, in confidence, unless compelled to disclose by judicial or administrative process or by other requirements of law, all confidential documents and information concerning the Business, except to the extent that (i) such information can be shown to have been in the public domain through no fault of Seller or its Affiliates or (ii) later lawfully acquired on a nonconfidential basis by Seller or its Affiliates from sources other than those related to their prior ownership of the Purchased Assets or the Business. In addition, the Seller agrees to cooperate with Buyer in Buyer's enforcement of nondisclosure agreements with respect to the Purchased Assets transferred to Buyer hereunder, provided that Buyer shall reimburse reasonable costs in connection with such enforcement.

### Section 5.3 Notices of Certain Events.

(a)    Seller shall promptly notify Buyer of:

(i)    any notice or communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(ii)    any notice or other communication from any Governmental Entity in connection with the transactions contemplated by this Agreement;

(iii)    any actions, suits, claims, investigations or proceedings commenced or, to the Seller's Knowledge, threatened against, relating to or involving or otherwise affecting Seller or the Purchased Assets or the Assumed Liabilities, that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to Section 3.7, that relate to the consummation of the transactions contemplated by this Agreement; and

(iv)    the damage or destruction by fire or other casualty of any material Purchased Asset or any material part thereof or if any material Purchased Asset or any material part thereof becomes the subject of any proceeding or, to the Seller's Knowledge, threatened proceeding, for the taking thereof or any part thereof or of any right relating thereto by condemnation, eminent domain or other similar governmental action.

(b)    Seller shall promptly notify Buyer of, and furnish Buyer any information which Buyer may reasonably request with respect to, the occurrence to the Seller's Knowledge of any event or condition or the existence to the Seller's Knowledge of any fact that would cause any of the conditions to Buyer's obligations to consummate the purchase and sale of the Purchased Assets not to be fulfilled. If between the date hereof and the Closing Date, any of the matters referenced in Section 5.3(a)(iv) shall have occurred, then Seller, at its option, shall either repair any damage or casualty at its expense or deliver to Buyer on the Closing Date any insurance proceeds (including but not limited to condemnation insurance proceeds), or rights to receive insurance proceeds, with respect thereto or the Purchase Price shall be reduced by such amount.

**Section 5.4    Bankruptcy Court Approval.**

(a)    Within three days from the date hereof, Seller shall file a motion seeking the approval of sale procedures (the "Sale Procedures Motion").  Seller shall pursue the Sale Procedures Motion and seek entry of the order therein in the form attached hereto as Exhibit A (the "Sale Procedures Order") on the grounds that, *inter alia*, the New DIP Loan provided by Buyer has preserved the value of Seller's assets and the negotiation of the Agreement by Buyer and its offer for the Purchased Assets will maximize the value to be obtained from the Purchased Assets.

(b)    As soon as practicable after execution of this Agreement, Seller shall file with the Bankruptcy Court an application or motion (the "Sale Motion") (reasonably satisfactory in form and substance to Buyer) on shortened time seeking:

(i)    approval of all transactions contemplated under the Agreement on the terms contained herein and the performance of Seller of its obligations under the Agreement, including without limitation the sale, transfer, assignment, conveyance and delivery of the Purchased Assets to Buyer (or its successors or permitted assigns) free and clear of all Liens (except for the Permitted Liens);

(ii)    approval of the Seller's assumption and assignment of all of the Assumed Contracts to Buyer;

(iii)     approval of the Breakup Fee on the grounds that, *inter alia*, the New DIP Loan provided by Buyer has preserved the value of the Seller's assets and the negotiation of the Agreement by Buyer and its offer for the Purchased Assets will maximize the value to be obtained from the Purchased Assets for the benefit of all creditors;

(iv)     entry of the Sale Order; and

(v)     relief from the 14-day stay imposed by Rule 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure.

(c)     Consistent with the Sale Procedures Order, Seller shall provide written notice to each of the non-Seller parties to each Assumed Contract of their intent to assume and assign such Assumed Contracts (including any Cure Amounts) to Buyer.

(d)     Seller further agrees to promptly take such actions as are reasonably requested by Buyer to assist in obtaining Bankruptcy Court approval of the Agreement and entry of the Sale Order, including without limitation furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court.

**Section 5.5     Permits**.  Prior to the Closing Date, Seller shall use its commercially reasonable efforts (i) to identify all material permits necessary to transfer the Purchased Assets on the Closing Date and necessary to operate the Business from and after the Closing Date and (ii) to obtain consents to the transfer of such material permits which are transferable to Buyer at or prior to Closing.  Prior to and after the Closing, Seller shall cooperate with Buyer with respect to the transfer of all material permits.

**Section 5.6     Cure Amounts**.  Unless the Bankruptcy Court orders otherwise, promptly after the Closing, Seller shall pay all amounts, as determined by the Bankruptcy Court or otherwise agreed upon, required under Section 365 of the Bankruptcy Code to cure any and all defaults under the Assumed Contracts and to compensate the parties to the Assumed Contracts for any actual pecuniary losses resulting from such defaults (the "Cure Amount"), which amounts shall be advanced by Buyer to Seller for such payment.

**Section 5.7     Name Changes**.  Promptly, but in no event later than 30 days, after the Closing, Seller agrees (a) to change the name of each Seller to some other name not using the word "Image Trends" and (b) after the Closing, until papers are duly filed with the applicable Secretaries of State to effect such name changes, not to use the name of Seller in any way for the purpose of selling or marketing any product or service or otherwise in any manner which does or might compete with Buyer or, in any other way which, in the Buyer's reasonable judgment, could be detrimental to Buyer's enjoyment of the rights and goodwill it sought when it paid for and acquired the assets of Seller, except as expressly agreed by Buyer in its sole discretion. Seller shall also file a motion with the Bankruptcy Court to change the caption of the Bankruptcy Case to reflect such name change.

## ARTICLE 6
## COVENANTS OF BUYER

Buyer agrees that:

**Section 6.1     Confidentiality**.  Prior to the Closing Date, the Nondisclosure Agreement shall remain in full force and effect.  After the Closing, Buyer shall continue to be subject to the Nondisclosure Agreement to the extent that Buyer has received from Seller any information which relates to an Excluded Asset or Excluded Liability.

**Section 6.2     No Additional Representations**.  Buyer acknowledges and agrees that none of Seller nor any other Person has made any representation or warranty, expressed or implied, with respect to (i) the transactions contemplated hereby, (ii) Seller or Seller's assets, liabilities or Business, or (iii) the accuracy or completeness of any information regarding Seller furnished or made available to Buyer and its representatives, except as expressly set forth in this Agreement.

**Section 6.3     Assignment to Affiliate**.  Prior to the Closing, upon not less than two (2) Business Days' notice to Seller, Buyer may assign to its Affiliate all of its rights under this Agreement and cause its Affiliate to assume all of the liabilities and obligations of Buyer under this Agreement.

**Section 6.4     Buyer's Cooperation**.   Buyer shall use its commercially reasonable efforts to cooperate in providing such information and evidence as is necessary to obtain the orders described in Section 5.4.

**Section 6.5     Delivery of List of Assumed Contracts**.  Buyer shall deliver to Seller on or before the date hereof a list of contracts Buyer has designated as the Assumed Contracts, provided that Buyer may remove contracts from that list at any time prior to 30 days after the Closing.

## ARTICLE 7
## COVENANTS OF ALL PARTIES

Buyer and Seller agree that:

**Section 7.1     Commercially Reasonable Efforts; Further Assurances**.

(a)     Subject to the terms and conditions of this Agreement, Buyer and Seller will each use their commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable laws and regulations to consummate the transactions contemplated by this Agreement.  Seller and Buyer each agree to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or desirable in order to consummate or implement expeditiously the transactions contemplated by this Agreement and to vest in Buyer good and marketable title to the Purchased Assets.

(b)    Seller hereby constitute and appoint, effective as of the Closing Date, Buyer and its successors and assigns as the true and lawful attorney of Seller with full power of substitution in the name of Buyer or in the name of Seller, but for the benefit of Buyer (i) to collect for the account of Buyer any items of Purchased Assets and (ii) to institute and prosecute all proceedings which Buyer may in its sole discretion deem proper in order to assert or enforce any right, title or interest in, to or under the Purchased Assets, and to defend or compromise any and all actions, suits or proceedings in respect of the Purchased Assets.  Buyer shall be entitled to retain for its own account any amounts collected pursuant to the foregoing powers, including any amounts payable as interest in respect thereof.

(c)    Subject to the terms and conditions of this Agreement, Buyer and Seller will each use their commercially reasonable efforts to take all action and to do all things necessary, proper, or advisable to consummate and make effective the transactions contemplated by this Agreement (including without limitation Seller's use of its commercially reasonable efforts to file any and all necessary documents to transfer or assign the domain names with the applicable registrar of domain names) and to obtain approval and entry of the Sale Order.

**Section 7.2    Certain Filings**.  Seller and Buyer shall cooperate with one another (a) in determining whether any action by or in respect of, or filing with, any Governmental Entity is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material contracts, in connection with the consummation of the transactions contemplated by this Agreement and (b) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

**Section 7.3    Public Announcements**.  The parties agree to consult with each other before issuing any press release or making any public statement with respect to this Agreement or the transactions contemplated hereby and, except as may be required by applicable law or any listing agreement with any national securities exchange, will not issue any such press release or make any such public statement prior to such consultation.

**Section 7.4    Post-Closing Access to Books and Records**.  After the Closing Date, the parties agree that they will each cooperate with and make available to the other party, during normal business hours, all Books and Records, information or employees (without substantial disruption of employment) retained and remaining in existence after the Closing Date which are necessary or useful in connection with any inquiry relating to Taxes or any audit, investigation or dispute, any litigation or investigation or any other matter requiring any such Books and Records, information or employees for any reasonable business purpose including to administer the chapter 11 case in an orderly fashion.  The party requesting any such Books and Records, information shall bear all of the out-of-pocket costs and expenses (including, without limitation, attorneys' fees, but excluding reimbursement for general overhead, salaries and employee benefits) reasonably incurred in connection with providing such Books and Records, information or employees.  Seller may require certain financial information relating to the Business for periods prior to the Closing Date for the purpose of filing federal, state, local and foreign Tax Returns and other governmental reports, and Buyer agrees to furnish such information to Seller at Seller's request and expense.

## ARTICLE 8
## TAX MATTERS

**Section 8.1**    **Tax Matters**. Seller hereby represents and warrants to Buyer that:

(a)    Seller duly and timely filed or caused to be filed (taking into account any extension of time within which to file) all Tax Returns required to be filed by it prior to or on the Closing Date, all such filed Tax Returns are correct and complete in all respects, and all Taxes owed by it (whether or not shown as due on any Tax Return) have been duly and timely paid to the appropriate Governmental Entity.

(b)    There are no Liens on any of the Purchased Assets that arose in connection with any failure (or alleged failure) to pay any Tax other than Permitted Liens. Seller has established, in accordance with generally accepted accounting principles applied on a basis consistent with that of preceding periods, adequate reserves for the payment of, and will timely pay, all Tax liabilities, assessments, interest and penalties which arise from or with respect to the Purchased Assets or the operation of the Business and are incurred in or attributable to any Pre-Closing Tax Period, the non-payment of which would result in a Lien on any Purchased Asset, would otherwise adversely affect the Business or would result in Buyer becoming liable therefor.

(c)    No audit of any Tax Return filed by the Seller is pending or, to the knowledge of the Seller, threatened by any Governmental Entity, and the Seller has not waived any statute of limitations in respect of the payment of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency. There is no dispute or claim concerning any Tax liability of the Seller claimed or raised by any Governmental Entity, and the Seller is not presently contesting any Tax liability alleged to be owed by it.

(d)    The Seller has not received any written notice from a Governmental Entity with respect to any jurisdiction in which any of the Seller does not file Tax Returns claiming that the Seller is or may be subject to taxation by that jurisdiction.

(e)    At the Closing, Seller shall provide a schedule reflecting accrued and unpaid real and personal property Taxes on all Purchased Assets using a ratable daily accrual method. Seller will furnish Buyer with an analysis of this amount itemized by property and jurisdiction.

**Section 8.2**    **Tax Cooperation; Allocation of Taxes**.

(a)    Buyer and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Purchased Assets and the Business as is reasonably necessary for the filing of all Tax Returns, and making of any election related to Taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax return. Seller and Buyer shall cooperate with each other in the conduct of any audit or other proceeding related to Taxes involving the Business and each shall execute and deliver such documents as are necessary to carry out the intent of this paragraph (a) of <u>Section 8.2</u>.

(b)     All Apportioned Obligations shall be apportioned between Seller and Buyer as of the Closing Date based on the number of days of the relevant taxable period included in the Pre-Closing Tax Period and the number of days of such taxable period included in the Post-Closing Tax Period.  Seller shall be liable for the proportionate amount of such taxes that is attributable to the Pre-Closing Tax Period, and Buyer shall be liable for the proportionate amount of such taxes that is attributable to the Post-Closing Tax Period.

Within 90 days after the Closing, Seller and Buyer shall each present a statement to the other setting forth the amount of reimbursement to which each is entitled under this Section 8.2(b) together with such supporting evidence as is reasonably necessary to calculate the proration amount.  The proration amount shall be paid by the party owing it to the other within 10 days after delivery of such statement.  Thereafter, Seller shall notify Buyer upon receipt of any bill for real or personal property taxes relating to the Purchased Assets, part or all of which is attributable to the Post-Closing Tax Period, and shall promptly deliver such bill to Buyer, who shall pay the same to the appropriate taxing authority, provided that if such bill covers the Pre-Closing Tax Period, Seller shall also remit prior to the due date of assessment to Buyer, payment for the proportionate amount of such bill that is attributable to the Pre-Closing Tax Period.  If either Seller or Buyer shall thereafter make a payment for which it is entitled to reimbursement under this Section 8.2(b), the other party shall make such reimbursement promptly but in no event later than 30 days after the presentation of a statement setting forth the amount of reimbursement to which the presenting party is entitled along with such supporting evidence as is reasonably necessary to calculate the amount of reimbursement.  Any payment required under this Section and not made within 10 days of delivery of the statement shall bear interest at the rate per annum determined, from time to time, under the provisions of Section 6621(a)(2) of the IRC for each day until paid.

(c)     Any transfer, documentary, sales, use or other similar Taxes assessed upon or with respect to the transfer of the Purchased Assets to Buyer and any recording or filing fees with respect thereto shall be paid by Seller.

**Section 8.3**     **Transfer Taxes**.  All transfer taxes incurred as a result of the transactions contemplated hereby shall be paid by Seller.  In the event sales, use or other transfer taxes are assessed at Closing or at any time thereafter on the transfer of any other Assets, such taxes incurred as a result of the transactions contemplated hereby shall be paid by Seller.

**Section 8.4**     **Tax Payments Made by Buyer**.  Any payments made by Buyer for which it is entitled to reimbursement under Section 8.2(b) and Section 8.3 of this Agreement shall constitute allowed super-priority administrative expense claims against the Seller's estates with priority over any and all administrative expenses of the kind specified in Bankruptcy Code Sections 503(b) and 507(b).

## ARTICLE 9
## CONDITIONS TO CLOSING

**Section 9.1**     **Conditions to Buyer's Obligations**.     The obligation of Buyer to consummate the Closing is subject to the satisfaction (or waiver by Buyer, without further notice to parties in interest or approval by the Bankruptcy Court) of the following conditions:

(a)      The representations and warranties of Seller made in this Agreement shall be true and correct in all material respects as of the Closing Date as though made as of such time, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date).  Seller shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by Seller by the Closing Date.  Seller shall have delivered to Buyer a certificate dated the Closing Date confirming the foregoing.

(b)      No provision of any applicable statute, rule, regulation, executive order, decree, temporary restraining order, judgment, preliminary or permanent injunction or other order enacted, entered, promulgated, enforced or issued by any Governmental Entity shall be in effect that (x) prevents the sale and purchase of the Purchased Assets or any of the other transactions contemplated by this Agreement, (y) would adversely affect or interfere with the operation of the Business previously conducted after the Closing, or (z) would require Buyer or any of its Affiliates to sell or otherwise dispose of, hold separate or otherwise divest itself of, or operate in any particular manner, any of the Purchased Assets or any of the assets, properties or business of Buyer or any of its Affiliates.

(c)      There shall not be pending or threatened by any Governmental Entity any suit, action or proceeding, (i) challenging or seeking to restrain, prohibit, alter or materially delay the sale and purchase of the Purchased Assets or any of the other transactions contemplated by this Agreement, or seeking to obtain from Buyer or any of its Affiliates in connection with the sale and purchase of the Purchased Assets any material damages or (ii) seeking to prohibit Buyer or any of its Affiliates from effectively controlling or operating a material portion of the Business or the Purchased Assets.

(d)      Seller shall have received all Required Consents as set forth in Schedule 3.4.

(e)      The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not have been modified, amended or stayed, except as agreed to by Buyer, and shall have become a Final Order.

(f)      The Intellectual Property Rights shall be transferred to the Buyer, and upon Closing shall be free and clear of all liens, claims, interests and encumbrances of any kind or nature whatsoever.

(g)      All documentation that is necessary to transfer and assign to Buyer the Intellectual Property Rights or to perfect and record such transfer and assignment shall have been delivered to Buyer.

(h)      Seller shall have provided a properly executed certificate of non-foreign status in a form meeting the requirements of Treasury Regulations Section 1.1445-2(b)(2).

(i)      Seller shall have executed and delivered to Buyer appropriate assignment agreements in respect of any Intellectual Property Rights constituting Purchased Assets.

**Section 9.2** **Conditions to Obligation of Seller**.  The obligation of Seller to consummate the Closing is subject to the satisfaction (or waiver by Seller, without further notice to parties in interest or approval by the Bankruptcy Court) of the following conditions:

(a)     The representations and warranties of Buyer made in this Agreement shall be true and correct as of the Closing Date as though made as of such time, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date).  Buyer shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by Buyer by the Closing Date.  Buyer shall have delivered to Seller a certificate dated the Closing Date and signed by the chief financial officer or other similar officer of Buyer confirming the foregoing and certifying the resolutions of Buyer's Board of Directors approving the transactions contemplated hereunder.

(b)     No provision of any applicable statute, rule, regulation, executive order, decree, temporary restraining order, judgment, preliminary or permanent injunction or other order enacted, entered, promulgated, enforced or issued by any Governmental Entity shall be in effect that prevents the sale and purchase of the Purchased Assets or any of the transactions contemplated by this Agreement.

(c)     There shall not be pending or threatened by any Governmental Entity any suit, action or proceeding, (i) challenging or seeking to restrain, prohibit, alter or materially delay the sale and purchase of the Purchased Assets or any of the other transactions contemplated by this Agreement or seeking to obtain from Seller in connection with the sale and purchase of the Purchased Assets any material damages.

(d)     The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not have been modified, amended or stayed, except as agreed to by Seller, and shall have become a Final Order.

**Section 9.3** **Frustration of Conditions**.  Neither Buyer nor Seller may rely on the failure of any condition set forth in Section 9.1 or 9.2, respectively, to be satisfied if such failure was caused by such party's failure to act in good faith or to use its reasonable efforts to cause the Closing to occur, as provided in this Agreement.

## ARTICLE 10
## SURVIVAL

**Section 10.1** **Survival**.  The covenants, agreements, representations and warranties of Seller and Buyer hereto contained in this Agreement or in any certificate or other writing delivered pursuant hereto or in connection herewith shall not survive the Closing except for the covenants and agreements contained herein which contemplate or specifically provide for performance after the Closing Date.

## ARTICLE 11
## TERMINATION

**Section 11.1    Grounds for Termination**.  This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written agreement of Seller and Buyer;

(b)    by either Seller or Buyer if the Closing shall not have been consummated on or before April 20, 2015; provided, that a party may not so terminate this Agreement if the reason for the failure to close by such date is due to the failure by such party to have satisfied a closing condition, a covenant or representation and warranty of such party hereunder;

(c)    by either Seller or Buyer if there shall be any law or regulation that makes the consummation of the transactions contemplated hereby illegal or otherwise prohibited or if consummation of the transactions contemplated hereby would violate any nonappealable final order, decree or judgment of any court or governmental body having competent jurisdiction;

(d)    by Buyer if (i) there is the entry of an order, which has not been withdrawn, dismissed or reversed dismissing the Bankruptcy Case or converting the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code, (ii) Seller files a motion, application or other petition to effect or consent to the foregoing or (iii) there is an Event of Default under the New DIP Loan;

(e)    by Buyer if the Sale Order shall not have been entered on or prior to February 28, 2015;

(f)    if the Bankruptcy Court shall have approved the sale of any or all of the Purchased Assets to a Person other than Buyer; and

(g)    by Buyer if the Sales Procedure Order shall not have been entered on or prior to January 27, 2015.

The party desiring to terminate this Agreement pursuant to clauses (b), (c), (d), (e), (f), or (g) shall give notice of such termination to the other parties.

**Section 11.2    Effect of Termination**.  If this Agreement is terminated as permitted by Section 11.1, such termination shall be without liability of any party (or any stockholder, director, officer, employee, agent, consultant or representative of such party) to the other party to this Agreement; provided that if such termination shall result from the willful failure of any party to fulfill a condition to the performance of the obligations of another party, failure to perform a covenant of this Agreement or breach by any party to this Agreement of any representation or warranty or agreement contained herein, such failing or breaching party shall be fully liable for any and all losses incurred or suffered by the other party as a result of such failure or breach; and provided further that if this Agreement is terminated pursuant to Section 11.1(d)(i), (d)(ii) or (f), Seller shall pay Buyer the Breakup Fee.  The provisions of Sections 5.2, 6.1, 11.2, 13.3, 13.4 and 13.5 shall survive any termination hereof pursuant to Section 11.1.

## ARTICLE 12
## MISCELLANEOUS

**Section 12.1   Notices**.  All notices or other communications required or permitted to be given hereunder shall be in writing and shall be delivered by hand, sent by confirmed fax or sent, postage prepaid, by registered, certified or express mail or reputable overnight courier service and shall be deemed given when so delivered by hand, confirmed faxed or if mailed, three days after mailing (one Business Day in the case of express mail or overnight courier service), as follows (or to such other address or telecopy number as the applicable party shall have notified the other parties in writing in accordance with this Section):

if to Buyer, to:

Astral Images Corporation
401 Congress Ave., Suite 1650
Austin, TX 78701
Attn:  Thomas Pickens
Email: TPickens@astrotechcorp.com

with a copy to:

Sheppard, Mullin, Richter & Hampton LLP
30 Rockefeller Plaza, 38th Floor
New York, NY 10112
Attn:  John R. Hempill

if to Seller, to:

Image Trends Incorporated
Building One, Suite 450
6300 Bridgepoint Parkway
Austin, TX 78730
Attn:  Terry Hazell
Email:  20tech13@gmail.com

with a copy to:

Hohmann, Taube & Summers, LLP
100 Congress Ave., Suite 1800
Austin, Texas 78701
Attn:  Morris D. Weiss, Esq.
Email: morrisw@hts-law.com

**Section 12.2   Amendments and Waivers**.

(a)      Any provision of this Agreement may be amended or waived prior to the Closing Date if, but only if, such amendment or waiver is in writing and is signed, in the case of

an amendment, by each party to this Agreement, or in the case of a waiver, by the party against whom the waiver is to be effective.

(b)     No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

**Section 12.3   Fees and Expenses**.

(a)     Except as otherwise provided herein, all costs and expenses incurred in connection with this Agreement shall be paid by the party incurring such cost or expense.

(b)     Seller shall pay (i) all fees or commissions of any investment banker, broker or finder retained by it that has acted for Seller in connection with this Agreement or the transactions contemplated hereby and (ii) the Breakup Fee if this Agreement is terminated pursuant to Section 11.1(f) as contemplated by Section 11.2.

(c)     Buyer shall pay all fees or commissions of any investment banker, broker or finder retained by it that has acted for Buyer in connection with this Agreement or the transactions contemplated hereby.

**Section 12.4   Successors and Assigns**.   The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided that no party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of the other party hereto except that, pursuant to Section 6.4, Buyer may transfer or assign, in whole or from time to time in part, to its Affiliate, the right to purchase all or a portion of the Purchased Assets.

**Section 12.5   Governing Law**.   This Agreement shall be governed by and construed in accordance with the law of the State of Texas, without regard to the conflicts of law rules of such state.

**Section 12.6   Counterparts; Effectiveness**.   This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.   This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other parties hereto.

**Section 12.7   Entire Agreement; Third Party Beneficiaries**.   This Agreement, and the documents referred to herein and therein constitute the entire agreement between the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, both written and oral, between the parties with respect to such subject matter.   No representation, inducement, promise, understanding, condition or warranty not set forth herein has been made or relied upon by any party hereto.   Neither this Agreement nor any provision hereof is intended to confer upon any Person other than the parties hereto any rights or remedies hereunder.

**Section 12.8**   **Captions**.  The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.

**Section 12.9**   **Severability**.  If any provision of this Agreement (or any portion thereof) or the application of any such provision (or any portion thereof) to any Person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision hereof (or the remaining portion thereof) or the application of such provision to any other Persons or circumstances.

**Section 12.10**  **Consent to Jurisdiction**.  Each party hereto irrevocably submits to the non-exclusive jurisdiction of the Bankruptcy Court for the purposes of any action, suit or other proceeding arising out of or related to this Agreement, or any transaction contemplated hereby but for no other purpose.   Each party hereto irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in the Bankruptcy Court, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

**Section 12.11** **WAIVER OF JURY TRIAL**.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY OTHER DOCUMENT REFERRED TO HEREIN OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**BUYER:**

**ASTRAL IMAGES CORPORATION**

BY: _____

    Name: Eric Stober

    Title: CFO

**SELLER:**

**IMAGE TRENDS INC.**

BY: _____

    Name:

    Title:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**BUYER:**

**ASTRAL IMAGES CORPORATION**

BY:_____
    Name:
    Title:


**SELLER:**

**IMAGE TRENDS INC.**


BY:_____
    Name: Torry C Hazell
    Title: Sole Director
            CEO

**Schedule 2.1**

**Permitted Liens**

Without conceding the validity of the liens or the underlying debt, and without forfeiting any valid defenses thereto, UCC filings exist in favor of Warren N. Lieberfarb and Dell Financial Services L.L.C.

**Schedule 2.1(a)**

**Assets**

| Room # | Classification | Personal Property | Serial Number | Quantity | Service Date | Fair Market Value | Total |
|---|---|---|---|---|---|---|---|
| Lobby | Furniture & Fixtures | Awards | | 16 | | | |
| 94054 | Furniture & Fixtures | Bench Work - Metal 60" W X 36 " D  X 37" H | | 1 | 2000 | $149.18 | **$149.18** |
| 94032 | Furniture & Fixtures | Bench Work - Metal 60" W X 36 " D  X 31 1/2 H | | 2 | 2000 | $149.18 | **$298.35** |
| 94036 | Furniture & Fixtures | Bench Work - Metal 60" W X 36 " D  X 31 1/2 H | | 2 | 2000 | $149.18 | **$298.35** |
| 94056 | Furniture & Fixtures | Blu-Ray Player - Toshiba | | 1 | 2011 | $30.00 | **$30.00** |
| 94024 | Furniture & Fixtures | Bookcase - Metal - 35 1/2 w X 14 1/2 D x 53 H | | 1 | 2001 | $45.90 | **$45.90** |
| 94028 | Furniture & Fixtures | Bookcase - Metal - 29 1/2 w X 14 1/2 D x 47 H | | 1 | 2001 | $45.90 | **$45.90** |
| 94034 | Furniture & Fixtures | Bookcase - Metal - 35 w X 14 1/2 D x 53 H | | 1 | 2001 | $45.90 | **$45.90** |
| 94048 | Furniture & Fixtures | Bookcase - Metal - 35 1/2 w X 14 1/2 D x 53 H | | 1 | 2001 | $45.90 | **$45.90** |
| 94052 | Furniture & Fixtures | Bookcase - Metal - 29 1/2 W x 15 1/2 D x 46 1/2 H | | 1 | 2001 | $38.25 | **$38.25** |
| 94054 | Furniture & Fixtures | Bookcase - Metal - 3 Shelf - 30 1/2 w X 14 1/2 D x 47 H | | 1 | 2001 | $38.25 | **$38.25** |
| Lobby | Furniture & Fixtures | Bookcase - Wood Laminate - 37 1/2" W x 15 1/2 " D x 43" H | | 2 | 2001 | $19.89 | **$39.78** |
| Lobby | Furniture & Fixtures | Bookcase - Wood Laminate - 37 1/2" W x 15 1/2 " D x 84" H | | 3 | 2001 | $38.25 | **$114.75** |
| 94046 | Furniture & Fixtures | Bookcase - Wood Laminate (36 W | | 1 | 2001 | $34.43 | **$34.43** |

| Room # | Classification | Personal Property | Serial Number | Quantity | Service Date | Fair Market Value | Total |
|---|---|---|---|---|---|---|---|
| | | X 12 D X 72 H) | | | | | |
| 94034 | Furniture & Fixtures | Bookcase - Wood Laminate (36 W X 12 D X 48 H) | | 1 | 2001 | $34.43 | **$34.43** |
| 94030 | Furniture & Fixtures | Bookcase - Wood Laminate (36 W X 12 D X 72 H) | | 1 | 2001 | $34.43 | **$34.43** |
| 94044 | Furniture & Fixtures | Bookcase - Wood Laminate (36 W X 12 D X 72 H) | | 1 | 2001 | $34.43 | **$34.43** |
| 94024 | Furniture & Fixtures | Bookcase - Wood Lamiate (36 W X 12 D X 66 H) | | 1 | 2001 | $34.43 | **$34.43** |
| 94038 | Furniture & Fixtures | Bookcase - Wood Lamiate (36 W X 12 D X 72 H) | | 1 | 2001 | $34.43 | **$34.43** |
| Lobby | Furniture & Fixtures | Bookcase - Wood Laminate (36 W X 12 D X 72 H) | | 2 | 2001 | $34.43 | **$68.85** |
| Lobby | Furniture & Fixtures | Box Binder | | 1 | 2001 | | **$0.00** |
| 94032 | Furniture & Fixtures | Cabinet - 16X30X72 inch metal storage | -- | 1 | 2001 | $76.50 | **$76.50** |
| 94032 | Furniture & Fixtures | Cabinet - 16X30X72 inch metal storage | -- | 1 | 2001 | $76.50 | **$76.50** |
| 94054 | Furniture & Fixtures | Cabinet - 19X19X24 | | 1 | 2001 | $30.00 | **$30.00** |
| 94024 | Machinery & Equip. | Calibration Weights 2KG-5g Serial# 7936 | | | 2003 | | **$0.00** |
| 94032 | Machinery & Equip. | Camera | | 1 | 2003 | $150.00 | **$150.00** |
| 94054 | Machinery & Equip. | Camera - CoolPix | | 1 | 2003 | | **$0.00** |
| 94026 | Furniture & Fixtures | Cart - Utility 34 x 17 1/2 x 32 | | 2 | 2001 | $26.78 | **$53.55** |
| Lobby | Furniture & Fixtures | Cart - Utility 40 x 25 1/2 x 32 | | 2 | 2001 | $26.78 | **$53.55** |
| 94036 | Furniture & Fixtures | Cart - RubberMaid | | 1 | 2001 | $30.00 | **$30.00** |
| 94052 | Furniture & Fixtures | Chair - Aeron Ergonomic Chair | | 1 | 2001 | $114.75 | **$114.75** |
| 94048 | Furniture & Fixtures | Chair - Aeron Ergonomic Chair | | 1 | 2001 | $114.75 | **$114.75** |
| 94046 | Furniture & Fixtures | Chair - Aeron Ergonomic Chair | | 1 | 2001 | $114.75 | **$114.75** |
| 94042 | Furniture & Fixtures | Chair - Amisco Industries - With | | 9 | 6/29/1999 | $7.65 | **$68.85** |

| Room # | Classification | Personal Property | Serial Number | Quantity | Service Date | Fair Market Value | Total |
|---|---|---|---|---|---|---|---|
| | | Wheels | | | | | |
| 94046 | Furniture & Fixtures | Chair - Black Leather | | 1 | 2001 | $57.38 | **$57.38** |
| 94030 | Furniture & Fixtures | Chair - Highback Exec./Conf. Tilt | | 1 | 2001 | $64.99 | **$64.99** |
| 94040 | Furniture & Fixtures | Chair - Highback Exec./Conf. Tilt Black | | 1 | 2001 | $64.99 | **$64.99** |
| 94028 | Furniture & Fixtures | Chair - Guest - Side With Arms - Fabric | | 2 | 2001 | $22.19 | **$44.37** |
| 94056 | Furniture & Fixtures | Chair - Highback Exec./Conf. Tilt | | 11 | 2001 | $64.99 | **$714.85** |
| 94048 | Furniture & Fixtures | Chair - Highback Exec. Tilt | | 1 | 2001 | | **$0.00** |
| 94038 | Furniture & Fixtures | Chair - Cloth - Tan | | 1 | 2001 | | **$0.00** |
| 94048 | Furniture & Fixtures | Chair - Side With Arms - Fabric | | 2 | 2001 | $7.65 | **$15.30** |
| 94052 | Furniture & Fixtures | Chair - Visitor - Fabric Red | | 1 | 2001 | $7.65 | **$7.65** |
| 94044 | Furniture & Fixtures | Chair - Highback Exec. Tilt | | 1 | 2001 | | **$0.00** |
| 94044 | Furniture & Fixtures | Chair - Cloth w/ Arms, Tilt | | 1 | 2001 | | **$0.00** |
| 94034 | Furniture & Fixtures | Chair - Gray Cloth | | 1 | 2001 | $7.65 | **$7.65** |
| 94052 | Furniture & Fixtures | Chair - Black Highback Exec | | 3 | 2001 | $64.99 | **$194.97** |
| 94054 | Furniture & Fixtures | Chair - Bench Chair | | 1 | 2001 | $15.00 | **$15.00** |
| 94054 | Furniture & Fixtures | Chair - Secretary | | 1 | 2001 | $15.00 | **$15.00** |
| 94034 | Furniture & Fixtures | Chair - Black | | 1 | 2001 | $15.00 | **$15.00** |
| 94046 | Furniture & Fixtures | Chair - Cloth on Wheels | | 1 | 2001 | $15.00 | **$15.00** |
| 94034 | Furniture & Fixtures | Chair - Side Gray | | 1 | 2001 | $15.00 | **$15.00** |
| 94040 | Furniture & Fixtures | Chair - Highback, Cloth w/ arms | | 1 | 2001 | $15.00 | **$15.00** |
| 94044 | Furniture & Fixtures | Chair - Side Fabric | | 2 | 2001 | $15.00 | **$30.00** |
| 94024 | Furniture & Fixtures | Chair - Desk | | 1 | 2001 | $15.00 | **$15.00** |
| 94036 | Furniture & Fixtures | Chair - Tall Bench Chairs | | 2 | 2001 | $15.00 | **$30.00** |
| 94036 | Furniture & Fixtures | Chair - Conf Room | | 1 | 2001 | $64.99 | **$64.99** |
| 94030 | Furniture & Fixtures | Chair - Side Chair Cloth | | 2 | 2001 | $15.00 | **$30.00** |
| 94032 | Furniture & Fixtures | Chair - Bench - Lift | | 1 | 2001 | $15.00 | **$15.00** |
| 94024 | Furniture & Fixtures | Chair - Bench - Lift | | 1 | 2001 | $15.00 | **$15.00** |
| 94034 | Furniture & Fixtures | Chair - Secretary - Red | | 1 | 2001 | $15.00 | **$15.00** |

| Room # | Classification | Personal Property | Serial Number | Quantity | Service Date | Fair Market Value | Total |
|---|---|---|---|---|---|---|---|
| 94050 | Furniture & Fixtures | Chair - Red | | 1 | 2001 | | **$0.00** |
| 94028 | Furniture & Fixtures | Chair - Leather, Tilt Exec. | | 1 | 2001 | | **$0.00** |
| Throughout Office | Furniture & Fixtures | Clock | | 4 | 2001 | | **$0.00** |
| 94042 | Furniture & Fixtures | Coffeemaker - Bloomfield | | 1 | 2005 | $30.00 | **$30.00** |
| 94026 | Machinery & Equip. | Compressor - SpeedAire 20 Gallon | L612812000-00029 | 1 | 2004 | $114.75 | **$114.75** |
| Throughout Office | Furniture & Fixtures | Computer Stand | | 7 | 2001 | | **$0.00** |
| 94036 | Furniture & Fixtures | Corkboard | | 1 | 2001 | | **$0.00** |
| 94054 | Furniture & Fixtures | Corkboard | | 1 | 2001 | | **$0.00** |
| 94046 | Furniture & Fixtures | Corkboard | | 1 | 2001 | | **$0.00** |
| 94028 | Furniture & Fixtures | Corkboard | | 1 | 2001 | | **$0.00** |
| 94024 | Furniture & Fixtures | Corkboard | | 1 | 2001 | | **$0.00** |
| 94026 | Furniture & Fixtures | Corkboard | | 1 | 2001 | | **$0.00** |
| 94056 | Furniture & Fixtures | Credenza - Wood 72 W X 20 D X 29 H | | 1 | 2001 | $95.63 | **$95.63** |
| Hallway | Furniture & Fixtures | Credenza - Wood 72 W X 20 D X 29 H | | 1 | 2001 | $95.63 | **$95.63** |
| 94054 | Machinery & Equip. | Densitometer - X-rite | 12743 | 1 | 2001 | $75.74 | **$75.74** |
| 94052 | Furniture & Fixtures | Desk - Metal | | 1 | 2001 | $114.75 | **$114.75** |
| 94040 | Furniture & Fixtures | Desk - Metal | | 1 | 2001 | $114.75 | **$114.75** |
| 94048 | Furniture & Fixtures | Desk - Metal | | 1 | 2001 | $114.75 | **$114.75** |
| 94028 | Furniture & Fixtures | Desk - Metal | | 2 | 2001 | $114.75 | **$229.50** |
| 94046 | Furniture & Fixtures | Desk - Used Wood Laminate Desk | | 1 | 2001 | $76.46 | **$76.46** |
| 94038 | Furniture & Fixtures | Desk - Used Wood Laminate Desk | | 1 | 2001 | $76.46 | **$76.46** |
| 94034 | Furniture & Fixtures | Desk - Used Wood Laminate Desk | | 1 | 2001 | $76.46 | **$76.46** |
| 94030 | Furniture & Fixtures | Desk - Used Wood Laminate Desk | | 1 | 2001 | $76.46 | **$76.46** |
| 94024 | Furniture & Fixtures | Desk - Metal | | 1 | 2001 | $114.75 | **$114.75** |
| 94026 | Furniture & Fixtures | Dolly - 2 Wheel | | 1 | 2001 | $19.13 | **$19.13** |

| Room # | Classification | Personal Property | Serial Number | Quantity | Service Date | Fair Market Value | Total |
|---|---|---|---|---|---|---|---|
| 94046 | Furniture & Fixtures | Fan | | 1 | 2001 | | **$0.00** |
| IT Room | Furniture & Fixtures | Box Fan | | 1 | 2001 | | **$0.00** |
| 94040 | Furniture & Fixtures | File - Four Drawer Lateral 41" W X 19" D X 51 " H | | 1 | 2001 | $76.50 | **$76.50** |
| 94052 | Furniture & Fixtures | File - Two Drawer Lateral 31 1/2" W X 22" D X 29" H | | 2 | 2001 | $76.50 | **$153.00** |
| 94040 | Furniture & Fixtures | File - Two Drawer Lateral - Metal 31 1/2 w X 22 D X 29 H | | 1 | 2001 | $38.25 | **$38.25** |
| 94046 | Furniture & Fixtures | File - Two Drawer Lateral - Simulated Wood  36 W x 20 D x 29 1/2 H | | 1 | 2001 | $38.25 | **$38.25** |
| 94050 | Furniture & Fixtures | File - Two Drawer Lateral - Metal 32 w X 22 D X 29 H | | 1 | 2001 | $38.25 | **$38.25** |
| 94030 | Furniture & Fixtures | File - Two Drawer Lateral - Simulated Wood  36 W x 20 D x 29 1/2 H | | 1 | 2001 | $38.25 | **$38.25** |
| 94028 | Furniture & Fixtures | File - Three Drawer Lateral 15 W X 20 D X 27 H | | 2 | 2001 | $38.25 | **$76.50** |
| 94040 | Furniture & Fixtures | File - Two Drawer Sentry | | 2 | 2001 | $38.25 | **$76.50** |
| 94024 | Furniture & Fixtures | File - Two Drawer 30 W X 19 D X 27 H Metal | | 1 | 2001 | $38.25 | **$38.25** |
| 94024 | Furniture & Fixtures | File - Six Drawer Wood Laminate | | 1 | 2001 | $85.00 | **$85.00** |
| 94044 | Furniture & Fixtures | File - Two Drawer Lateral Simulated Wood 36 W X 20 D X 30 H | | 1 | 2001 | $38.25 | **$38.25** |
| 94042 | Furniture & Fixtures | File - Two Drawer Lateral Metal 31 W X 22 D X 28 H | | 2 | 2001 | $38.25 | **$76.50** |
| 94042 | Furniture & Fixtures | File - Four Drawer Lateral Metal 36 W X 18 D X 54 H | | 2 | 2001 | $38.25 | **$76.50** |
| 94048 | Furniture & Fixtures | File - Two Drawer 31 1/2 W X 21 1/2 D X 29 H | | 1 | 2001 | $38.25 | **$38.25** |

| Room # | Classification | Personal Property | Serial Number | Quantity | Service Date | Fair Market Value | Total |
|---|---|---|---|---|---|---|---|
| 94034 | Furniture & Fixtures | File - Two Drawer Lateral Simulated Wood 36 W X 20 D X 30 H | | 1 | 2001 | $38.25 | **$38.25** |
| 94038 | Furniture & Fixtures | File - Two Drawer Simulated Wood 36 W X 20 D X 30 H | | 1 | 2001 | $38.25 | **$38.25** |
| 94042 | Furniture & Fixtures | Film - 35mm rolls of film (unused) | | | 2006 | | **$0.00** |
| IT Room | Furniture & Fixtures | Film Desicant | | 1 | 2012 | | **$0.00** |
| 94054 | Machinery & Equip. | Filmosound - Bell & Howell | | 1 | 5/1/2010 | $14.00 | **$14.00** |
| 94054 | Machinery & Equip. | Film Rewinder | | 1 | 2000 | | **$0.00** |
| 94054 | Machinery & Equip. | Film Winder - Small | | 1 | 2000 | | **$0.00** |
| 94026 | Machinery & Equip. | Film Winder (Set) | | 1 | 2000 | | **$0.00** |
| 94026 | Furniture & Fixtures | Furniture Movers 4-Wheel | | 5 | 2000 | $50.00 | **$250.00** |
| 94024 | Furniture & Fixtures | Furniture Mover 4-Wheel | | 1 | 2000 | $50.00 | **$50.00** |
| 94026 | Machinery & Equip. | Granite Optical Table | | 1 | 2002 | | **$0.00** |
| 94026 | Machinery & Equip. | Gretag MCBeth | | 1 | 2001 | $50.00 | **$50.00** |
| 94040 | Furniture & Fixtures | LabelMaker - Brother P-Touch Extra | | 2 | 2001 | | **$0.00** |
| 94046 | Furniture & Fixtures | Lamp, Desk | | 2 | 2001 | $11.48 | **$22.95** |
| IT Room | Furniture & Fixtures | Lamp, Desk | | 1 | 2001 | | **$0.00** |
| 94048 | Furniture & Fixtures | Lamp, Pole | | 1 | 2001 | $16.81 | **$16.81** |
| 94050 | Furniture & Fixtures | Lamp, Pole | | 1 | 2001 | $16.81 | **$16.81** |
| Hallway | Furniture & Fixtures | Lamp, Pole | | 1 | 2001 | $16.81 | **$16.81** |
| 94052 | Furniture & Fixtures | Lamp, Pole | | 1 | 2001 | | **$0.00** |
| 94056 | Furniture & Fixtures | Lamp, Pole | | 1 | 2001 | $16.81 | **$16.81** |
| 94046 | Furniture & Fixtures | Lamp, Pole | | 2 | 2001 | $16.81 | **$33.62** |
| 94040 | Furniture & Fixtures | Lamp, Pole | | 1 | 2001 | $16.81 | **$16.81** |
| 94030 | Furniture & Fixtures | Lamp, Pole | | 1 | 2001 | $16.81 | **$16.81** |
| 94056 | Furniture & Fixtures | Lava Lamp | | 2 | 2001 | | **$0.00** |
| 94056 | Computer Hardware | Laser Presenter - Wireless | | 1 | 11/8/2011 | $8.99 | **$8.99** |
| 94028 | Machinery & Equip. | Light Table | | 1 | 2001 | | **$0.00** |

| Room # | Classification | Personal Property | Serial Number | Quantity | Service Date | Fair Market Value | Total |
|---|---|---|---|---|---|---|---|
| 94026 | Machinery & Equip. | Metcal SP440 - Solder Iron | 04798 | 1 | 2002 | $97.54 | **$97.54** |
| 94040 | Furniture & Fixtures | MicroCell - 3G | | 1 | 2013 | | **$0.00** |
| 94032 | Machinery & Equip. | Microscope - Leica GZ6 (10-2503.80) 8 yrs old | | 1 | 2006 | $103.28 | **$103.28** |
| 94032 | Machinery & Equip. | Microscope - sciencescope Mini Stereo Zoom | | 1 | 2006 | $197.37 | **$197.37** |
| 94042 | Furniture & Fixtures | Microwave | 111557 | 1 | 2009 | $19.13 | **$19.13** |
| Throughout Office | Computer Hardware | Misc Computer Equipment (keyboards, mice, etc.) | | | 2001-2005 | | **$0.00** |
| Lobby | Machinery & Equip. | Misc Film Cans (Empty) | | | 2005-2006 | | **$0.00** |
| 94042 | Furniture & Fixtures | Misc Kitchen Small Appliances and Utensils, etc. | | | 2001 | | **$0.00** |
| 94032 | Machinery & Equip. | Misc Part Bins (with Parts) | | 1 | 2001 | | **$0.00** |
| Throughout Office | Machinery & Equip. | Misc Tools | | | 2001 | | **$0.00** |
| 94032 | Machinery & Equip. | Oscilloscope - Tektronics TDS 3034B | | 1 | 2003 | $2,500.00 | **$2,500.00** |
| 94046 | Furniture & Fixtures | Ottoman - Red | | 1 | 2001 | | **$0.00** |
| Lobby | Furniture & Fixtures | Paper Cutter | | 1 | 2001 | | **$0.00** |
| 94042 | Furniture & Fixtures | Paper Cutter | | 1 | 2001 | | **$0.00** |
| 94054 | Furniture & Fixtures | Pelican Case | | 1 | 2009 | | **$0.00** |
| Throughout Office | Furniture & Fixtures | Power Strips | | 92 | 2001-2005 | | **$0.00** |
| 94056 | Furniture & Fixtures | Polycom | | 1 | 2001 | $38.24 | **$38.24** |
| 94032 | Machinery & Equip. | Power supply - Kepco Model MPS-620M | 9800859 | 1 | 2001 | $26.78 | **$26.78** |
| 94032 | Machinery & Equip. | Power supply - DC Tenma Model PSV-5 | 9900048 | 1 | 2001 | $26.78 | **$26.78** |
| 94032 | Machinery & Equip. | Power supply - DC Tenma Model XP-4 | 9902165 | 1 | 2001 | $26.78 | **$26.78** |

| Room # | Classification | Personal Property | Serial Number | Quantity | Service Date | Fair Market Value | Total |
|--------|----------------|-------------------|---------------|----------|--------------|-------------------|-------|
| 94032 | Machinery & Equip. | Power supply  - DC Tenma Model 72-2010 | | 2 | 2001 | $26.78 | **$53.55** |
| 94032 | Machinery & Equip. | Power supply  - DC Tenma Model 72-4045 A | 142216 | 1 | 2001 | $114.75 | **$114.75** |
| 94054 | Machinery & Equip. | Power Supply - Model XP-4 | | 1 | 2001 | $26.78 | **$26.78** |
| 94032 | Machinery & Equip. | Power Supply - Kepco MPS 620M | | 1 | 2001 | | **$0.00** |
| Throughout Office | Furniture & Fixtures | Picture Frames | | 90 | 2005 | $1.00 | **$90.00** |
| 94042 | Computer Hardware | PanaFax UF-560 | | 1 | 2/1/1998 | $50.00 | **$50.00** |
| 94040 | Computer Hardware | Printer - Epson 520 | FQ5E469080 | 1 | 8/30/2011 | $53.55 | **$53.55** |
| 94048 | Computer Hardware | Printer - Epson Workforce 630 | | 1 | 2011 | $120.00 | **$120.00** |
| 94046 | Computer Hardware | Printer - Epson Stylus Photo R320 | GCSK008284 | 1 | 2004 | $80.00 | **$80.00** |
| 94026 | Computer Hardware | Printer  HP  Laserjet  4050TN [Aquaman] | USCC086101 | 1 | 10/25/1999 | $37.49 | **$37.49** |
| 94042 | Computer Hardware | Printer  HP  Color  LaserJet CP3525dn [R2-D2] | | 1 | 11/24/2008 | $245.00 | **$245.00** |
| 94024 | Computer Hardware | Printer HP LaserJet P2035n | | 1 | 7/1/2008 | $85.00 | **$85.00** |
| 94056 | Furniture & Fixtures | Projection Screen | | 1 | 2001 | $150.00 | **$150.00** |
| 94056 | Furniture & Fixtures | Projector - Epson Home Cinema 3020 | | 1 | 2012 | $1,000.00 | **$1,000.00** |
| Lobby | Furniture & Fixtures | Projector - Panasonic XGA5000 (BAD) | | 1 | 2001 | | **$0.00** |
| Lobby | Furniture & Fixtures | Rack - Metal With Wheels 47 " W X 18 " D X 68' H | | 1 | 2005 | $76.50 | **$76.50** |
| Lobby | Furniture & Fixtures | Rack - Metal  With Wheels 35 " W X 18 " D X 78' H | | 1 | 2005 | $76.50 | **$76.50** |
| IT Room | Furniture & Fixtures | Rack - Metal with Wheels 60" x 29" x 60" | | 1 | 2005 | | **$0.00** |
| 94026 | Furniture & Fixtures | Rack - Metal With Wheels | | 3 | 2005 | $76.50 | **$229.50** |
| 94054 | Furniture & Fixtures | Rack - Metal Wheels 35 W X 18 D | | 1 | 2005 | $76.50 | **$76.50** |

| Room # | Classification | Personal Property | Serial Number | Quantity | Service Date | Fair Market Value | Total |
|---|---|---|---|---|---|---|---|
| | | X 78 H | | | | | |
| IT Room | Furniture & Fixtures | Rack - Portable, Aluminum | | 1 | 2005 | | **$0.00** |
| 94042 | Furniture & Fixtures | Refrigerator - GE 20.6 cu ft | | 1 | 2001 | $76.50 | **$76.50** |
| 94042 | Furniture & Fixtures | Scale | | 1 | 2001 | $20.00 | **$20.00** |
| 94026 | Furniture & Fixtures | Screen | | 1 | 2001 | $150.00 | **$150.00** |
| Lobby | Furniture & Fixtures | Shop Vac | | 1 | 2001 | $40.00 | **$40.00** |
| 94042 | Furniture & Fixtures | Shredder - Fellows PS80C-2 | | 1 | 2001 | $25.00 | **$25.00** |
| 94028 | Machinery & Equip. | SimEx | | 1 | 2001 | | **$0.00** |
| Lobby | Furniture & Fixtures | Sofa - Black - 72" | | 1 | 2001 | $25.00 | **$25.00** |
| 94050 | Furniture & Fixtures | Sofa - Red 76" | | 1 | 2001 | $15.00 | **$15.00** |
| 94042 | Furniture & Fixtures | Spiral Binder - Ibimatic | | 1 | 2001 | $30.00 | **$30.00** |
| Lobby | Furniture & Fixtures | Stands - Trade Show | | 3 | 2001 | $50.00 | **$150.00** |
| 94036 | Furniture & Fixtures | Step Ladder | | 1 | 2001 | | **$0.00** |
| IT Room | Furniture & Fixtures | Step Ladder | | 1 | 2001 | | **$0.00** |
| Throughout Office | Furniture & Fixtures | Stepstools | | 3 | 2001 | | **$0.00** |
| Throughout Office | Furniture & Fixtures | Storage Containers (Large) | | 31 | 2001 | | **$0.00** |
| Throughout Office | Furniture & Fixtures | Storage Containers (Small) | | 13 | 2001 | | **$0.00** |
| Throughout Office | Furniture & Fixtures | Storage Bins (Open) | | 43 | 2001 | | **$0.00** |
| Throughout Office/Lobby | Furniture & Fixtures | Supplies - Misc Office | | 1 | 2005 | $100.00 | **$100.00** |
| Throughout Office | Machinery & Equip. | Supplies - Misc Film Splicing | | | 2005 | | **$0.00** |
| 94056 | Furniture & Fixtures | Table - 36WX291/2DX30 1/2 H - Conference Room | | 1 | 2001 | $125.00 | **$125.00** |
| 94052 | Furniture & Fixtures | Table - Circular - 42 " diameter X 30 " H | | 1 | 2001 | $57.38 | **$57.38** |

| Room # | Classification | Personal Property | Serial Number | Quantity | Service Date | Fair Market Value | Total |
|--------|----------------|-------------------|---------------|----------|--------------|-------------------|-------|
| Lobby | Furniture & Fixtures | Table - Coffee Glass 36" Diameter x 16 1/2" H | | 1 | 2001 | $19.13 | **$19.13** |
| Lobby | Furniture & Fixtures | Table - Glass 23 1/2" Diameter x 21" H | | 2 | 2001 | $19.13 | **$38.25** |
| 94042 | Furniture & Fixtures | Table - Glass 42 X 72 X 29 3/4 | | 1 | 2001 | $75.00 | **$75.00** |
| 94054 | Furniture & Fixtures | Table - 36 W X 30 D X 30 H | | 1 | 2001 | $50.00 | **$50.00** |
| 94026 | Furniture & Fixtures | Table - Painter | | 1 | 2001 | $35.00 | **$35.00** |
| 94040 | Furniture & Fixtures | Table - Lift | | 1 | 2007 | $390.00 | **$390.00** |
| 94050 | Furniture & Fixtures | Table - Lift | | 1 | 2007 | $390.00 | **$390.00** |
| 94044 | Furniture & Fixtures | Table - Lift | | 1 | 2007 | $390.00 | **$390.00** |
| 94044 | Furniture & Fixtures | Table - Round 42" | | 1 | 2001 | $58.00 | **$58.00** |
| 94042 | Furniture & Fixtures | Table - Printer Table 36 W X 24 D X 26.5 H | | 1 | 2001 | $40.00 | **$40.00** |
| 94030 | Furniture & Fixtures | Table - Lift | | 1 | 2007 | $390.00 | **$390.00** |
| 94030 | Furniture & Fixtures | Table - Printer Table | | 1 | 2001 | $20.00 | **$20.00** |
| Lobby | Furniture & Fixtures | Table - White Plastic - Folding 72 W X 30 D | | 4 | 2000 | $20.00 | **$80.00** |
| 94032 | Furniture & Fixtures | Tool Box (with Tools) - small, Craftsman | | 1 | 2001 | | **$0.00** |
| 94032 | Furniture & Fixtures | Tool Chest - Craftsman - 11 Drawers 26" x 18 x 48' | | 1 | 2000 | $68.85 | **$68.85** |
| 94054 | Furniture & Fixtures | Tool Case | | 1 | 2001 | | **$0.00** |
| 94032 | Furniture & Fixtures | Tool Case | | 1 | 2001 | | **$0.00** |
| IT Room | Furniture & Fixtures | Turtle Case for LTO Tape Storage | | 2 | 2010 | | **$0.00** |
| 94056 | Furniture & Fixtures | TV - Samsung Model# UN46C6300SF | | 1 | 2009 | | **$0.00** |
| 94042 | Furniture & Fixtures | Vacuum - 3M | | 1 | 2001 | | **$0.00** |
| Lobby | Computer Hardware | Video Camera - Sony and Tapes | | 1 | 2001 | | **$0.00** |
| 94016 | Furniture & Fixtures | Waste Basket | | 18 | 2001 | $0.77 | **$13.77** |
| Throughout | Furniture & Fixtures | White Board - Various Sizes | | 13 | 2001 | $22.95 | **$298.35** |

| Room # | Classification | Personal Property | Serial Number | Quantity | Service Date | Fair Market Value | Total |
|---|---|---|---|---|---|---|---|
| Office | | | | | | | |
| 94052 | Furniture & Fixtures | White Board - Panasonic | 30083LD0230 | 1 | 2001 | $100.50 | **$100.50** |
| 94048 | Furniture & Fixtures | White Board - Panasonic | | 1 | 2001 | $100.50 | **$100.50** |
| 94056 | Furniture & Fixtures | White Board - Panasonic | 5659XLA0109 | 1 | 2001 | $100.50 | **$100.50** |
| 94026 | Furniture & Fixtures | White Board - Panasonic | | 1 | 2001 | $100.50 | **$100.50** |
| | | | | | | | |
| | | | | | | | |
| **IT Equipment** | | | | | | | |
| 94036 | Computer Hardware | Computer - ATCS - Audio/Video (Broken) | | 1 | 4/22/2005 | $160.00 | **$160.00** |
| 94048 | Computer Hardware | Computer - Dell Optiplex 9010 | | 1 | Feb-13 | $495.00 | **$495.00** |
| 94036 | Computer Hardware | Computer - Dell Precision 340 | | 1 | 2002 | $40.00 | **$40.00** |
| 94036 | Computer Hardware | Computer - Dell Precision 450 | | 2 | 9/24/2003 | $100.00 | **$200.00** |
| 94024 | Computer Hardware | Computer - Dell Precision 490 | | 1 | 5/29/2007 | $225.00 | **$225.00** |
| IT Room | Computer Hardware | Computer - Dell Precision 490 | | 1 | 2007 | $225.00 | **$225.00** |
| 94056 | Computer Hardware | Computer - Dell T3500 | | 1 | 9/22/2009 | $250.00 | **$250.00** |
| 94054 | Computer Hardware | Computer - Dell Precision T5400 (attached to Oxberry in Austin) | | 1 | 2/23/2009 | $275.00 | **$275.00** |
| CA - MTI Film | Computer Hardware | Computer - Dell Precision T5400 (attached to Oxberry in CA) | | 1 | 2009 | $275.00 | **$275.00** |
| 94036 | Computer Hardware | Computer - Dell Precision T5500 | | 1 | 10/14/2009 | $275.00 | **$275.00** |
| 94046 | Computer Hardware | Computer - Dell T7400 | | 1 | 2010 | $380.00 | **$380.00** |
| 94040 | Computer Hardware | Computer - Dell T7400 | | 1 | 4/17/2008 | $380.00 | **$380.00** |
| 94028 | Computer Hardware | Computer - Dell T7500 | | 1 | 6/4/2011 | $450.00 | **$450.00** |
| 94030 | Computer Hardware | Computer - Dell Precision T7500 | | 1 | 5/24/2010 | $450.00 | **$450.00** |
| Office | Computer Hardware | Computer - HP Pavillion PC [Travel Laptop] | | 1 | 4/23/2012 | $623.99 | **$623.99** |
| 94048 | Computer Hardware | Computer - Lenovo IdeaCentre K210 | | 1 | 2007 | $45.00 | **$45.00** |

| Room # | Classification | Personal Property | Serial Number | Quantity | Service Date | Fair Market Value | Total |
|---|---|---|---|---|---|---|---|
| 94036 | Computer Hardware | Computer - Mac G5 (Bad) | | 2 | 2003 | $129.00 | **$258.00** |
| 94052 | Computer Hardware | Computer - Sun Ultra 24 | | 1 | 2011 | $179.00 | **$179.00** |
| Throughout Office | Computer Hardware | Computer Speakers | | 7 | 2003 | | **$0.00** |
| IT Room | Computer Hardware | Firewall - Netgear FVS338 | | 1 | 2005 | $14.50 | **$14.50** |
| 94042 | Computer Hardware | Firewall - SonicWALL TZ170 | | 1 | 5/1/2006 | $20.00 | **$20.00** |
| 94026 | Computer Hardware | LTO Tape Library - Dell PowerVault TL2000 (Bad Drive Head) | | 1 | 2010 | | **$0.00** |
| IT Room | Computer Hardware | LTO Tape Library - Dell PowerVault TL2000 | | 1 | Jul-10 | $1,200.00 | **$1,200.00** |
| IT Room | Computer Hardware | Misc Server Rack Rails | | | 2009 | | **$0.00** |
| Throughout Office | Computer Hardware | Misc Computer Hardware (RAM (memory), etc.) | | | | | |
| 94036 | Computer Hardware | Monitor - Acer | | 1 | 7/26/2012 | $17.99 | **$17.99** |
| 94054 | Computer Hardware | Monitor - Dell (attached to Oxberry in Austin) | | 1 | 2009 | $60.00 | **$60.00** |
| 94040 | Computer Hardware | Monitor - Dell 2208WFPt | | 1 | 2008 | $75.00 | **$75.00** |
| IT Room | Computer Hardware | Monitor - Dell | | 1 | 7/1/2008 | $60.00 | **$60.00** |
| 94036 | Computer Hardware | Monitor - Dell | | 1 | 12/1/2006 | $60.00 | **$60.00** |
| 94036 | Computer Hardware | Monitor - Dell | | 1 | 2008 | $60.00 | **$60.00** |
| 94046 | Computer Hardware | Monitor - Dell | | 1 | 2008 | $60.00 | **$60.00** |
| 94048 | Computer Hardware | Monitor - HP 2509m | | 1 | 3/1/2010 | $60.00 | **$60.00** |
| 94030 | Computer Hardware | Monitor - LG W2252TQ | | 2 | 4/1/2008 | $50.00 | **$100.00** |
| 94046 | Computer Hardware | Monitor - LG W2252TQ | | 1 | 2008 | $50.00 | **$50.00** |
| 94026 | Computer Hardware | Monitor - Mac | | 2 | 2003 | $75.00 | **$150.00** |
| 94026 | Computer Hardware | Monitor - OptiQuest Q1716 | | 1 | 2005 | $30.00 | **$30.00** |
| 94054 | Computer Hardware | Monitor - Samsung (attached to Oxberry in Austin) | | 1 | 2009 | $50.00 | **$50.00** |
| CA - MTI | Computer Hardware | Monitor - Samsung (attached to | | 1 | 2009 | $50.00 | **$50.00** |

SMRH:203877085.2

| Room # | Classification | Personal Property | Serial Number | Quantity | Service Date | Fair Market Value | Total |
|---|---|---|---|---|---|---|---|
| Film | | Oxberry in CA) | | | | | |
| 94054 | Computer Hardware | Monitor - Samsung T220 | | 1 | 2010 | $75.00 | **$75.00** |
| 94030 | Computer Hardware | Monitor - Samsung SA550 | | 1 | 2010 | $75.00 | **$75.00** |
| 94028 | Computer Hardware | Monitor - Samsung TA550 | | 1 | 3/1/2011 | $75.00 | **$75.00** |
| 94024 | Computer Hardware | Monitor - Samsung T220 | | 1 | 2010 | $75.00 | **$75.00** |
| 94052 | Computer Hardware | Monitor - Samsung P2350 | | 1 | 6/1/2010 | $150.00 | **$150.00** |
| 94036 | Computer Hardware | Monitor - Sony | | 1 | 2003 | $40.00 | **$40.00** |
| IT Room | Computer Hardware | Netbotz Wall Botz Security Camera | | 1 | 2005 | $50.00 | **$50.00** |
| IT Room | Computer Hardware | RAID - Dell MD1000 with 15-2TB Hitachi Internal Drives | | 2 | 2011 | $1,100.00 | **$2,200.00** |
| IT Room | Computer Hardware | RAID - Continental Resources with 15-2TB Internal Drives | | 1 | 7/27/2009 | $1,025.00 | **$1,025.00** |
| IT Room | Computer Hardware | RAID - Office One Dell (Used) with 15-2TB Internal Drives | | 1 | 7/6/2009 | $1,025.00 | **$1,025.00** |
| CA - MTI Film | Computer Hardware | RAID - Dell MD1000 with 15-1TB Internal Drives | | 3 | 2009 | $500.00 | **$1,500.00** |
| Throughout Office | Computer Hardware | Raritan | | 8 | 2001 | $10.00 | **$80.00** |
| Throughout Office | Computer Hardware | Routers/Hubs - Netgear | | 22 | 2001-2008 | $20.00 | **$440.00** |
| Throughout Office | Computer Hardware | Routers/Hubs - Cisco | | 2 | 2001 | $20.00 | **$40.00** |
| CA - MTI Film | Computer Hardware | Server - Dell NF500 | | 1 | 2009 | $50.00 | **$50.00** |
| IT Room | Computer Hardware | Sever - Dell PowerEdge 1800 [Earth] | | 1 | 5/1/2006 | $125.00 | **$125.00** |
| IT Room | Computer Hardware | Server - Dell PowerVault 110T [Earth's Tape Backup] | | 1 | 5/1/2006 | $30.00 | **$30.00** |
| IT Room | Computer Hardware | Server - Dell PowerEdge 1950 [Post D&E] | | 2 | 2007 | $60.00 | **$120.00** |

| Room # | Classification | Personal Property | Serial Number | Quantity | Service Date | Fair Market Value | Total |
|--------|---------------|-------------------|---------------|----------|--------------|-------------------|-------|
| IT Room | Computer Hardware | Server - Dell PowerEdge SC1425 [FTP] | | 1 | 4/17/2005 | $50.00 | **$50.00** |
| IT Room | Computer Hardware | Server - Dell PowerEdge 2850 [Tape Backup] | | 1 | 2004 | $100.00 | **$100.00** |
| IT Room | Computer Hardware | Server - Dell PowerEdge 2950 [PostC] | | 1 | 2008 | $125.00 | **$125.00** |
| IT Room | Computer Hardware | Server - Dell PowerEdge R710 [StgD] | | 1 | 8/23/2011 | $500.00 | **$500.00** |
| 94026 | Computer Hardware | Server - Dell PowerEdge 2950 [PostA] (Not Working) | | 1 | 2008 | | **$0.00** |
| IT Room | Computer Hardware | Server - IBM E Server X Series 225 | | 1 | 2007 | $50.00 | **$50.00** |
| IT Room | Computer Hardware | Server Rack | | 1 | 2006 | $100.00 | **$100.00** |
| IT Room | Computer Hardware | Server Rack 36 x 24 x 81 | | 1 | 2008 | $100.00 | **$100.00** |
| 94026 | Computer Hardware | Server Rack 36 x 24 x 81 | | 1 | 2008 | $100.00 | **$100.00** |
| Throughout Office | Computer Hardware | Supplies - Computer Equipment (ie: keyboards, mice, etc.) | | | 2001-2006 | | **$0.00** |
| Throughout Office | Computer Hardware | Supplies - IT Equipment (ie: power supplies, network cables, raritan cables, etc.) | | | 2001 | | **$0.00** |
| IT Room | Computer Hardware | Switch - Dell 5324 (BAD) | | 1 | 2010 | | **$0.00** |
| IT Room | Computer Hardware | Switch - Dell 5424 | | 2 | 8/25/2010 | $80.00 | **$160.00** |
| IT Room | Computer Hardware | Switch - HP 18106 | | 1 | 2010 | $70.00 | **$70.00** |
| IT Room | Computer Hardware | Switch - HP 8000 | | 2 | 2010 | $30.00 | **$60.00** |
| 94036 | Computer Hardware | Switch - Linksys 16-port 1Gb | | 1 | 2005 | | **$0.00** |
| IT Room | Computer Hardware | UPS - APC | | 4 | 2000-2003 | | **$0.00** |
| 94026 | Computer Hardware | UPS - APC (Bad) | YS0324221505 | 1 | 2000-2003 | | **$0.00** |
| 94026 | Computer Hardware | UPS - APC (Bad) | YS0333122311 | 1 | 2000-2003 | | **$0.00** |
| 94040 | Computer Hardware | UPS - APC | | 1 | 2000-2003 | | **$0.00** |
| 94026 | Computer Hardware | UPS - APC (unsure if works) | | 1 | 2000-2003 | | **$0.00** |
| | | | | | | | |

SMRH:203877085.2

| Room # | Classification | Personal Property | Serial Number | Quantity | Service Date | Fair Market Value | Total |
|---|---|---|---|---|---|---|---|
| **Media** | | | | | | | |
| 94048 | Computer Hardware | External Hard Drive w/ Data - Acomdata 300GB #1 | | 1 | 2006 | | **$0.00** |
| IT Room | Computer Hardware | External Hard Drive w/ Data - Hitachi 2TB #6 | | 1 | 2010 | | **$0.00** |
| 94048 | Computer Hardware | External Hard Drive w/ Data - HP 320GB #3 (portable) | | 1 | 2010 | | **$0.00** |
| 94048 | Computer Hardware | External Hard Drive w/ Data - LaCie 1TB #5 | | 1 | 2011 | | **$0.00** |
| IT Room | Computer Hardware | External Hard Drive w/ Data - LaCie 1TB #8 | | 1 | 2011 | | **$0.00** |
| 94048 | Computer Hardware | External Hard Drive w/ Data - LaCie 1TB #9 | | 1 | 2011 | | **$0.00** |
| 94048 | Computer Hardware | External Hard Drive w/ Data - Seagate 300GB #11 | | 1 | 2006 | | **$0.00** |
| 94048 | Computer Hardware | External Hard Drive w/ Data - Seagate 320GB #13 (portable) | | 1 | 2009 | | **$0.00** |
| 94048 | Computer Hardware | External Hard Drive w/ Data - Seagate 1.5TB #1 | | 1 | 2006 | | **$0.00** |
| IT Room | Computer Hardware | External Hard Drive w/ Data - Seagate 1.5TB #2 | | 1 | 2006 | | **$0.00** |
| IT Room | Computer Hardware | External Hard Drive w/ Data - Seagate [Disk Images Master] | | 1 | 2006 | | **$0.00** |
| IT Room | Computer Hardware | External Hard Drive w/ Data - Seagate 2TB #6 [Test Images] | | 1 | 2007 | | **$0.00** |
| IT Room | Computer Hardware | External Hard Drive w/ Data - Seagate 2TB #7 [Test Images Backup] | | 1 | 2007 | | **$0.00** |
| 94048 | Computer Hardware | External Hard Drive w/ Data - Seagate 2TB #9 | | 1 | 2009 | | **$0.00** |
| 94048 | Computer Hardware | External Hard Drive w/ Data - | | 1 | 2011 | | **$0.00** |

| Room # | Classification | Personal Property | Serial Number | Quantity | Service Date | Fair Market Value | Total |
|---|---|---|---|---|---|---|---|
| | | Seagate 2TB #18 | | | | | |
| 94048 | Computer Hardware | External Hard Drive w/ Data - Seagate 2TB #19 | | 1 | 2011 | | $0.00 |
| 94048 | Computer Hardware | External Hard Drive w/ Data - Seagate 2TB #22 | | 1 | 2011 | | $0.00 |
| 94030 | Computer Hardware | External Hard Drive w/ Data - Seagate 3TB #24 | | 1 | 2011 | | $0.00 |
| 94048 | Computer Hardware | External Hard Drive w/ Data - Seagate 3TB #26 | | 1 | 2011 | | $0.00 |
| 94048 | Computer Hardware | External Hard Drive w/ Data - Seagate 4TB #29 | | 1 | 2012 | | $0.00 |
| 94048 | Computer Hardware | External Hard Drive w/ Data - Seagate 4TB #31 | | 1 | 2012 | | $0.00 |
| IT Room | Computer Hardware | External Hard Drive w/ Data - Simpletech 500GB [Source Safe Backup] | | 1 | 2014 | | $0.00 |
| 94048 | Computer Hardware | External Hard Drive w/ Data - Toshiba 320GB #11 (portable) | | 1 | 2013 | | $0.00 |
| 94048 | Computer Hardware | External Hard Drive w/ Data - Toshiba 3TB | | 1 | 2013 | | $0.00 |
| 94048 | Computer Hardware | External Hard Drive w/ Data - Western Digital 200GB #2 | | 1 | 2005 | | $0.00 |
| 94030 | Computer Hardware | External Hard Drive w/ Data - Western Digital 1TB #1 | | 1 | 2006 | | $0.00 |
| 94048 | Computer Hardware | External Hard Drive w/ Data - Western Digital 1TB #4 | | 1 | 2006 | | $0.00 |
| 94048 | Computer Hardware | External Hard Drive w/ Data - Western Digital 1TB #6 | | 1 | 2006 | | $0.00 |
| IT Room | Computer Hardware | External Hard Drive w/ Data - Western Digital 1TB #7 [Disk Images Backup] | | 1 | 2006 | | $0.00 |
| 94048 | Computer Hardware | External Hard Drive w/ Data - Western Digital 1TB #11 | | 1 | 2006 | | $0.00 |

| Room # | Classification | Personal Property | Serial Number | Quantity | Service Date | Fair Market Value | Total |
|---|---|---|---|---|---|---|---|
| IT Room | Computer Hardware | External Hard Drive w/ Data - Western Digital 1TB #13 | | 1 | 2006 | | **$0.00** |
| 94048 | Computer Hardware | External Hard Drive w/ Data - Western Digital 2TB #2 | | 1 | 2009 | | **$0.00** |
| 94048 | Computer Hardware | External Hard Drive w/ Data - Western Digital 2TB #4 | | 1 | 2009 | | **$0.00** |
| 94048 | Computer Hardware | External Hard Drive w/ Data - Western Digital 2TB #5 | | 1 | 2009 | | **$0.00** |
| 94048 | Computer Hardware | External Hard Drive w/ Data - Western Digital 2TB #6 | | 1 | 2009 | | **$0.00** |
| 94048 | Computer Hardware | Flashdrive - PNY 16GB #8 | | 1 | 2010 | | **$0.00** |
| 94048 | Computer Hardware | Flashdrive - Polaroid 16GB #2 | | 1 | 2011 | | **$0.00** |
| 94048 | Computer Hardware | Flashdrive - HP 32GB #6 | | 1 | 2012 | | **$0.00** |
| IT Room | Computer Hardware | LTO2 Tapes w/ Data | | 19 | 2006 | | **$0.00** |
| IT Room | Computer Hardware | LTO2 Cleaning Tapes | | 1 | 2006 | | **$0.00** |
| IT Room | Computer Hardware | LTO2 Unused | | 1 | 2006 | | **$0.00** |
| IT Room | Computer Hardware | LTO4 Tapes w/ Data | | 61 | 2009-2012 | | **$0.00** |
| IT Room | Computer Hardware | LTO4 Cleaning Tapes - Brand New | | 1 | 2009 | | **$0.00** |
| | Computer Hardware | LTO5 Tapes | | 2 | 2014 | | **$0.00** |
| Throughout Office | Computer Hardware | Misc Internal Hard Drives | | | 2006-2012 | | **$0.00** |
| | | | | | | | |
| | | | | | | | |
| **Film Machinery** | | | | | | | |
| 94054 | Machinery & Equip. | 8mm shuttle | | 1 | 7/10/2012 | $8,600.00 | **$8,600.00** |
| 94054 | Machinery & Equip. | 3 perf gate | | 1 | 2012 | $5,060.00 | **$5,060.00** |
| 94054 | Machinery & Equip. | 3 perf sprocket set | | 1 | 2012 | $5,356.00 | **$5,356.00** |
| 94054 | Machinery & Equip. | 16mm Sprocket Set | | 2 | 7/10/2012 | $5,570.00 | **$11,140.00** |
| 94054 | Machinery & Equip. | 16mm Shuttle (Standard) | | 2 | 7/10/2012 | $5,820.00 | **$11,640.00** |

| Room # | Classification | Personal Property | Serial Number | Quantity | Service Date | Fair Market Value | Total |
|---|---|---|---|---|---|---|---|
| 94054 | Machinery & Equip. | 35mm Shuttle | | 1 | 2008 | $5,820.00 | **$5,820.00** |
| 94054 | Machinery & Equip. | 35mm 4 perf Advanced Shuttle | | 1 | 2008 | $4,560.00 | **$4,560.00** |
| 94032 | Machinery & Equip. | Aspheric Condenser Lens | | 1 | 8/28/2012 | $110.56 | **$110.56** |
| 94054 | Machinery & Equip. | Precision Sound Reader Optical Magnetic | | 1 | 11/30/2012 | $72.80 | **$72.80** |
| 94054 | Machinery & Equip. | LED's | | 1 | 2012-2013 | $312.78 | **$312.78** |
| 94054 & CA - MTI | Machinery & Equip. | Princeton Camera (attached to Oxberrys in CA & Austin) | | 2 | 11/20/2009 | $8,000.00 | **$16,000.00** |
| | | | | | | | |
| | | | | | | TOTAL | **$100,485.45** |

**Schedule 2.1(b)**

**Assumed Contracts**

Agreement, dated December 3, 2012, between Image Trends Inc. and Lasergraphics, Inc., as amended by the Amendment, dated January 20, 2015.

## Schedule 2.1(c)

## Intellectual Property

**Current Patents in Process at USPTO**

**"Black ICE"**
61/725,075
System and Method for Processing an Image Carried by an Optical Substrate and Computer Readable Medium Made Using Same
Provisional filed 11/12/2012

14/073,768 – Assigned to Image Trends on 11/5/2013.  Recorded in USPTO on 12/06/2013. System and Method for Processing an Image Carried by an Optical Substrate and Computer Readable Medium Made Using Same
Filed 11/06/2013 claiming 11/12/2012 priority date

**"Dufay Color Converter"**
61/989,317 – Assigned to Image Trends on 1/7/2015
Recovery of Improved Digital Images from Color Matrix Film
Provisional filed 05/06/2014

**Prior Patents**

**"AutoMatting"**
Method and System for Creating Matted Image
61/192,768
Provisional filed 09/06/2007
Provisional refiled 09/22/2008, not converted

**"Pyros"**
Method and System for Filling Image Data Through Extension
61/137,015
Provisional filed 07/25/2008, not converted

**"SensorKleen"**
Method and System for Defect Image Correction
Provisional 60/963,595, filed 08/06/2007,
Application 12/221,778, filed 08/06/2008, abandoned 04/30/2012

**"Hem**i"
System and Method of Fisheye Lens Image Planar Projection
Provisional 60/854,833, filed 10-27-2006
Application 11/975,855, filed  10/22/2007, Application abandoned 03/27/2012

**"ShineOff**"
Method and System to Detect and Correct Shine
Provisional 60/934,283, filed 06/12/2007,
Application 12/157,735, filed 06/12/2008, Application abandoned 11/22/2011

**"PearlyWhites"**
Method and System to Detect and Correct Teeth Whiteness Within a Digital Image
Provisional  60/934,250, filed  06/12/2007,
Application 12/157,676, filed 06/12/2008, Application abandoned 11/28/2011

**Image Trends Logos and Marks**

**"Digital ICE" logo**
4,371,171
Registered 07/23/2013

**"DIGITAL ICE" words**
4,349,322
Registered 06/11/2013

**"Image Trends" words**
3,547,311
Registered 12/16/2008

**"Image Trends" logo**
3,349,160
Registered 12/04/2007
(early version 77/029724 abandoned 03/25/2007)

**"ScanMaster" words**
77574002
Applied 09/19/2008

**Image Trends Diamonds-in-Oval Logo**
77029724
Abandoned 03/25/2007 This was the color logo.  Once there is a B&W logo, no color logo is
required to be registered.

---

| **Domain Names (GoDaddy Registration):** | Expiration: |
|---|---|
| Imagetrends.com | May 22, 2015 |
| Imagetrends.jp | June 30, 2015 |
| Imagetrendsinc.com | January 5, 2016 |
| GoDaddy WEB Server @ $47.95/month | |

**Schedule 3.2(a)**

**List of Seller's conflicts**

None.

SMRH:203877085.2

**Schedule 3.3(a)(ii)**

**List of actions pending against Seller related to Seller's title to the Purchased Assets**

None.

SMRH:203877085.2

**Schedule 3.4**

**Each agreement, contract or other instrument binding upon Seller requiring a consent or other action by any person as a result of the execution, delivery and performance of the Agreement**

None.

## Schedule 3.5(a)

### List of material agreements to which Seller is bound

The following agreements are all known to the Seller and have been disclosed:

1.      Contract with Texas Emerging Technology Fund, dated May 15, 2008.

2.      Term Sheet agreed upon with Grinberg, dated December 9, 2013.

3.      Binding term sheet with Lasergraphics dated January 20, 2015.

4.      Notes Payable to Warren Lieberfarb.

5.      Settlement Agreement with Oxberry dated February 2014 (although this may not be a binding agreement as to Seller)

6.      Lease dated March 3, 2007 with Bridgepoint Property Trust, for certain premises located at 6300 Bridgepoint Pkwy.   Lease extended per amendment dated October 31, 2015. Lease may be considered in default by landlord.     There is a sublease to Bridgepoint Consulting, dated March 27, 2014.

7.      Commission agreement with Dave Cavena, dated August 31, 2014.

8.      Agreement with Beau Ross re: Image Trends IP, LLC, dated May 14, 2013.

9.      Broker Agreement between Ray Galasso and Image Trends IP, LLC, dated August 8, 2014.

10.     Informal/pending agreement still pending with MTI Film.

11.     Letter agreement with Technicolor Creative Services, dated October 30, 2012.

12.     Agreement with Imadio dated August 25, 2010.

13.     Agreement with Sony, dated November 10, 2010.

14.     Agreement with Epson, dated June 3, 2013.

15.     There may also be notes payable in favor of Susan Sullivan, Dr. Darryl Polk, and Daniel Sullivan, and Dell Financial Services L.L.C.

**Schedule 3.6(a)**

**List of each trademark (including service marks and logos), corporate name, trade name, domain name, patent, subscriber list, registered copyright and any material third party computer software owned by Seller**

*See* Schedule 2.1(c).

**Schedule 3.6(b)**

**List of all licenses, sublicenses and other agreements as to which Seller is a party and pursuant to which any person is authorized to use any Intellectual Property Rights owned, licensed or used by Seller**

None.

**Schedule 3.6(c)**

**List of Seller's and any other person's uses of Scheduled Intellectual Property that
infringe, misappropriate or otherwise violate the rights of any other person**

No known misappropriations or violations.

**Schedule 3.6(d)**

**Reasons that could reasonably be expected to prevent any application for registration of Scheduled Intellectual property from being granted with coverage substantially equivalent to the latest amended version of the pending application or application for registration**

No known reasons.

## Schedule 3.6(f)

### Restrictions on the disclosure, use or transfer of any
### Intellectual Property Rights owned by Seller

Without conceding the validity of such claim, Grinberg may claim some restrictions emerging from its dealings with Seller, as has been disclosed in the shared folder.  In addition, Seller's agreements with and/or liens granted to Warren Lieberfarb may contain some restrictions.

**Schedule 3.7**

**List of all legal actions, suits and proceedings related to the Business or
the Purchased Assets pending as of the date hereof against any Seller**

None.

**<u>Exhibit B</u>**
**Sale Procedures Order**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

|  |  |  |
|---|---|---|
| In re: | § | |
| | § | |
| | § | |
| IMAGE TRENDS INC., | § | Case No. 14-11583 |
| | § | |
| Debtor. | § | |
| | § | |

**ORDER APPROVING SALE PROCEDURES AND RELATED
RELIEF REGARDING THE SALE OF THE DEBTOR'S ASSETS**

Upon the motion, dated January 21, 2015 (the "**Sale Motion**"),[1] of Image Trends Inc., as

debtor and debtor-in-possession in the above-captioned chapter 11 case (the "**Debtor**") pursuant to

sections 105, 363 and 365 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy**

**Code**"), Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**") and Rule 6004(b) of the Local Rules for the United States Bankruptcy Court

for the Western District of Texas (the "**Local Rules**") for entry of (i) an order (the "**Sale Procedures**

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion.

Order"), among other things, (a) approving the Debtor's proposed procedures for submitting and considering competing bids for the sale (the "**Sale**") of certain designated assets of the Debtor (the "**Purchased Assets**"), including the proposed form and manner of notice and the related dates and deadlines (the "**Bidding Procedures**"), (b) approving the Debtor's proposed bidder protections for the Astral Images Corporation (the "**Buyer**") as the "stalking horse" bidder (the "**Bid Protections**"), and (c) approving the Debtor's proposed procedures for the assumption and assignment of certain executory contracts and unexpired leases; and (ii) an order (the "**Sale Order**") (a) authorizing the sale of the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests pursuant to sections 105, 363(b), (f), and (m) of the Bankruptcy Code, (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases pursuant to sections 363 and 365 of the Bankruptcy Code, and (c) granting related relief; and the Court having held a hearing to consider the relief requested herein on January [__], 2015 (the "**Hearing**") with the appearances of all interested parties noted in the record of the Hearing; and the Court having read and considered the Motion, objections to the Motion, if any, and arguments of any counsel appearing regarding the relief requested in the Motion at the Hearing, the Court finds and determines the following:

A. The Court has jurisdiction over the Sale Motion pursuant to 28 U.S.C. § 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is core within the meaning of 28 U.S.C. § 157(b). The statutory predicates for the relief sought herein are sections 105, 363 and 365 of the Bankruptcy Code, and the procedural predicates are Rules 2002, 6004 and 6006 of the Bankruptcy Rules and Rule 6004(b) of the Local Rules.

B. Notice of the Hearing was given to (i) the Office of the United States Trustee for the Western District of Texas, (ii) counsel for the Buyer, (iii) the Debtor's 20 largest creditors, and

(iv) all other known parties-in-interest in this bankruptcy case (including any party who has entered an appearance and request for service of papers pursuant to Fed. R. Bankr. P. 2002). Based on the record made by the Debtor, the Court finds that appropriate notice of the Interim Hearing has been given.

   C.  The legal and factual bases set forth in the Motion establish just and sufficient cause to grant the relief requested therein. The relief granted herein is in the best interests of the Debtor, its estate, creditors, and all parties in interest.

**THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

   1.  The Motion is granted as set forth below. All objections to the Motion that have not been settled or withdrawn are hereby overruled.

   2.  The time period for notice pursuant to Bankruptcy Rule 2002(a) of a sale of certain of the Debtors' assets is hereby reduced to accommodate the sale as set forth in the Motion.

   3.  The following deadlines, protections, and procedures (the "**Bidding Procedures**") are approved and established in connection with the Debtor's contemplated sale of the Purchased Assets:

   (a)  **Participation Requirements**. Parties interested in making a competing bid for the purchase of some or all of the Purchased Assets (each, a "**Potential Bidder**") will be required to execute a confidentiality agreement in form and substance acceptable to the Debtor prior to gaining access to the due diligence materials.

   (b)  **Due Diligence**. The Debtor will afford Potential Bidders such due diligence access or additional information as may be reasonably requested by the Potential Bidder and that the Debtor, in its business judgment, determines to be reasonable and appropriate under the circumstances.

   (c)  **Submission of Bids**. In order to qualify as a Qualified Bid (as defined below) for the Purchased Assets, a Potential Bidder must timely submit a written bid that satisfies the following criteria:

     (i)  The bid must exceed the Purchase Price by at least $75,000 plus an amount sufficient to pay the Breakup Fee (defined below);

     (ii)  The bid must be accompanied by a cash deposit in an amount equal to 10% of the aggregate value of such bid (each, a "**Good Faith Deposit**");

(iii)     The bid must be accompanied by an executed Purchase Agreement in substantially the form of the Purchase Agreement attached as Exhibit A and a blackline showing any modifications the bidder is proposing, and that:

a.     indicates which of the Purchased Assets or other assets of the Debtor such bidder proposes to acquire pursuant to the Purchase Agreement;

b.     indicates which of the Debtor's executory contracts and unexpired leases such bidder intends to take assignment of pursuant to the Purchase Agreement; and

c.     does not contain any conditions to closing which are not contained in the Purchase Agreement (including financing and due diligence) or is based on terms or conditions any less favorable, or otherwise more burdensome or conditional than those set forth in the Purchase Agreement;

(iv)     The bid must include financial statements of the Potential Bidder (or the entity that will furnish the funding required to consummate and perform under the Purchase Agreement) establishing such entity's financial wherewithal to timely close the transactions contemplated thereunder;

(v)     The bid must contain written evidence demonstrating adequate assurance of future performance by the acquiring entity to the Contract Counterparties (as defined below) under the unexpired leases and executory contracts to be assumed and assigned pursuant to the Purchase Agreement, which may include, without limitation, a representation as to the solvency of the Potential Bidder following consummation of the Potential Bidder's purchase of the Purchased Assets; and

(vi)     The bid must contain a written statement identifying the controlling interest holders in the acquiring entity and evidence that the board of directors (or comparable governing body) for the entity making the bid has fully authorized and approved the submission, execution, and delivery of the Purchase Agreement and the consummation of the transactions contemplated thereby.

(vii)     The bid must be delivered to the following parties: (i) the Debtor, Image Trends, Inc., Building One, Suite 450, 6300 Bridgepoint Parkway, Austin, TX 78730; (ii) the Debtor's counsel, Hohmann, Taube & Summers, L.L.P., Attn: Eric J. Taube, Esq. and Morris Weiss, Esq., 100 Congress Ave., 18th Floor, Austin, Texas 78701; and (iii) counsel for the Buyer, Sheppard Mullin Richter & Hampton LLP, Attn: Edward H. Tillinghast, III, Esq. and Blanka K. Wolfe, Esq., 30 Rockefeller Plaza, New York, NY 10112.

(d)     **Qualification of Bid**.  After a Potential Bidder has delivered a bid, the Debtor, in consultation with any official Committee (if one is appointed), will determine whether (i) the Potential Bidder has demonstrated the financial capacity to consummate the purchase of the Purchased Assets, (ii) is reasonably likely to be able to and willing to consummate the contemplated transactions, and (iii) has otherwise timely satisfied the

requirements described above. If so, the Debtor shall designate such potential bidder as a "**Qualified Bidder**" and such bid as a "**Qualified Bid**," and will promptly notify such bidder and the Buyer of this determination. The Debtor acknowledges and the Court finds that Buyer is a Qualified Bidder and the Purchase Agreement executed by the Buyer is a Qualified Bid.

      (e)    **Deadline for Submission of Bids**. The deadline for submitting any and all competing bids shall be no later than [February 11, 2015] at 5:00 p.m. CST, or such other date as is established by the Court (the "**Bid Deadline**").

      (f)    **Auction**. In the event that competitive Qualified Bids are received, the Debtor will conduct an auction to determine the highest or best bid for the Purchased Assets on [February 12, 2015], or such other date as may be established by the Court, at the law offices of the Debtor's counsel, 100 Congress Ave., 18th Floor, Austin, Texas 78701, beginning at 10:00 a.m. CST. The Auction may be adjourned by announcement of the adjournment at the Auction to those parties who appear thereat.

      (g)    **Auction Procedures**. Only Qualified Bidders who have submitted Qualified Bids will be eligible to participate at the Auction. At the Auction, Qualified Bidders will be permitted to increase and/or improve their bids, provided that Qualified Bidders other than the Buyer concurrently increase their Good Faith Deposit to represent 10% of their most recent bid. The bidding at the Auction shall start and continue in increments of at least $50,000. The Buyer shall have the right, but not the obligation, to participate in the Auction. The Auction shall continue in one or more rounds of bidding and shall conclude after each participating bidder has had a reasonable opportunity to submit an additional subsequent bid with full knowledge of the then existing highest or best bid and the identity of the other party making the then highest or best bid. The Debtor may conduct the Auction in the manner it determines will maximize the value of the Purchased Assets. If the only Qualified Bidder is the Buyer, the Auction will be cancelled and the Buyer will be declared the Successful Bidder (defined below).

      (h)    **Determination of Successful Bidder**. At the conclusion of the Auction, the highest or best bid, as determined by the Debtor consistent with these Bidding Procedures, shall be designated as the "**Successful Bidder**." The Debtor may designate the next highest or best bidder for the Purchased Assets at the Auction as the "**Backup Bidder**."

      (i)    **Sale Hearing**. Only in the event that the Buyer is not the Successful Bidder or an objection is timely filed to this Motion by the Sale Objection Deadline (as defined below) or an objection to a Cure Notice is not consensually resolved, the Court will hold a hearing to approve the Sale of the Purchased Assets to the Successful Bidder (the "**Sale Hearing**") on or before [February 18, 2015], or such other date as is established by the Court. Any Sale Hearing shall be an evidentiary hearing and parties shall be prepared to present their evidence in support of or in opposition to the proposed Sale at the Sale Hearing. If the Successful Bidder fails to consummate the purchase of the Purchased Assets, the Backup Bid will automatically be deemed the Successful Bid.

(j)  **Closing**.  Closing shall take place promptly after the entry of the Sale Order, but in any event no later than on the later to occur of (i) the date on which the conditions to Closing set forth in Article 9 of the Purchase Agreement shall have been satisfied or waived and (ii) the first business day following the day that is fourteen (14) days after the entry of the Sale Order and after the Sale Order has become a Final Order, or at such other time or place as Buyer and Seller may agree in writing.

(k)  **Return of Good Faith Deposit**.  The Good Faith Deposits of all Qualified Bidders shall be held in escrow by the Debtor and shall not become property of the Debtor's estate.  Upon the closing of the Sale, the Good Faith Deposit of any Qualified Bidders that are not the Successful Bidder will be returned.

(l)  **Reservation of Rights**.  The Debtor reserves the right, in consultation with its professionals, and any Committee, if any, to alter these Bidding Procedures, and to establish procedures and rules during the Auction, as they may determine reasonably appropriate to maximize the value realized by the estates.

(m)  **Bid Protections**.

(i)  The Buyer shall be entitled to the payment of a break-up fee (the "**Break-Up Fee**") of 5% of the Purchase Price, in accordance with the Purchase Agreement, if (a)  the Bankruptcy Court approves the Sale of any or all of the Purchased Assets to an entity other than the Buyer; (b)  an order is entered, which has not been withdrawn within ten calendar days, dismissed or reversed, dismissing the Bankruptcy Case or converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, or (c) the Debtor files a motion, application or other petition to effect or consent to the foregoing.  The terms and payment of the Break-Up Fee are governed by the Purchase Agreement.

(ii)  In the event that the Buyer is not the Successful Bidder for the Sale of the Purchased Assets, the proceeds of the Sale will be used (a) first, to repay the outstanding amounts of the DIP Loan, (b) second, to repay the outstanding amounts of the Second Astral Debt, and (c) third, to repay the outstanding amounts of the Second WL Debt.

(n)  **Cure Notices:**  The Debtor shall file and serve a Cure Notice in the form attached to the Motion as <u>Exhibit C</u> on those non-Debtor parties (the "**Contract Counterparties**") to executory contracts and unexpired leases designated for assumption and assignment by (1) the Buyer (the "**Assumed Contracts**") promptly after entry of this Order or (2) other Successful Bidder after the Auction, and shall provide additional Cure Notices as additional Assumed Contracts are designated by the Buyer or other Successful Bidder thereafter.  In each case, the proposed form of Cure Notice will set forth the amounts the Debtor believes are owed to each Contract Counterparty designated therein, in order to cure any defaults that exist under such Assumed Contract.  The deadline for the Contract Counterparties to object to the Debtor's proposed Cure Amount as listed in each such Cure Notice shall be that date which is 10 calendar days after the filing of such Cure Notice.  Any objections to the Cure Amounts timely filed and served by any Contract Parties in

accordance with the Cure Notice, and which are not otherwise resolved by the parties, shall be heard by the Court at the Sale Hearing. Any objections timely filed to Cure Notices for which the objection deadline falls on a date after the Sale Hearing, shall be heard by the Court on a date or dates to be set by the Court after the Sale Hearing. The Buyer or other Successful Bidder, as the case may be, shall be responsible for satisfying any Cure Amounts as may be agreed upon or otherwise set by final order of the Court and providing adequate assurance of future performance in connection with the proposed assumption and assignment of any Assumed Contract designated by such party.

4.      Not later than three calendar days after the entry of this Order (the "**Mailing Deadline**"), the Debtor will cause a notice of the Sale, substantially in the form attached to the Sale Motion as <u>Exhibit D</u> (the "**Sale Notice**"), as modified to conform with this Order, to be sent by first-class mail postage prepaid, or by another method reasonably calculated to provide notice, to (i) the Office of the United States Trustee for the Western District of Texas, (ii) counsel for the Committee, if any, (iii) counsel for the Buyer, (iv) the Debtor's 20 largest creditors, (v) all entities known to have expressed a bona fide interest in acquiring the assets being sold, and (vi) all other known parties-in-interest in these bankruptcy cases (including any party who has entered an appearance and request for service of papers pursuant to Fed. R. Bankr. P. 2002). Such notice of the proposed sale shall be good and sufficient for purposes of Rules 2002, 6004 and 6006 of the Bankruptcy Rules. The Sale Notice shall include the proposed Sale Order.

5.      On the Mailing Deadline, or as soon as practicable thereafter, the Debtor will cause a publication version of the Sale Notice, substantially in the form attached to the Motion as <u>Exhibit E</u> (the "**Publication Notice**"), as modified to conform to this Order, to be published one time in the Wall Street Journal – Regional Edition. In addition, on the Mailing Deadline, or as soon as practicable thereafter, the Debtor will cause the Publication Notice to be published on the Debtor's website at www.imagetrends.com.

6.      Any party objecting to the Sale of the Purchased Assets shall file with the Court its written objection and serve such objection (so as to be received) no later than February 11, 2015 by

5:00 p.m. CST (the "**Sale Objection Deadline**"), on: (i) the Debtor, Image Trends, Inc., Building One, Suite 450, 6300 Bridgepoint Parkway, Austin, TX 78730; (ii) the Debtor's counsel, Hohmann, Taube & Summers, L.L.P., Attn: Eric J. Taube, Esq. and Morris Weiss, Esq., 100 Congress Ave., 18th Floor, Austin, Texas 78701; and (iii) counsel for the Buyer, Sheppard Mullin Richter & Hampton LLP, Attn: Edward H. Tillinghast, III, Esq. and Blanka K. Wolfe, Esq., 30 Rockefeller Plaza, New York, NY 10112.

7.      Objections to the Sale will be heard at the Sale Hearing to be held before this Court on February [18], 2015 at 10:00 a.m. CST.

8.      The Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

###

**<u>Exhibit C</u>**
**Cure Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | |
| | § | |
| IMAGE TRENDS INC., | § | Case No. 14-11583 |
| | § | |
| Debtor. | § | |
| | § | |

### NOTICE OF PROPOSED CURE AMOUNT IN CONNECTION WITH THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS

**PLEASE TAKE NOTICE THAT** on January 21, 2015, the above-captioned debtor and debtor-in-possession (the "**Debtor**"),[1] filed the *Motion of Debtor Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006 for (I) An Order Approving Bidding Procedures and Bidder Protections for the Sale of Certain Designated Assets of the Debtor; and (II) An Order (A) Approving the Sale of Certain Designated Assets of the Debtor Free and Clear of All Liens, Claims, and Encumbrances, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Dk. __] (the "**Sale Motion**").

**PLEASE TAKE FURTHER NOTICE THAT** by its Sale Motion, the Debtor seeks, among other things, (i) an order (the "**Sale Procedures Order**") (a) approving bidding procedures for the sale (the "**Sale**") of certain designated assets of the Debtor (the "**Purchased Assets**"), including the proposed form and manner of notice and the related dates and deadlines (the "**Bidding Procedures**"), (b) approval of the Debtor's proposed bidder protections for Astral Images Corporation (the "**Buyer**") as the "stalking horse" bidder (the "**Bid Protections**"), and (c) approval of the Debtor's proposed procedures for the assumption and assignment of certain executory contracts; and (i) an order (the "**Sale Order**") (a) authorizing the Sale of the Purchased Assets to the Buyer on the terms set out in the Asset Purchase Agreement, dated January 21, 2015, between the Debtor and the Buyer (the "**Purchase Agreement**"), or to a higher and better bidder, free and clear of all liens, claims, encumbrances, and other interests pursuant sections 105, 363(b), (f), and (m) of the Bankruptcy Code, (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale pursuant to sections 363 and 365 of the Bankruptcy Code, and (c) granting related relief.

---

[1] Capitalized terms not otherwise defined here in shall have the meanings ascribed to them in the Sale Procedures Order.

**IF YOU ARE A PARTY TO AN UNEXPIRED LEASE OR AN UNEXPIRED EXECUTORY CONTRACT WITH THE DEBTOR THIS PROCESS MAY AFFECT YOUR RIGHTS AND REQUIRES YOUR IMMEDIATE ATTENTION.**

**PLEASE TAKE FURTHER NOTICE** pursuant to the Purchase Agreement, the Debtor intends to assume and assign to the Buyer certain executory contracts and unexpired leases, as designated by the Buyer (the "**Assumed Contracts**").  The Buyer will designate the executory contracts and unexpired leases that are Assumed Contracts in Schedule 2.1(b) to the Purchase Agreement.  However, at any time prior to 30 days after the Closing Date (as defined in the Purchase Agreement), the Buyer may, in its sole discretion, exclude any executory contract or unexpired lease previously designated as an Assumed Contract by written notice to the Debtor and the counterpart to such contract (each, a "**Contract Counterparty**").

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Purchase Agreement, with respect to any Assumed Contracts, the Debtor shall pay any Cure Amounts set by the Court or as otherwise agreed-upon by the Buyer and the Contract Counterparty in connection with the proposed assumption and assignment of any Assigned Contract, which amounts shall be advanced by the Buyer, promptly after the Closing Date.  To the extent necessary, the Buyer can demonstrate that adequate assurance of future performance is present.  In addition, any competing bids must contain written evidence demonstrating adequate assurance of future performance by the acquiring entity.

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Sale Procedures Order, attached hereto as <u>Exhibit 1</u> is a list of the executory contracts and unexpired leases that the Buyer[2] has designated for assumption and assignment as part of the Sale of the Purchased Assets, showing the amount, if any, that the Debtor asserts is necessary to cure defaults thereunder (the "**Cure Amount**").

**PLEASE TAKE FURTHER NOTICE that objections, if any, to the proposed Cure Amount or to the proposed assumption and assignment of the Assumed Contracts, including, but not limited to, objections related to adequate assurance of future performance or objections relating to whether applicable law excuses the Contract Counterparty from accepting performance by, or rendering performance to, the Buyer for purposes of section 365(c)(1) of the Bankruptcy Code, must be made in writing, filed with the Bankruptcy Court, and served on following parties: (i) counsel for the Debtor, Hohmann, Taube & Summers, L.L.P., Attn: Eric J. Taube, Esq. and Morris Weiss, Esq., 100 Congress Ave., 18th Floor, Austin, Texas 78701; and (ii) counsel for the Buyer, Sheppard Mullin Richter & Hampton LLP, Attn: Edward H. Tillinghast, III, Esq. and Blanka K. Wolfe, Esq., 30 Rockefeller Plaza, New York, NY 10112, so as to be received no later than ten calendar days after receipt of this Notice (the "<u>Assumption Objection Deadline</u>").**

---

[2] The Buyer reserves the right to add to or subtract from the list of contracts and leases to be assumed and assigned.

**PLEASE TAKE FURTHER NOTICE** that if an objection is timely filed, the Debtor, the Buyer and the Contract Counterparty shall meet and confer in good faith to attempt to resolve any such objection without Court intervention.  If there are any objections to the Cure Amounts which are not otherwise resolved by the parties, the Court will hold a hearing (the "**Sale Hearing**") on February [18], 2015 at 10:00 a.m. (CST) at the United States Bankruptcy Court for the Western District of Texas, Austin Division, at the Homer J. Thornberry Federal Judicial Bldg., 903 San Jacinto Blvd., Suite 332, Austin, Texas 78701.  The Sale Hearing may be adjourned or rescheduled without notice by an announcement of the adjourned date at the Sale Hearing.  Any objections timely filed to a Cure Notice for which the objection deadline falls on a date after the Sale Hearing shall be heard by the Court on a date or dates to be set by the Court after the Sale Hearing.

**PLEASE TAKE FURTHER NOTICE** that any Contract Counterparty to an Assumed Contract who fails to timely file an objection to the proposed Cure Amount or the proposed assumption and assignment by the Assumption Objection Deadline will be deemed to have consented to such Cure Amount and the assumption and assignment of such Assumed Contract, and such party shall be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts against the Debtor, its estate or the Buyer.

Dated:  January [__], 2015
         Austin, TX

**<u>Exhibit 1</u>**
**(List of Assumed Contracts and Proposed Cure Amounts)**

## **Exhibit D**
**Sale Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

|  | § |  |
|---|---|---|
| In re: | § |  |
|  | § |  |
| IMAGE TRENDS INC., | § | Case No. 14-11583 |
|  | § |  |
| Debtor. | § |  |
|  | § |  |

### NOTICE OF PROPOSED SALE OF CERTAIN DESIGNATED ASSETS OF THE DEBTOR FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES, AND SCHEDULING FINAL SALE HEARING RELATED THERETO

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.     On October 24, 2014 (the "**Petition Date**"), an involuntary petition was filed by Grinberg Asset Holdings, LLC ("**Grinberg**"), Dave Cavena, and Oxberry, LLC against Image Trends Inc. (the "**Debtor**") under chapter 7 of title 11 of the of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Western District of Texas Austin Division (the "**Bankruptcy Court**"), which was amended on January 7, 2015 to add Lisa Griffin as a petitioning creditor.

2.     On January 21, 2015, the Debtor exercised its right to convert the case to one under chapter 11 the Bankruptcy Code.  The Debtor has continued in possession of its properties and is operating and managing its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.     On January 21, 2015, the Debtor and Astral Images Corporation (the "**Buyer**"), a Delaware corporation, entered an asset purchase agreement (the "**Purchase Agreement**"), which encompasses the terms for the sale (the "**Sale**") of certain designated assets of the Debtor (the "**Purchased Assets**").

4.     On January 21, 2015, the Debtor filed a motion with the Bankruptcy Court (the "**Sale Motion**") seeking, among other things, (i) an order (the "**Sale Procedures Order**") (a) approving bidding procedures for the Sale, including the proposed form and manner of notice and the related dates and deadlines (the "**Bidding Procedures**"), (b) approval of the Debtor's proposed bidder protections for the Buyer as the "stalking horse" bidder (the "**Bid Protections**"), and (c) approval of the Debtor's proposed procedures for the assumption and assignment of certain executory contracts; and (ii) an order (the "**Sale Order**") (a) authorizing the Sale of the Purchased Assets to the Buyer, or to a higher and better bidder, free and clear of all liens, claims, encumbrances, and other interests pursuant sections 105, 363(b), (f), and (m) of the Bankruptcy Code, (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale pursuant to sections 363 and 365 of the Bankruptcy Code, and (c) granting related relief.

5.      A hearing on the portion of the Sale Motion concerning the Sale Procedures Order was held before the Bankruptcy Court on January [__], 2015, after which the Bankruptcy Court entered the Sale Procedures Order [Dk __].

6.      A copy of the Sale Procedures Order is attached hereto as <u>Exhibit 1</u>.  The Sale Procedures Order establishes the Bidding Procedures that govern the manner for submitting and considering bids for the Sale of the Purchased Assets.  All bids must comply with the Bidding Procedures and be submitted so as to be received not later than 5:00 p.m. CST, on February [11], 2015.

7.      In the event that competitive Qualified Bids (as defined in the Sale Motion) are received, the Debtor will conduct an auction to determine the highest or best bid for the Purchased Assets on February [12], 2015, at the law offices of the Debtor's counsel, 100 Congress Ave., 18th Floor, Austin, Texas 78701, beginning at 10:00 a.m. CST.  The Auction may be adjourned by announcement of the adjournment at the Auction to those parties who appear thereat.  At the conclusion of the Auction, the highest and best bid, as determined by the Debtor consistent with the Bidding Procedures, shall be designated as the "**Successful Bidder**."

8.      In the event that the Buyer is not the Successful Bidder or an objection is timely filed to the Sale Motion by the Sale Objection Deadline (as defined below) or an objection to a Cure Notice (as defined in the Sale Motion) is not consensually resolved, the Court will hold a hearing to approve the Sale of the Purchased Assets to the Successful Bidder (the "**Sale Hearing**") on February [18], 2015 at 10:00 a.m. (CST) at the United States Bankruptcy Court for the Western District of Texas, Austin Division, at the Homer J. Thornberry Federal Judicial Bldg., 903 San Jacinto Blvd., Courtroom 1,  Austin, Texas 78701.

9.      If the Buyer is the Successful Bidder, the Debtor anticipates seeking entry of a Sale Order substantially in the form of the order attached hereto as <u>Exhibit 2</u> (the "**Sale Order**").  The Sale Hearing may be adjourned or rescheduled without notice by an announcement of the adjourned date at the Sale Hearing.

10.     A copy of the Purchase Agreement and the Sale Motion is available on the Court's docket or may be obtained by sending a written request to counsel to the Debtor, Hohmann, Taube & Summers, L.L.P., Attn: Eric J. Taube, Esq. and Morris Weiss, Esq., 100 Congress Ave., 18th Floor, Austin, Texas 78701.

11.     **OBJECTIONS TO ANY RELIEF REQUESTED IN THE SALE MOTION, INCLUDING THE DEBTOR'S REQUEST TO APPROVE THE SALE OF THE PURCHASED ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES TO THE BUYER OR ANOTHER SUCCESSFUL BIDDER (EACH, AN "<u>OBJECTION</u>"), MUST BE MADE IN WRITING, FILED WITH THE BANKRUPTCY COURT, AND SERVED SO AS TO BE ACTUALLY RECEIVED BY 5:00 P.M. (CST) ON FEBRUARY [11], 2015 (THE "<u>SALE OBJECTION DEADLINE</u>"); *PROVIDED, HOWEVER*, THAT IF THE SUCCESSFUL BIDDER IS NOT THE BUYER, PARTIES IN INTEREST MAY OBJECT SOLELY ON THAT BASIS AT THE SALE HEARING.**

12.     **Any Objection must be served in accordance with the foregoing paragraph on each of the following parties: (i) counsel for the Debtor, Hohmann, Taube & Summers, L.L.P., Attn: Eric J. Taube, Esq. and Morris Weiss, Esq., 100 Congress Ave., 18th Floor, Austin, Texas 78701; and (ii) counsel for the Buyer, Sheppard Mullin Richter & Hampton LLP, Attn: Edward H. Tillinghast, III, Esq. and Blanka K. Wolfe, Esq., 30 Rockefeller Plaza, New York, NY 10112.**

13.     The Purchase Agreement contemplates, and the Sale Order, if approved, shall authorize, the assumption and assignment of various executory contracts and unexpired leases that are the property of the Debtor (collectively, the "**Assumed Contracts**").  In accordance with the Sale Procedures Order, additional individual notices setting forth the specific Assumed Contracts to be assumed by the Debtor and assigned to the Buyer, along with the proposed cure amounts for such contracts, will be given to all counterparties to such Assumed Contracts.

14.     The failure of any person or entity to file an Objection on or before the Sale Objection Deadline shall be deemed a consent to the Sale of the Purchased Assets to the Buyer or another Successful Bidder and the other relief requested in the Sale Motion, and be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Sale Motion, the Sale of the Purchased Assets, the Debtor's consummation and performance of the Purchase Agreement or other agreement with a different Successful Bidder (including in any such case, without limitation, the transfer of the Purchased Assets free and clear of all liens, claims and encumbrances).

15.     This Notice is subject to the full terms and conditions of the Sale Motion and the Sales Procedures Order, which shall control in the event of any conflict.  The Debtor encourages parties in interest to review such documents in their entirety and consult an attorney if they have questions or want advice.

Dated:   January [__], 2015
           Austin, TX

**Exhibit 1**
**(Sale Procedures Order)**

**Exhibit 2**
**(Proposed Sale Order)**

**<u>Exhibit E</u>**
**Publication Notice**

In re: IMAGE TRENDS INC. (W.D. TX. Case No. 14-11583)

## NOTICE OF PROPOSED SALE

On 1/21/15, Image Trends Inc. ("**Debtor**"), a debtor in a bankruptcy case under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Western District of Texas – Austin Division ("**Court**"), and Astral Images Corporation ("**Buyer**") entered an asset purchase agreement ("**Agreement**") for the sale ("**Sale**") of certain assets of Debtor ("**Assets**").  On that date, Debtor filed a motion with the Court ("**Motion**") seeking an order ("**Procedures Order**") approving bidding procedures for the Sale ("**Procedures**") and an order ("**Sale Order**") authorizing the Sale free and clear of all claims, as set forth in the Motion.

On 1/__/15, the Court entered the Procedures Order [Dk __], which establishes the Bidding Procedures.  All bids must comply with the Procedures and be submitted so as to be received not later than 5:00 p.m. CST, on 2/[11]/15.  In the event that competitive Qualified Bids (as defined in the Motion) are received, Debtor will conduct an auction to determine the highest or best bid for the Assets on 2/[12]/15, at the offices of the Debtor's counsel, 100 Congress Ave., 18th Floor, Austin, Texas, beginning at 10:00 a.m. CST.  At the conclusion of the Auction, the highest and best bid, as determined by the Debtor consistent with the Procedures, shall be designated as the "**Successful Bidder**."

In the event Buyer is not the Successful Bidder the Court will hold a hearing to approve the Sale of the Assets to the Successful Bidder ("**Hearing**") on 2/[18]/15 at 10:00 a.m. (CST) at the Court at Homer J. Thornberry Federal Judicial Bldg., 903 San Jacinto Blvd., Courtroom 1, Austin, Texas.  The Hearing may be adjourned or rescheduled without notice by an announcement at the Hearing.  If the Buyer is the Successful Bidder, Debtor anticipates seeking entry of a Sale Order without further hearing.

A copy of the Agreement and the Motion is available on the Court's docket or may be obtained by sending a written request to the Debtor's counsel, Hohmann, Taube & Summers, L.L.P., Attn: Morris Weiss, Esq., 100 Congress Ave., 18th Floor, Austin, Texas 78701.

**OBJECTIONS TO ANY RELIEF REQUESTED IN THE MOTION, INCLUDING DEBTOR'S REQUEST TO APPROVE THE SALE OF THE ASSETS FREE AND CLEAR OF ALL CLAIMS TO BUYER OR ANOTHER SUCCESSFUL BIDDER MUST BE MADE IN WRITING, FILED WITH THE COURT, AND SERVED SO AS TO BE RECEIVED BY 5:00 P.M. (CST) ON 2/[11]/15 ("DEADLINE"); *PROVIDED, HOWEVER, THAT IF THE SUCCESSFUL BIDDER IS NOT THE BUYER, PARTIES IN INTEREST MAY OBJECT SOLELY ON THAT BASIS AT THE HEARING.*  Any objection must be served in accordance with the foregoing paragraph on each of the following parties: (i) counsel for the Debtor, Hohmann, Taube & Summers, L.L.P., Attn: Morris Weiss, 100 Congress Ave., 18th Floor, Austin, Texas 78701; and (ii) counsel for the Buyer, Sheppard Mullin Richter & Hampton LLP, Attn: Edward H. Tillinghast, III, 30 Rockefeller Plaza, New York, NY 10112.**

Failure of any person or entity to file an objection on or before the Deadline shall be deemed a consent to the Sale of the Assets to Buyer or another Successful Bidder and the other

relief requested in the Motion, and be a bar to the assertion, at the Hearing or thereafter, of any objection to the Motion, the Sale of the Assets, the Debtor's consummation and performance of the Agreement or other agreement with a different Successful Bidder.

This Notice is subject to the full terms and conditions of the Motion and the Procedures Order, which shall control in the event of any conflict. The Debtor encourages parties in interest to review such documents and consult an attorney.