IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| In Re: | § | |
| | § | |
| IMAGE TRENDS, INC. | § | Case No. 14-11583-tmd |
| | § | Chapter 11 |
| Debtor | § | |

## OBJECTION TO MOTION FOR ORDER APPROVING BIDDING PROCEDURES AND FOR SALE FREE AND CLEAR OF LIENS

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

COMES NOW, **Grinberg Asset Holdings, LLC**, ("Grinberg") a creditor and party in interest, and files this *Objection to Motion for Order Approving Bidding Procedures and for Sale Free and Clear of Liens* ("Sale Motion"), and in support thereof would show the following:

### Introduction

1. The proposed sales process is designed to sell substantially all of the Debtor's assets on an unreasonably short time frame pursuant to a process designed to unfairly favor the Astral Images, Inc., the "Stalking Horse" Bidder ("Astral" or "Stalking Horse"). While there is no disclosure with regard to the persons behind Astral, an entity formed less than two months ago, it appears to be controlled by insiders. The Court should delay any sale until parties-in-interest have received adequate notice and an opportunity to conduct reasonable due diligence. The process should also be transparent and provide information to allow third party potential bidders to determine whether they want to participate in the sales process, which it currently does not.

2. This Objection is supported by the Declarations of Steven Blum and Karen Clark, which provide a detailed history of the events leading up to the proposed sale and the reasons it ought not go forward at this time or in the form proposed by the Debtor.

3. This case involves complex relationships between and among many different parties wearing many different hats. A chart describing these relationships as understood by Grinberg is attached as Exhibit A.

**Factual Background**

4. **Debtor's Management.** Image Trends, Inc. ("Debtor" or "Image Trends") was incorporated in Delaware on May 5, 2005. Until approximately April of 2014, Daniel Sullivan was president of the Debtor and in charge of its operations. Mr. Sullivan was convicted on federal child pornography charges on April 16, 2014, and is currently serving a ten year sentence. *Blum Decl. 5, 22.* Image Trends has had several presidents since that time, including George Halloran, who had previously been an administrative assistant to Sullivan, and Wayne Galella, an engineer. *Blum Decl. 23, 42.* The Board of Directors of Image Trends has also been in flux: apparently Sullivan and Halloran were the sole members of the Board until June 14, 2014, when Sullivan resigned. Warren Lieberfarb ("Lieberfarb") served on the Board for some period of time and continued to direct the Debtor's affairs afterward. *Blum Decl. 25, 30-38.* Terry Chase Hazel ("Hazel"), former director of the Emerging Technologies Fund of the State of Texas[1] ("ETF"), apparently joined the Debtor's Board of Directors during 2014 and then became its President on January 21, 2015, the day after she resigned from the ETF. *Blum Decl. 42, 50*.

*5.* **Debtor's Business.** The Debtor's main product is a software product it developed known as "Black Ice" Black Ice is used to digitize film images and remove defects without altering the original material. *Blum Decl. 6.*

6. **Debtor's Transactions with Grinberg.** Grinberg owns the Shermann Grinberg

---

[1] The Emerging Technologies Fund (ETF) is a fund created by the Texas Legislature in 2005 to invest in start-up businesses. The ETF is both a shareholder and an unsecured creditor of the Debtor.

Film Library, a collection of over 20 million feet of historical films and newsreels. *Blum Decl. 2.* Beginning in February of 2012, Grinberg negotiated with the Debtor to digitize its film library using Debtor's Black Ice software. Debtor proposed that it would purchase the hardware components of the system for Grinberg and install the software. The hardware component would include a Dell computer system and a Lasergraphics scanner system. By October 1, 2013, Grinberg had provided the Debtor with a payment of $150,000 as an advance for future scanning services. On October 23, 2013, Grinberg sent an additional $50,000 to the Debtor. On December 9, 2013, Debtor and Grinberg entered into a Term Sheet. *Blum Decl. 3, 7-15, Exh. B.* The Term Sheet characterized the initial payment of $150,000 as an advance payment for scanning services and provided that Grinberg pay an additional $450,000 for the purchase, installation and certification of components for an overall scanning system which Grinberg would then own. Grinberg would have the right to use the system in return for a payment to Image Trends of $.15 per foot. In reliance upon Debtor's representations and the Term Sheet, Grinberg advanced an additional $130,000 on December 9, 2013 and $150,000 on February 5, 2014. *Blum Decl. 17, 18.* Rather than using Grinberg's money to *purchase* the computer equipment from Dell, Debtor instead entered into a *lease* with Dell for same. *Blum Decl. 19.* On April 2, 2014, Grinberg wired $230,488 to Image Trends to complete payment for the Lasergraphics scanning system. However, Lasergraphics received only $30,000.00 from Debtor of the total amount paid by Grinberg for the Lasergraphics system. The remaining funds were not applied as agreed by the Debtor. *Blum Decl. 21.* After Grinberg learned that the Debtor had not used its funds for their intended purpose, Debtor informed Grinberg that it had borrowed money from Warren Lieberfarb to pay for the Dell computer equipment. In August 2014, the Debtor installed the Dell computer equipment at Grinberg's location but failed to provide the

computer codes necessary to operate the system.[2] *Blum Decl. 36*. Grinberg then had to pay $270,000 directly to Lasergraphics to fund the remaining portion of the purchase price for the Lasergraphics system. *Blum Decl. 40: .* Grinberg ended up paying twice for the Lasergraphics scanner and obtained a computer system it could not use.

    *7.* **Debtor's Transactions with Warren Lieberfarb.** Warren Lieberfarb made an initial unsecured loan of $400,000 ("First Lieberfarb Loan") to the Debtor with an option to convert to equity on June 9, 2009. Sale Motion, para. 8. At the end of July 2014, Lieberfarb agreed to advance the funds necessary to honor the Debtor's commitments to Grinberg. *Blum Decl. 34*. He advanced an additional $160,000 pursuant to a promissory note dated July 28, 2014 ("Second Lieberfarb Note"). The Second Lieberfarb Note was secured by a blanket lien on the Debtor's assets and also provided for the First Lieberfarb Note to be collateralized by the same collateral. Lieberfarb apparently perfected his lien by filing a UCC-1 financing statement on August 6, 2014. *Sale Motion, para. 9.* After advancing the sum of $160,000, which was sufficient to purchase the Dell Equipment, Lieberfarb reneged and refused to advance the funds necessary to pay for the Lasergraphics scanner, the other main component of the scanning system for which Grinberg had paid. *Blum Decl. 39*. Based upon information and belief from those with personal knowledge, Lieberfarb was also directing the actions of Debtor and its employees during this period (*i.e.* June to August 2014). *Blum Decl. 29-38.*

    8. **The Involuntary Bankruptcy.** On August 25, 2014, Grinberg's representative, Steven Blum ("Blum"), met with Wayne Galella, the President of the Debtor, and Terry Chase Hazel and Joseph O'Bell from the ETF. The parties discussed the fact that it was important for a bankruptcy proceeding to be filed within ninety (90) days after the date that

---

[2] The Debtor has referred to certain leased Dell computer equipment. Grinberg does not know whether Debtor has entered into a separate lease of the Dell Computer equipment or whether this refers to the equipment provided to Grinberg.

Lieberfarb secured the First Lieberfarb Note. However, as mid-October and the end of the preference period approached, the Debtor went silent. *Blum Decl. 47.* On October 24, 2014, Grinberg, Oxberry, LLC and Dave Cavena filed an involuntary petition against the Debtor. Counsel for the Debtor initially indicated that the Debtor would be promptly converting to Chapter 11. However, on November 18, 2014, the Debtor filed an answer to the involuntary petition and requested sanctions against the petitioning creditors. *Dkt. #5.* As late as January 14, 2015, the Debtor continued to indicate that it would oppose the involuntary petition. It also stated that the Debtor would likely not have a control person until after the new governor was inaugurated on January 20, 2015. *Dkt. #9.* However, in yet another flip, Debtor consented to an Order for Relief on January 21, 2015, and requested the bankruptcy case be converted from chapter 7 to chapter 11. At the same time, Debtor requested an order to allow an expedited sale of *all* its assets as well as debtor-in-possession financing.

9. **The Proposed Stalking Horse.** The Sale Motion identifies Astral Images, Inc. as its proposed Stalking Horse. No information is provided about the Stalking Horse in the Debtor's moving papers. The Delaware Secretary of State indicates that Astral Images, Inc. is a Delaware Corporation formed on December 21, 2014. The signatory for Astral Images, Inc. is Eric Stober, its Chief Financial Officer. Mr. Stober is also the Chief Financial Officer of AstroTech Corporation, a company based in Austin, Texas. Astrotech's Chairman of the Board and CEO is Thomas B. Pickens, III. Mr. Pickens is a member of the Advisory Board of the ETF and had been advising the Debtor prior to its decision to propound the sale described in its moving papers. *Blum Decl. 44, 46.* There is apparently one or more connections between Pickens, Astral Images and Lieberfarb but the precise nature these connections is not disclosed in the Debtor's moving papers.

10. **Proposed Debtor in Possession Financing.** Astral Images is not only the Stalking Horse proposed by the Debtor but the lender being proposed for Debtor's post-petition financing as well. The financing of up to $920,085.38 would be used to pay: (i) $65,000 in pre-petition debt incurred to Astral, (ii) $314,415.58 in operating expenses as incurred, (iii) $157,500.00 for legal fees expected to be incurred, and (iv) $20,670.00 in capital expenditures. The proposed financing also includes $362,500.00 without any designation or description of the intended use of these sums.

## The Sale Motion

11. The Sale Motion seeks approval of a Sales Procedure Order which includes the following provisions:

    (a) third parties wishing to bid must meet the following requirements:

        (i) they must exceed the value of the Stalking Horse bid by $75,000;
        (ii) they must submit a cash deposit equal to 10% of the amount of the bid;
        (iii) they must disclose financial statements sufficient to show ability to close;
        (iv) they must disclose their controlling interest holders; and
        (v) they must be approved as a bidder by the Debtor and (if one has been appointed) the Official Committee of Unsecured Creditors.

    (b) bids must be received by 5:00 p.m. on February 11, 2015; and

    (c) in the event that the Stalking Horse is not the successful bidder, it would be entitled to a breakup fee of 5% of the amount of its bid. Because the Stalking Horse bid includes various unliquidated amounts, it is difficult to measure the amount of the break-up fee.

    (d) the Stalking Horse bidder would be allowed to credit bid the following amounts:

        (i) $100,000 plus interest for amounts lent to the Debtor on January

        21, 2015;
   (ii) $160,000 plus interest for the amount of the Second Lieberfarb Note;
   (iii) all amounts drawn under the DIP financing.

 (e) The Stalking Horse bidder is only required to pay $25,000 in new money for its bid.

## Objections to the Sale Motion

12. The Motion does not substantially comply with the Court's "Guidelines for Early Disposition of Assets in Chapter 11 Cases the Sale of Substantially All Assets Under Section 363 and Overbid and Topping Fees." *Local Bankruptcy Rules for the Western District of Texas, Appendix L-1020, Exhibit I.* While these Guidelines are included with the rules for complex cases, the Guidelines themselves appear to apply generally to attempts to sell substantially all of the assets of a Debtor within the first 60 days of a case. Among other things, the Motion omits in whole or in part:

- a list of the 20 largest unsecured creditors with fax and phone numbers;
- an itemization and estimate of administrative expenses relating to the sale;
- an estimate of the gross proceeds anticipated from the sale together with an estimate of net proceeds to the estate;
- a brief description of the Debtor's debt structure (although there is some disclosure of secured claims);
- "an extensive discussion of why the assets of the estate must be sold on an expedited basis;"
- any discussion of marketing attempts;
- any discussion of when the decision to sell was made;
- any disclosure of the relationship of the Buyer to other persons in the case;
- any disclosure of post-sale relationship with the Debtor;
- any discussion of the connections between secured creditors whose claims are being paid and the debtor's offices, directors, employers or other insiders;
- any discussion of current compensation of the Debtor's officers received pending approval of the sale.

As a result, the Motion should be denied as inadequate.

13. The Motion should also be denied as premature. The Debtor is seeking approval

of a pre-negotiated sale of *all its assets* on twenty-one days' notice. As of this date, the Debtor has not filed schedules, the U.S. Trustee has not had the opportunity to appoint a Committee of Unsecured Creditors and there has not been a first meeting of creditors. Furthermore, the Debtor has provided no explanation whatsoever as to why the sales process needs to be expedited. The Debtor has been drifting rudderless since April of 2014 when Dan Sullivan was convicted. The involuntary petition had been pending for nearly ninety (90) days when the Motion was filed. Nevertheless, the Debtor now wishes to rush a sale through on extremely expedited terms which could very well minimize rather than optimize the value of its assets.

14. The Court should further reject the sale as not being the result of the Debtor's sound business judgment. The proposed sale was negotiated with insiders and parties with insider knowledge. There is no evidence that the Debtor engaged in a marketing process or obtained an appraisal for its assets to determine whether the offer of the Stalking Horse is even close to the assets of its assets and/or its business. With no other bidders, the proposed sale will yield just $25,000 to the estate, while providing for payment of hundreds of thousands of dollars to insiders and professionals.

15. The Court should further not approve Astral. as the Stalking Horse because there has not been sufficient disclosure of the relationships between it and other major parties in the case. On information and belief, Grinberg submits that Astral should be treated as an insider based upon the following connections of which it is aware (as well as others that may subsequently come to light):

   a. Astral Images is an affiliate of Astrotech Corporation. *Decl. of Morris Weiss, n 2, Dkt. #17*. Astrotech's Chairman and CEO is Thomas B. Pickens, III ("Pickens").
   b. Pickens is a member of the Advisory Board of the ETF. The ETF is the Debtor's largest shareholder and its former director, Terry Chase Hazel, is now the Debtor's CEO and sole director. *Blum Decl. 50.*

    c. Debtor's law firm, Hohman, Taube & Summers, have previously represented Astrotech in other matters, *e.g., In re Astrotech Corporation*, 2014 Tex. App. LEXIS 1807 (Tex. App.—Austin, 2014, orig. proc.), and in fact consulted with Astrotech about acquiring Debtor's assets. *Decl. of Morris Weiss, Dkt. #17.* Both Mr. Taube and Mr. Weiss represented Astrotech in litigation in the District Court of Travis County, Texas until July 2014.

    d. Warren Lieberfarb is somehow connected with Astral. He served briefly as a director of the Debtor, apparently controlled the Debtor's actions for a period of months, and created secured debt to himself which is avoidable.

    e. The Sale Motion is designed to ensure that Astral is the only party who will be in a position to bid.

16. The Court should reject the bidding procedures because they allow the Stalking Horse he right to credit bid. Under 11 U.S.C. §363(k), the court shall allow credit bidding "unless the court for cause orders otherwise." Section 363(k) allows the court to "exercise its inherent equitable powers to modify or deny the rights otherwise provided under § 363(k)." *In re RML Development, Inc.*, 2014 Bankr. LEXIS 3024 (Bankr. W.D. Tenn. 2014) at *10. The Court went on to state that "(t)he bankruptcy court should only modify or deny a §363(k) credit bid when equitable concerns give it cause." *Id*. Another Court stated:

> Generally, "a court may deny a lender the right to credit bid in the interest of any policy advanced by the Code, such as to ensure the success of the reorganization or to foster a competitive bidding environment."

*In re The Free Lance-Star Publishing Co. of Fredericksburg*, 512 B.R. 798, 805 (Bankr. E. D. Va. 2014). The Court may also limit or deny credit bidding where the extent or validity of the creditor's liens are in dispute. *Id.*

17. "Cause" to limit credit bidding in this case on any number of grounds:

    a. The extent of Astral's security interest, which is apparently the successor-in-interest to Liebfarb's liens on the Debtor's assets, is unknown. No evidence of perfection or security documents was provided with the motion.

    b. The liens obtained by Astral from Liebfarb are subject to avoidance and/or

equitable subordination. The securing of First Lieberfarb Note loan is a clear preferential transfer. Because Liebfarb has not released the preferential transfer, his claim is subject to being denied under 11 U.S.C. §502(d). Further, Liebfarb's claim is subject to equitable subordination under 11 U.S.C. §510(b). Liebfarb used his position to secure his pre-existing debt in return for a promise to advance enough money to honor the Debtor's commitments to Grinberg but he then only advanced a portion of the funds so that Debtor never full performed on its commitment to or provided the technology promised to Grinberg.

    c.    Astral is attempting to engage in a "loan to own" transaction. On January 21, 2015,while the Debtor was in bankruptcy, Astral loaned the Debtor $165,000 on a secured basis. It is now attempting to use this loan as a basis for a credit bid. It has also offered to provide DIP financing to increase its credit bid and deter third party bidding.

17. The Court should reject the proposed bidding procedures for the reason that multiple provisions depend on the amount of the Stalking Horse's bid. For example, overbids must be at least $75,000 above the Stalking Horse bid and the break-up fee is calculated based on 5% of the amount of the bid. However, the purchase price, as set forth in Section 2.6 of the Purchase Agreement, is an unliquidated sum. Without a fixed benchmark, it is impossible for other bidders to know what amount they must bid.

18. The Court should reject the proposed bidding procedures because they unfairly discriminate against third party bidders. The Stalking Horse is not required to provide proof of financial capacity, provide a deposit, make disclosure of pertinent relationships or obtain approval as a bidder. On the other hand, third party bidders must meet each of these requirements and must be approved by the Debtor and, if one exists, the Unsecured Creditors'

Committee. Thus, the Debtor can arbitrarily deny approval of any bidders other than the Stalking Horse without the opportunity for judicial review.

19. The Court should find that the proposed sale should not be made free and clear of the right of Grinberg to utilize the Debtor's technology at least to the extent of the $600,000 it has paid to the Debtor for this purpose. Grinberg negotiated for the right to use the Debtor's technology for a fixed price per foot and pre-paid $150,000 for future scanning plus another $450,000 for the rest of the integrated scanning system. Under the doctrine of recoupment, Grinberg may apply and offset this pre-paid amount, as well as its other damages, against the use of the Black Ice technology. Additionally, under section 365(n), the Debtor may not strip a licensor of intellectual property or its right to use such property.

20. The Court should reject the proposed finding under 11 U.S.C. § 363(m). The Debtor and the Stalking Horse have not provided any evidence that the purchase agreement was the result of arms-length negotiation. The purchase agreement was negotiated in secret between closely related parties.

21. The Court should reject the proposed break-up fee. The Fifth Circuit recently approved a procedure which provided for reimbursing all bidders for the amount of their expenses. *Asarco Incorporated v. Elliott Management (Matter of Asarco, LLC)*, 630 F.3d 593 (5th Cir. 2011). The Court described a break-up fee as follows:

> A break-up fee is "a fee paid by a seller to a prospective purchaser in the event that a contemplated transaction is not consummated." (citation omitted). In the context of established that section 503 governs an unsuccessful bidder's request for breakup bankruptcy auction sales, break-up fees "are sometimes authorized . . . because they provide an incentive for an initial bidder to serve as a so-called 'stalking horse,' whose initial research, due diligence, and subsequent bid may encourage later bidders." (citation omitted). The break-up fee "compensates the stalking horse for the risk it shoulders in being the first bidder."

*Asarco* at 602, n. 9. The Court also discussed cases from other courts which had rejected

break-up fees. Among other things, it noted that break-up fees could be rejected where they would tend to chill bidding rather than incentivize it.

22. In this case, the Debtor proposes to grant a 5% break-up fee without any evidence that this bears a reasonable relationship to the expenses incurred by the Stalking Horse or that such a fee was necessary to incentivize the Stalking Horse to submit a bid. The Stalking Horse submitted its bid approximately one month after it was formed. The parties already had intimate knowledge of the Debtor's operations because Lieberfarb had been a lender to the Debtor since 2009. He had also been involved in the management of the Debtor, as had Thomas B. Pickens. The break-up fee is being used to justify an overbid of $75,000 despite the fact that the Stalking Horse is only offering a cash payment of $25,000 to the estate. As a result, it would be likely to chill bidding rather than incentivize it.

## Conclusion

23. Grinberg believed that it was entering into a profitable business relationship with the Debtor. Because Debtor chose to misappropriate the funds provided by Grinberg, Grinberg is now one of the Debtor's largest unsecured creditors. The present Sale Motion does not represent the Debtor's exercise of its fiduciary duty for the benefit of its creditors. Rather, it clearly appears to be an attempt to use the power of the Court to transfer the assets to a buyer with multiple insider relationships with the Debtor for little or no benefit to the estate. The Court should not only deny this request but should consider whether the Debtor is capable of meeting its fiduciary obligations as a Debtor-in-Possession.

WHEREFORE PREMISES CONSIDERED, Grinberg prays that the Court deny the relief requested and for such other and further relief, both in law and in equity, to which it may be entitled.

          Respectfully Submitted,

          **BARRON & NEWBURGER, P.C.**
          1212 Guadalupe, Suite 104
          Austin, Texas 78701
          (512) 476-9103 x 220
          (512) 476-9253 Facsimile
          ssather@bn-lawyers.com

By: /s/ Stephen W. Sather
     Stephen W. Sather
     State Bar No. 17657520

**ATTORNEYS FOR GRINBERG ASSET HOLDINGS, LLC**

<u>**CERTIFICATE OF SERVICE**</u>

     I hereby certify that a true and correct copy of the foregoing instrument has been duly served by the Court's ECF Noticing System and/or by first class mail on the 28th day of January, 2015 to the parties listed below and on the attached list:

**Eric J. Taube**
Morris D. Weiss
Hohmann Taube & Summers, LLP
100 Congress Ave, Suite 1800
Austin, TX 78701

U.S. Trustee's Office
903 San Jacinto, Rm. 322
Austin, TX 78701

          /s/ Stephen W. Sather

**SERVICE LIST**

**Debtor**
Image Trends, Inc.
Building One, Suite 450
6300 Bridgepoint Parkway
Austin, TX 78730

**Government Entities**
*(via overnight delivery or Express Mail unless otherwise noted)*
U.S. Trustee *(via ECF)*
903 San Jacinto Blvd., Suite 230
Austin, TX 78701

California Franchise Tax Board
PO Box 942857
Sacramento, CA 94257-0501

Internal Revenue Service
Centralized Insolvency Operations
P.O. Box 7346
Philadelphia, PA 19101-7346

State of Texas Franchise Tax
Central Services Building
1711 San Jacinto Blvd., Suite 180
Austin, TX 78701-1416

Texas Emerging Technology Fund
Office of the Governor
PO Box 12428
Austin, TX 78711

Travis Central Appraisal District
PO Box 149012
Austin, TX 78714-9012

**Counsel to Petitioning Creditors**
Stephen W. Sather *(via ECF)*
Barron & Newburger, P.C.
1212 Guadalupe, Suite 104
Austin, TX 78701

**Counsel to Lender**
Sheppard Mullin Richter & Hampton LLP
Attn: Edward H. Tillinghast, III, Esq. and Blanka K. Wolfe, Esq.
30 Rockefeller Plaza
New York, NY 10112
*Via email by consent to*
BWolfe@sheppardmullin.com and
etillinghast@sheppardmullin.com

**Counsel to Warren Lieberfarb**
Norton Rose Fulbright
Attn: Greg Wilkes
2200 Ross Avenue, Suite 2800
Dallas, TX 75201-2784
*Via email by consent to* greg.wilkes@nortonrosefulbright.com

**Employees** *(via email and First Class Mail)*
Albert Edgar
3912 Eaton Avenue
Austin, TX 78727

Amanda Cook
6263 McNeil Drive
Apt # 1536
Austin, TX 78729

Darryl R. Polk
9102 Balcones Club Drive
Austin, TX 78750

Martin Potucek
9440 Altona Way
Austin, TX 78767

Michael Wilder
11011 West Cave Blvd.
Dripping Springs, TX 78620

Wayne Galella
10703 Callanish Park Drive
Austin, TX 78750

**Other Creditors** *(via overnight delivery or Express Mail unless otherwise noted)*
ADP, LLC
1ADP Drive
MS-100
Augusta, GA 30909

Alteran, Inc.
Mr. Steve Crouch
9420 Lurline Ave., Ste C
Chatsworth, CA 91311

American Express
PO Box 650448
Dallas, TX 75266

Bestline Communications
500 Capital of TX Highway North
Reserve 8, Suite 200
Austin, TX 78746

BlueCross-BlueShield
BCBS Healthcare Service Corporation
PO Box 731428
Dallas, TX 75373-1428

Bridgepoint Consulting, LLC
Mr. Bob Smith
6300 Bridgepoint Parkway
Building One, Suite 575
Austin, TX 78730

Capital One Bank, USA
PO Box 60559
City of Industry, CA 91716

Chase Bank
PO Box 15123
Wilmington, DE 19850

CT Corp - State of Delaware Rep.
Madison Corporate Team 1
8020 Excelsior Drive
Suite 200
Madison, WI 53717

Daniel J. Sullivan 344 75-380 *(via First Class mail)*
FCI Fort Worth
Federal Correctional Institution
P.O. Box 15330
Fort Worth, TX 76119

Dell Business Credit
PO Box 5275
Carol Stream, IL 60197

Equity Commonwealth Management LLC
Attn: Chief Operating Officer and Genera
Two North Riverside Plaza, Suite 600
Chicago, IL 60606

FedEx
PO Box 660481
Dallas, TX 75266

George Halloran
484 Cypress Road
Rochester Hills, MI 48309

Guardian Dental
PO Box 824404
Philadelphia, PA 19182-4404

Hanover Insurance group
PO Box 580045
Charlotte, NC 28258-0045

Lasergraphics
20 Ada
Irvine, CA 92618

Luminus Systems
Mr. Gary Mueller
1775 Wiehle Avenue, Suite 400
Reston, VA 20190

Michael Conley
4210 Lakeway Blvd
Austin, TX 78734

Michael Wilkes
5813 York Bridge Circle
Austin, TX 78749

Pilot HSA, LLC
3070 Winward Plaza
Suite F815
Alpharetta, GA 30005

Principal Financial (Long Term Disability)
Principal Financial Group
Grand Island
PO Box 14513
Des Moines, IA 50306

Sheppard Parker
4817 Twin Valley Drive
Austin, TX 78731

Susan Sullivan
11705 Woodland Hills Trail
Austin, TX 78732

Tak Kambara *(via email and First Class Mail)*
221,0004, Kanagawa-ku
454-4-603
Nishioguchi
Yokohama, Japan 454-4-603

Ross-Co Investment Company, LP
Attn:  Mr. Kennard B. Ross
1305 Brians Meadow Cove
Austin, TX 78746-6757

Imadio LLC
7113 Seneca Falls Loop
Austin, TX 78739

